**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | Case No. 19 CR 322 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | Judge Robert M. Dow, Jr. |
| EDWARD M. BURKE, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**ALDERMAN EDWARD M. BURKE'S MEMORANDUM OF LAW IN SUPPORT OF
HIS MOTION TO SUPPRESS THE FRUITS AND DERIVATIVES OF THE
ELECTRONIC SURVEILLANCE CONDUCTED PURSUANT TO TITLE III OF THE
OMNIBUS CRIME CONTROL AND SAFE STREETS ACT OF 1968 ("TITLE III")**

Charles B. Sklarsky
Anton R. Valukas
E.K. McWilliams
JENNER & BLOCK
353 N. Clark Street
Chicago, IL 60654
Tel: (312) 222-9350
csklarsky@jenner.com
avalukas@jenner.com
emcwilliams@jenner.com

Joseph J. Duffy
Andrew R. DeVooght
Robin V. Waters
LOEB & LOEB, LLP
321 N. Clark Street
Chicago, IL 60654
Tel: (312) 464-3100
jduffy@loeb.com
adevooght@loeb.com
rwaters@loeb.com

*Attorneys for Alderman Edward M. Burke*

INTRODUCTION ................................................................................................................1

FACTUAL BACKGROUND ...............................................................................................4

I.     The Government's Investigation of Ald. ▮▮▮. .........................................................5

II.    The Government's Investigation of Ald. Burke. ...................................................6

     A.     The Wiretap Affidavits. ...........................................................................6

     B.     The Government's Title III Surveillance. ...............................................14

TITLE III SUPPRESSION BASES ...................................................................................16

ARGUMENT .....................................................................................................................18

I.     The Affidavits Did Not Establish Probable Cause. .............................................20

     A.     Honest Services Wire Fraud, Hobbs Act Extortion, and Facilitating State Bribery in Violation of the Travel Act All Require Intent to Enter Into A *Quid Pro Quo*, and Official Action.........................................................21

     B.     The Supreme Court's Unanimous *McDonnell* Decision Fundamentally Narrowed the Scope of Federal Bribery Law. ..........................................23

     C.     The Affidavits Failed to Satisfy *McDonnell*, or Demonstrate Probable Cause Ald. Burke Intended to Enter Into a *Quid Pro Quo*. ....................29

          1.     Ald. Burke's Conversations Regarding the Post Office's Amtrak Issues Did Not Satisfy *McDonnell* or Show He Intended to Enter Into a *Quid Pro Quo*. ...................................................................30

               a.     Ald. Burke's October 27, 2016 Conversation With ▮▮▮ ▮▮▮ Regarding ▮▮▮▮▮ ...................................31

               b.     Ald. Burke's mid-December, 2016 Conversation with ▮▮▮▮. ...........................................................................34

               c.     Ald. Burke's January and February 2017 Conversations With Ald. ▮▮▮ ..................................................35

          2.     Ald. Burke's Conversations and Receipt of an Email Regarding the Water Department Did Not Satisfy *McDonnell* or Show He Intended to Enter Into a *Quid Pro Quo*....................................38

**Page**

       a.      Ald. Burke's March 2017 Conversations with ▮ Regarding the Water Department. ..................................................40

     3.      The Affidavits Did Not Demonstrate Probable Cause that Ald. Burke Intended to Enter Into a Corrupt Agreement With Ald. ▮...................................................................................................44

    D.      The Affidavits Did Not Set Forth A Reasonable Basis For Believing that the City Hall Phones Were Being Used in the Commission Of Subject Offenses, or that Communications Concerning Any Offenses Would be Obtained..................................................................................................46

II.    Ald. Burke Is Entitled To A *Franks* Hearing.....................................................49

    A.      The *Franks* Standard.............................................................................49

    B.      The Government Deliberately or Recklessly Omitted Facts Highly Relevant to the Chief Judge's Probable Cause Determination. ...........................52

III.   Each of the Subsequent Wiretaps Were Derived from the Unlawful City Hall and Cell Phone Wiretaps, and Must Be Suppressed.........................................................60

CONCLUSION……………………………………………………………………………..63

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Berger v. New York,*
    383 U.S. 41 (1967).............................................................................................16

*Citizens United v. Fed. Election Comm'n,*
    558 U.S. 310 (2010)..........................................................................................33

*Dalia v. United States,*
    441 U.S. 238 (1979)..........................................................................................17

*In re Denzel W.,*
    930 N.E.2d 974 (Ill. 2010)................................................................................44

*DOT v. Ass'n of Am. R.R.,*
    575 U.S. 43 (2015)............................................................................................30

*Franks v. Delaware,*
    438 U.S. 154 (1978)................................................................................. *passim*

*Gelbard v. United States,*
    408 U.S. 41 (1972)............................................................................................16

*Johnson v. United States,*
    135 S. Ct. 2551 (2015).......................................................................................27

*Katz v. United States,*
    389 U.S. 347 (1967)..........................................................................................16

*Kelly v. United States*
    140 S. Ct. 1565 (2020).......................................................................................44

*Kolender v. Lawson,*
    461 U.S. 352 (1983)..........................................................................................27

*McDonnell v. United States,*
    136 S. Ct. 2355 (2016)............................................................................ *passim*

*McNally v. United States,*
    483 U.S. 350 (1987)..........................................................................................44

*Mills v. City of Harrisburg,*
    589 F. Supp 2d 544 (M.D. Pa. 2008) ...............................................................59

**Page**

*Ornelas v. United States*,
116 S. Ct. 1957 (1996).............................................................21

*People v. Gralewski*,
132 Ill. App. 2d 755 (2d Dist. 1971).......................................58

*Silverthorne Lumber Company v. United States*,
251 U.S. 385 (1920)...........................................................17, 60

*Skilling v. United States*,
130 S. Ct. 2896 (2010).....................................................22, 27

*Sorich v. United States*,
555 U.S. 1204 (2009)...............................................................44

*United States v. Abu-Jihad*,
639 F.3d 102 (2d Cir. 2010)....................................................17

*United States v. Allen*,
10 F.3d 405 (7th Cir. 1993) ....................................................33

*United States v. Boyland*,
862 F.3d 279 (2d Cir. 2017)....................................................28

*United States v. Brewer*,
204 Fed. App'x 205 (4th Cir. 2006) .......................................62

*United States v. Bryant*,
655 F.3d 232 (3rd Cir. 2011) ..................................................33

*United States v. Calandra*,
414 U.S. 338 (1974).................................................................16

*United States v. Dorfman*,
542 F. Supp. 345 (N.D.Ill.1982) .................................17, 50, 60

*United States v. Fattah*,
914 F.3d 112 (3d Cir. 2019).....................................................28

*United States v. Flynn*,
Case No. 17-cr-232 (D.D.C. May 7, 2020), ECF 198 .............54

*United States v. Ganim*,
510 F.3d 134 (2d Cir. 2007).....................................................33

*United States v. Giordano*,
416 U.S. 505 (1974).................................................................62

**Page**

*United States v. Glover,*
   755 F.3d 811 (7th Cir. 2014) ....................................................................51

*United States v. Gonzalez Inc.,*
   412 F.3d 1102 (9th Cir. 2005) ..................................................................61

*United States v. Hammond,*
   351 F.3d 765 (6th Cir. 2003) ....................................................................62

*United States v. Jacobs,*
   986 F.2d 1231 (8th Cir.1993) ........................................................51, 56, 58

*United States v. Kimberlin,*
   805 F.2d 210 (7th Cir.1986), *cert. denied*, 483 U.S. 1023 (1987).........56

*United States v. Leon,*
   468 U.S. 897 (1984).................................................................................62

*United States v. Malekzadeh,*
   855 F.2d 1492 (11th Cir. 1988) ...............................................................62

*United States v. Mancari,*
   663 F. Supp. 1343 (N.D. Ill.1987) .....................................................21, 57

*United States v. Mares-Martinez,*
   240 F. Supp. 2d 803 (N.D. Ill. 2002) ...........................17, 18, 20, 56

*United States v. McClinton,*
   135 F.3d 1178 (7th Cir. 1998) .................................................................21

*United States v. McMurtrey,*
   704 F.3d 502 (7th Cir. 2013) ............................................................50, 59

*United States v. Menendez,*
   291 F. Supp. 3d 606 (D.N.J. 2018) ..........................................................28

*United States v. Moore,*
   41 F.3d 370 (8th Cir. 1994) .....................................................................62

*United States v. Nayak,*
   769 F.3d 978 (7th Cir. 2014) ...................................................................22

*United States v. Patrick,*
   842 F.3d 540 (7th Cir. 2016) ...................................................................62

*United States v. Plasser Am. Corp,*
   57 F. Supp. 2d 140 (E.D. Pa. 1999) .........................................................30

**Page**

*United States v. Rice*
    478 F.3d 704 (6th Cir. 2007) ...............................................62

*United States v. Roberts,*
    477 F.2d 57 (7th Cir. 1973) ................................................61

*United States v. Siegelman,*
    640 F.3d 1159 (11th Cir. 2011) ..........................................33

*United States v. Silver (Silver I),*
    864 F.3d 102 (2d Cir. 2017)...............................................28

*United States v. Silver (Silver II),*
    948 F.3d 538 (2d Cir. 2020)................................28, 32, 58

*United States v. Spadaccino,*
    800 F.2d 292 (2d Cir. 1986)...............................................62

*United States v. Stanert,*
    762 F.2d 775 (9th Cir. 1985) ....................................... *passim*

*United States v. Stevens,*
    559 U.S. 460 (2010)...........................................................27

*United States v. Sun-Diamond Growers,*
    526 U.S. 398 (1999)...........................................................33

*United States v. Tate,*
    524 F.3d 499 (4th Cir. 2008) ...........................18, 50, 59

*United States v. Vest,*
    813 F.2d 477 (1st. Cir. 1987)............................................62

*United States v. Williams,*
    737 F.2d 594 (7th Cir.1984) ..............................................17

*United States v. Whitley,*
    249 F.3d at 621 .........................................50, 55, 60

*Wong Sun v. United States,*
    371 U.S. 471 (1963).....................................................17, 60

**Statutes**

720 ILCS 5/29A-2.................................................................23

720 ILCS 5/33-1(e)...................................................... *passim*

720 ILCS 5/33-3(a)(4) .........................................................23

# TABLE OF AUTHORITIES CONTINUED

**Page**

18 U.S.C. § 201(a)(3) ................................................................................. 24

18 U.S.C. § 1341 ........................................................................................ 22

18 U.S.C. § 1343 ...................................................................... 2, 19, 21, 22

18 U.S.C. § 1346 ............................................................... 2, 19, 21, 22, 23

18 U.S.C. § 1349 ................................................................................... 2, 19

18 U.S.C. § 1951 ............................................................... 2, 19, 21, 22, 23

18 U.S.C. § 1952 ...................................................................... 2, 19, 22, 39

18 U.S.C. § 2510 ............................................................................... *passim*

18 U.S.C. § 2515 .................................................................... 17, 49, 60, 61

18 U.S.C. § 2518 ............................................................................... *passim*

Pub. L. No. 91-518, § 301, 84 Stat. 1327 ................................................. 30

**Other Authorities**

24 J. Am. Jud. Soc'y 18 (1940), 31 J. Crim. L. 3 (1940) ........................... 55

American Bar Association Standing Committee on Pro Bono and Public Service, "Pro Bono," July 26, 2018, available at https://www.americanbar.org/groups/legal_education/resources/pro_bono/ .......................... 11

David Roeder, "Chicago's Old Main Post Office, long a white elephant, is seeing a striking turnaround," Chicago Sun Times, July 4, 2019, available at *https://chicago.suntimes.com/2019/7/4/20681579/chicago-old-main-post-office-landmark-corporate-appeal-walgreens-telos* ........................................ 4

U.S. Const. amen IV .......................................................................... *passim*

United States Courts, *Wiretap Report 2018* (https://www.uscourts.gov/statistics-reports/wiretap-report-2018) ................................................................. 15

## INTRODUCTION

In 2016, then-Alderman ████████, whom the Government had recently recorded committing a number of different crimes, told the Government that he had never engaged in corrupt activity with Alderman Edward M. Burke. In fact, despite being desperate to curry favor with the Government to limit his exposure to criminal liability, Ald. ███ told the Government that he had no knowledge of Ald. Burke having ever been involved in any corrupt activity in the twenty-five years they served together on the City Council. Nevertheless, the Government targeted Ald. Burke, enlisting Ald. ███, an admitted criminal, to record conversations with Ald. Burke. Specifically, the Government directed Ald. ███ to engage in carefully scripted interactions with Ald. Burke to try to develop evidence demonstrating probable cause that Ald. Burke took or promised to take official action as an Alderman in exchange for business for his law firm from the developers of the Old Chicago Main Post Office property (the "Post Office"). Despite these extensive efforts, including instructing Ald. ███ to repeatedly mislead and lie to Ald. Burke about the willingness of the Post Office developer to hire Ald. Burke's law firm, the Government failed. As explained below, none of the conduct described in the Government's submissions to the Chief Judge ever provided a basis from which one could reasonably conclude there was probable cause to believe Ald. Burke ever took, promised to take, or even suggested a willingness to take official action in exchange for business for his law firm.

Accordingly, Ald. Burke respectfully submits this Memorandum of Law in support of his Motion to Suppress the Fruits and Derivatives of the Electronic Surveillance Conducted Pursuant to Title III of the Omnibus Crime Control and Safe Streets Act of 1968 ("Title III"). The Government conducted extensive electronic surveillance of Ald. Burke, including: wiretapping six City Hall phone lines in the City of Chicago Committee on Finance office from May 1, 2017

1

through May 31, 2017 (the "City Hall Wiretap"); and, wiretapping Ald. Burke's cellular phone from May 12, 2017 through February 11, 2018 (the "Cell Phone Wiretap"). The Government submitted Affidavits to former Chief Judge Castillo on May 1st, 5th, and 12th, 2017, in support of the City Hall and Cell Phone Wiretaps (the "Affidavits") asserting that there was probable cause to believe that Ald. Burke committed three federal crimes—honest services wire fraud, attempted extortion, and Travel Act violations predicated on state bribery. *See* May 1, 2017 Affidavit for City Hall Telephones (Sealed Ex. A), pp. 62–63. [1]

Each of these federal crimes required proof that Ald. Burke took or agreed to take official acts in his capacity as an Alderman in exchange for private gain—in essence, that he committed bribery. *See* 18 U.S.C. §§ 1343, 1346, 1349, 1951 and 1952, 720 ILCS 5/33-1(e). To meet this burden, the Government primarily presented conversations it recorded between Ald. Burke and Ald. ▇▇. The Government argued in the Affidavits that these conversations established probable cause that Ald. Burke had solicited business for his law firm from the developers of the Post Office in exchange for his performance of official acts. The Chief Judge reviewed the Affidavits and signed Orders authorizing the Title III surveillance.

Respectfully, the Chief Judge erred in finding there to be probable cause because the Government's Affidavits failed to demonstrate that Ald. Burke took or promised to take any official action in exchange for legal business. The Government's failure was magnified by the Supreme Court's then-recent decision in *McDonnell v. United States*, 136 S. Ct. 2355 (2016), a unanimous opinion that fundamentally narrowed the scope of federal bribery law. *McDonnell*, which unequivocally provides that "merely arranging a meeting or hosting an event to discuss a

---

[1] For ease of the Court's review of Ald. Burke's arguments, counsel primarily cite to the May 1, 2017 City Hall Affidavit (Sealed Ex. A), because the May 5th and 12th Title III Affidavits (attached as Sealed Ex. B and C) are nearly identical in all matters pertinent to Ald. Burke's Motion.

matter" does not constitute an official act made clear that the Affidavits did not establish probable cause. 136 S. Ct. at 2368. Tellingly, the Government failed to even mention *McDonnell* to the Chief Judge, much less provide a fair assessment of its submissions in light of the decision.

The Chief Judge's finding of probable cause was also fundamentally undermined by the Government's having knowingly submitted Affidavits that contained numerous material omissions of fact, contrary to the Fourth Amendment principles articulated in *Franks v. Delaware*, 438 U.S. 154 (1978). Specifically, the Government recklessly and intentionally withheld from the Affidavits that it employed calculated ruses, directing a desperate Ald. ███ to mislead and lie to Ald. Burke about the willingness of the Post Office developer, ███████, to hire Ald. Burke's law firm. While the Government is, of course, permitted to employ ruses during the course of its investigations, its failure to disclose the use of such techniques to the Chief Judge was particularly problematic here given the Government's inability to develop probable cause despite its pervasive use of scripted conversations and lies. Disclosing the use of such ruses would have underscored the full extent of the Government's fruitless machinations.

Further, the Government withheld from the Chief Judge the nature and extent of its targeting of Ald. Burke. The Government did not disclose that it instructed a desperate Ald. ███ to record his conversations with Ald. Burke, even though Ald. ███ told the Government that he had no knowledge of Ald. Burke ever having been involved in corrupt activity in the twenty-five years they served together on the City Council. Here again, disclosure of this information would have helped the Chief Judge fully appreciate the unwarranted and failed nature of the Government's efforts to develop probable cause. For these reasons, Ald. Burke is entitled to a *Franks* hearing, at which he will demonstrate that had the Government disclosed the withheld facts

to the Chief Judge, the totality of the circumstances would have shown there was no reasonable basis to believe that Ald. Burke had committed or would commit any federal crime.

For these reasons, the Court should suppress the evidence that the Government obtained and derived from its Title III wiretaps.

## FACTUAL BACKGROUND

Elected to the Chicago City Council in 1969, Ald. Burke is the longest-serving alderman in Chicago history. He represents the 14th Ward, and for many years he chaired the Council's Committee on Finance. Ald. Burke is also a licensed attorney, and was a partner at the law firm of Klafter & Burke for almost fifty years. The Government's cooperator, former Ald. ███████, was the 25th Ward alderman from 1996 to 2019. During the time period relevant to the Affidavits, Mr. ███ chaired the City Council's Committee on Zoning, Landmarks and Building Standards, and Ald. Burke chaired the Committee on Finance.

The Post Office, a mammoth building located near the Eisenhower Expressway and South Canal Street in Chicago and elevated atop Amtrak railroad tracks, is located within then-Ald. ███'s 25th ward. As is widely known, the decaying historic building was a blight on the otherwise well-developed downtown, as it stood vacant for decades.[2] In 2014, the property was purchased by a British real estate developer, but he was unable to realize the redevelopment of the property. Through the concerted efforts of former Mayor Emanuel's administration, in 2016, the Post Office was sold to ████████ New-York based real estate company, which planned an extensive renovation of the property. The sale of the Post Office was heralded as a major victory

---

[2] *See, e.g.*, David Roeder, "Chicago's Old Main Post Office, long a white elephant, is seeing a striking turnaround," Chicago Sun Times, July 4, 2019, available at *https://chicago.suntimes.com/2019/7/4/20681579/chicago-old-main-post-office-landmark-corporate-appeal-walgreens-telos*.

for Mayor Emanuel's administration, which had gone to great lengths to support its redevelopment efforts—even moving to seize it by eminent domain from the prior owners. As a result of all of this energy around the project, the expedient development of the Post Office was a major City priority and a foregone conclusion as far as City Hall was concerned. It is within this context that the events described in the Affidavits are set.

## I.     The Government's Investigation of Ald. ███.

To put the challenged wiretaps in proper context, a brief background into the genesis and scope of the Government's investigation into Ald. ███ is necessary. On September 26, 2014, as part of an investigation into criminal activity by Ald. ███—not Ald. Burke—the Government requested and received authority under Title III to intercept Ald. ███ cellular phone. The Government's investigation of Ald. ███ related to his abuse of his public office for his own private gain, among numerous other illicit activities. The Government intercepted Ald. ███ calls from September 26, 2014 through August 21, 2015, totaling at least 240-days of monitoring. Ex. A, pp. 9–10. None of the affidavits that the Government filed with the Court for authorization to intercept Ald. ███ phone identified Ald. Burke as having any involvement in or knowledge of Ald. ███ wide-ranging criminal conduct.[3]

In June of 2016, the Government confronted Ald. ███ with evidence of his extensive criminal conduct. Almost immediately, Ald. ███ agreed to cooperate with the Government and consensually record conversations. Ex. A, p. 10.[4] As is typical, the Government spent substantial

---

[3] Based on the discovery materials, it appears that during the 240 days of monitoring, the Government intercepted just one innocuous call between Ald. ███ and Ald. Burke.

[4] On January 3, 2019, former-Ald. ███ entered a Deferred Prosecution Agreement ("DPA") related to his illegal solicitation and receipt of campaign contributions in violation of 18 U.S.C. § 666(a)(1)(B). (GJ_003-000127). Mr. ███ admitted that he solicited campaign contributions from a real estate developer in exchange for taking official actions as the Zoning Committee chairman. (GJ_003-0000131-32).

time debriefing Ald. ██ about his criminal activity and his knowledge of the criminal activity of others. In these debriefings, Ald. ██ told the Government that he had never been involved in any criminal wrongdoing with Ald. Burke—with whom he had served in the City Council for almost twenty-five years—and that he neither knew nor suspected that Ald. Burke had ever been involved in any illegal conduct whatsoever.

## II.     The Government's Investigation of Ald. Burke.

The origins of the Government's investigation into Ald. Burke are less clear. The Government has refused to confirm the timing of the opening of the full investigation into Ald. Burke, or the factual predicate for the opening of the investigation.

However, as described in the Affidavits, the Government's investigation of Ald. Burke apparently intersected with its separate investigation into Ald. ██ in July 2016, when Ald. ██ and Ald. Burke both attended the Democratic National Convention ("DNC") in Philadelphia, PA. While at the Convention, several elected officials approached Ald. ██ to refer contractors for consideration for work on the Post Office renovation, because Ald. ██ was coordinating the referral of contractors to the Post Office general contractor. Ex. A, p. 22 n.7. The individuals who approached Ald. ██ at the DNC included a State Senator and certain Chicago Aldermen, including Ald. Burke, who recommended a wrecking company. Ex. A, p. 21. Apparently based solely on Ald. Burke's recommendation of the wrecking company, the Government directed Ald. ██ to begin engaging in conversations with Ald. Burke surrounding the Post Office project, and to record the conversations.

### A.     The Wiretap Affidavits.

The conversations Ald. ██ recorded with Ald. Burke form the evidentiary core of the Affidavits. As set forth in the Affidavits, at the Government's direction Ald. ██ consensually recorded his conversations with Ald. Burke beginning in August 2016 and continuing through May

2017, both over the telephone and in person. The Government repeatedly scripted Ald. ███ to initiate conversations with Ald. Burke regarding the possibility of Ald. Burke's law firm obtaining legal work from Mr. ███ regarding the Post Office property, and to misrepresent to Ald. Burke that Mr. ███ was right on the verge of hiring Klafter & Burke. The Government withheld from the Affidavits the fact that Ald. ███ had no prior knowledge that Ald. Burke had ever been involved in criminal activity of any kind.

Further, because the Government also directed Ald. ███ to record his conversations with Mr. ███, the Government knew almost simultaneously that Mr. ███ had no intention of hiring Klafter & Burke for any legal work. But the Government chose to selectively withhold those conversations from the Affidavits. The Government also directed Ald. ███ to repeatedly mislead Ald. Burke into believing that if Ald. Burke would do certain personal favors for the Post Office, like introducing Mr. ███ to Ald. Burke's personal contacts at Amtrak, Mr. ███ would retain Klafter & Burke for legal work. The Government similarly concealed these ruses from the Affidavits.

The Affidavits provided that on August 26, 2016, Ald. ███ first initiated and recorded a telephone call with Ald. Burke. During this call, Ald. ███ told Ald. Burke that he had a meeting with Mr. ███, Mayor Emanuel, and several others, and that Ald. ███ intended to meet the general contractor for the Post Office in several days. Ex. A, p. 21. The meeting with the general contractor would be to create a process for Ald. ███ to refer contractors to the Post Office. *Id.* Ald. ███ told Ald. Burke he would bring up the wrecking company that Ald. Burke had mentioned at the DNC. *Id.* at p. 22. Ald. Burke remarked: "While you're at it recommend the good firm of Klafter & Burke to do the tax work." *Id.* After Ald. ███ agreed to do so, Ald. Burke stated: "Then we can certainly talk about a marketing arrangement for you." Ex. A, pp. 22–23.

One month later, on September 26, 2016, Ald. ███ recorded a meeting with Ald. Burke in Ald. Burke's City Hall Office. Ald. ███ said that he had met with Mr. ███ as well as the Post Office general contractor and that he brought up the wrecking company, as well as "[the] law work you do," and "[t]hey said they'd entertain it." Ex. A, p. 23. In response, Ald. Burke asked Ald. ███ whether he could get "face time" with Mr. ███. *Id.* at p. 24. Ald. ███ replied, "absolutely," and reiterated his interest in receiving a finder's or referral fee were Mr. ███ to hire Klafter & Burke. Ald. Burke responded that any such arrangement would have to "be done so that there's no pitfalls legally." *Id.*

Approximately one month later, "at the FBI's direction [] ███ contacted ███ and arranged for a meeting between ███, and Burke to take place on October 27, 2016." Ex. A, p. 26. The meeting took place on that date in Ald. ███ City Hall office. Before Ald. Burke entered the room, Ald. ███ told Mr. ███ and his son, who were based out of New York, a little about Ald. Burke's background, and how they should respond to Ald. Burke if he raised the topic of his law firm: "[He] is the senior Alderman in the City of Chicago. I think he wants to meet with you on the tax work. I don't want you to feel obligated on anything. I [want] you to just listen him . . . and it's up to you if you want to do anything." *See* Ex D-1. Mr. ███ replied: "Sure." Ald. ███ further instructed: "[P]robably the best thing to do is just to listen to him . . . and then just say that you'll be dealing with me[]." *Id.* Mr. ███ responded: "The future is obviously the future, but we've [] signed with a firm called Worsek & Vihon [] that does all the work for us. . . . I don't know, but you know we'll listen." Ald. ███ directed: "Yeah listen to him . . . *but if you don't want to, just say you'll consider it if he does mention* [the legal work]." *Id.* Mr. ███ replied, "okay," and later remarked: "If anyone could help us with Amtrak, I'd be

eternally grateful." *Id*. The Affidavits withheld this recorded conversation between Ald. ███ and the ███.

Ald. Burke then entered the room and introduced himself to Mr. ███. After some pleasantries, Ald. Burke said: "We'd love to present our firm to you, we do almost exclusively ad valorem taxation, property tax work." Ex. A, p. 27. Mr. ███ told Ald. Burke that the firm Worsek & Vihon "handled our stuff," but added, "I'm happy to open the door once our terms are over with them." *Id*. Later, Mr. ███ mentioned that he was having difficulty "work[ing] with Amtrak." *Id*. Ald. Burke replied that he has a "personal family relationship" with a member of the Amtrak Board of Directors, ███, and said: "If you ever run into a problem there, ██ can be helpful." *Id*. at p. 28. Ald. Burke had no further contact with Mr. ███ before the Government applied for the City Hall interception on May 1, 2017.

After the ███ exited the meeting, Ald. ███ again raised the possibility of receiving a finder's or referral fee if Mr. ███ hired Klafter & Burke, telling Ald. Burke that his 15-year-old was at St. Ignatius, and he wanted to "get him through college," adding that he also had a "big mortgage." Ex. A, pp. 29–30. Ald. ███ asked if there would be "legal problems" with a fee, and Ald. Burke reiterated there were none that he knew of. *Id*. at p. 30. Later, Ald. Burke asked what the Post Office developers needed from Amtrak. *Id*. at p. 31. Ald. ███ replied: "I think they need Amtrak to be cooperative." *Id*.

The Affidavits provided that on November 7, 2016, Ald. ███ and Ald. Burke met, and Ald. ███ reported that he had "contacted ███" and that "he's receptive but not committed [to hiring Klafter & Burke], but I have a strong feeling I can convince him." Ex. A, p. 32. This was another fabrication—the Government has not tendered any recordings showing Ald. ███ had any contact with Mr. ███ between October 27 and November 7, 2016. Ald. Burke replied: "Oh

good." *Id.* Ald. ███ continued: "I'm gonna remind [███] again cause he needs a lot of help, a lot of approvals, that I think carefully I can get him to go with you." *Id.* at p. 32. Ald. Burke responded: "Good." *Id.* Ald. ███ then asked: "How would the consulting work, would it be contractual, would it be a percentage?" *Id.* at pp. 32–33. Ald. Burke pondered aloud how they could arrange the relationship, stating: "We can't pay a non-lawyer a percentage." For the second time, Ald. Burke affirmed: "We'll just figure out a way that's gonna be above board, legal, etc." *Id.* at p. 34.

On November 11, 2016, Ald. ███ had another telephone call with Mr. ███, stating that he told Senator Durbin he may need assistance with the Post Office's Amtrak issues, but that he and Senator Durbin had not discussed the issues in detail. At the Government's direction, Ald. ███ again raised the idea of Mr. ███ hiring Ald. Burke's law firm, asking Mr. ███ if he had given it "any more thought." Mr. ███ again declined, insisting "my hands are tied for the foreseeable future" because the Post Office had a contract with Worsek & Vihon. *See* Ex. D-2. The Government withheld this critical telephone call from the Affidavits.

On December 9, 2016, Ald. ███ and Mr. ███ again spoke over the telephone. Ald. ███ told Mr. ███ that he had discussed the Post Office's Amtrak issues with Senator Durbin's Chief of Staff, and asked Mr. ███: "Have you spoken with anyone else from Chicago recently?" Mr. ███ replied that he had not. *See* Ex. D-3. The Government also withheld this call from the Affidavits. Yet three days later, on December 12, 2016, Ald. ███ called Ald. Burke's cell phone and represented that if Ald. Burke could follow up with his contact at Amtrak, "it would really make the deal for [███]." Ex. A, p. 37. None of that was true. While the

Government has now admitted as much,[5] it concealed this ruse from the Chief Judge. Regarding the request that Ald. Burke follow up with his contact at Amtrak, Ald. Burke replied, "I think I could." Ex. A, p. 36.[6]

Ald. ███ called Ald. Burke the next day, and during the call Ald. Burke said that "it would be helpful if I could speak to [the Post Office developers] directly. And it might also be necessary for me to go in with them and negotiate with the Amtrak bureaucrats that are pushing this thing." Ex. A, pp. 38–39. Ald. ███ replied that he would get back to Mr. ███ and then follow up with Ald. Burke. *Id.* at p. 39.

The two Aldermen next met on December 22, 2016, and Ald. Burke told Ald. ███ that he had gathered background on the Post Office's issues with Amtrak from a "good friend of a good friend of mine," ███, in the course of meeting with Mr. ███ on an unrelated issue. Ex. A, p. 40.[7] Ald. Burke also remarked: "I'm not hired to represent [the Post Office] so I'm just trying to get the background here. If indeed I get hired then it's a different story. Right now it's pro bono publica."[8] Ex. A, p. 41.

On January 25, 2017, in a meeting with Ald. Burke, Ald. ███ suggested that they take a tour of Union Station, and said: "I thought we were going to [] have a discussion with ███

---

[5] The Superseding Indictment plainly states that ███ lied to Ald. Burke during this conversation as a "ruse and at the direction of law enforcement." Sup. Indict. at ¶ 10.

[6] Toll records reflect that ███ called Ald. Burke's cell phone on December 9, 2016. Ex. A, p. 35.

[7] In his subsequent interview with law enforcement, Mr. ███ said that he came away from the meeting with Ald. Burke believing that Ald. Burke had come to discuss a separate issue from the Post Office—bids on the redevelopment of Chicago Union Station. OIG Interview of ███, AE-002-000002.

[8] The Latin phrase *pro bono publico* means "for the public good," and refers to work undertaken without a fee and without the expectation of a fee. *See* American Bar Association Standing Committee on Pro Bono and Public Service, "Pro Bono," July 26, 2018, available at https://www.americanbar.org/groups/legal_education/resources/pro_bono/.

or ▮▮▮▮▮ or somebody." Ex. A, p. 43. Ald. Burke reiterated that he was not going to do any "lifting" for ▮▮▮▮ unless the Post Office was "signed up." *Id*. Ald. ▮▮▮ asked whether Ald. Burke meant "signed up" for tax work or lobbying work, and Ald. Burke reiterated that he could do both—including representing the Post Office in negotiations with Amtrak. *Id*. at 44. Ald. ▮▮▮ stated: "What I wanna do is take the tour and show [the Post Office] we're serious and then I can push [▮▮▮▮ on the taxes," asking, "Is that all right?" Ald. Burke replied: "Yeah, I'd like to see it [Union Station] anyway." *Id*. at p. 44. Ald. ▮▮▮ also mentioned that the Post Office had "a lot of other stuff they they're gonna need in the future." *Id*. Ald. Burke reiterated that he had not yet been paid for conducting any legal work on the Post Office's behalf. *Id*.

Ald. ▮Solis▮ and Ald. Burke met on February 10, 2017 to tour Union Station with Mr. ▮Lang▮. Even though Ald. ▮Solis▮ apparently had not spoken with Mr. ▮Skydell▮ for almost two months, Ald. ▮Solis▮ again misrepresented Mr. ▮Skydell's▮ intentions about hiring Klafter & Burke. Before the tour, Ald. ▮Solis▮ again lied to Ald. Burke that Mr. ▮Skydell▮ was interested in engaging Klafter & Burke, when he remarked that Mr. ▮Skydell▮ was "really happy we're doing this" and was "definitely interested in giving you that [] law work." Ex. A, p. 46. During the tour, Mr. ▮Lang▮ mentioned that Union Station needed City approval for a new water access point. *Id*.

About two weeks later, on February 27, 2017, Ald. ▮Solis▮ called Ald. Burke and asked: "I was wondering how far along you are with your discussions with ▮Ray [Lang]▮ about what [Union Station] needs from the City?" Ald. Burke replied: "Not at all." Ex. A, p. 46. At the direction of the Government, Ald. ▮Solis▮ again misled that if Ald. Burke could help Union Station with its City water connection issue, then Mr. ▮Lang▮ would help the Post Office resolve its issues with Amtrak, and then "I think we'll be able to lock in the tax work." Ex. A, pp. 47–48. Ald. Burke ignored

Ald. ███ comment about helping Mr. ███, and asked Ald. ███ to provide a "list of things [the Post Office] need[s]" related to Amtrak. *Id*. at p. 47.

On February 28, 2017, the Post Office project manager, ██████████, sent Ald. ███ an email describing complex issues confronting the Post Office development related to its water access. *Id*. at p. 48. On March 9, 2017, Ald. ███ called Ald. Burke to discuss the email, which Ald. ███ described as "complicated." *Id*. at p. 47. Ald. Burke asked to take a look at it. *Id*. At the Government's direction, Ald. ███ again misled: "I think if we take care of the water commissioner, we should be able to get the tax work and maybe get my consulting from you." *Id*. p. at 49.

After reviewing the email, Ald. Burke called Ald. ███ back and said it was "rather complicated," and he did not know "how a layman would understand it." Ald. Burke suggested "bring[ing] ██████ in," the former Water Commissioner with his own engineering firm. *Id*. Ald. ███ then suggested that they meet with Mr. ███, and reiterated: "I just wanted to make sure you understood that I think this is real important and I think this will seal the deal[.]" Ex. A, p. 50.

Toll records reflect that Ald. Burke called Mr. ███ the next day. *Id*. Subsequently, Mr. ███ set up a meeting with the current Water Commissioner, ███. Ex. A, pp. 50–51. On March 21, 2017, Ald. ███ called Ald. Burke. Ald. Burke stated during the call: "[███] went to talk with ██████ . . . I don't think they can get a hundred percent on what they want, but I think they [can] get a situation where they'll be comfortable." *Id*. at p. 53.

Later on March 21, 2017, Ald. ███ called Mr. ███, stating that Ald. Burke told him "that you and ██████ had met." *Id*. at p. 54. Mr. ███ said he was meeting "tomorrow" with Post Office's "designers and builders" and one of their "lead engineering guys," remarking:

"I don't think they understand the complexities of [what] they want. I told them to bring their contractor in so we can explain the complexities. . . . I think what we've offered them is the best idea, but I'm certainly willing to listen to whatever ideas they have[.]" *Id*. at p. 55. Ald. ▇ then said: "Ed [Burke] gave me the impression [] your department could be helpful." *Id*. Mr. ▇ replied: "We can look at the alternatives. . . . that's why I said come on in and we'll sit down and figure out exactly what you guys are looking for and what other solutions there are." *Id*. at pp. 55–56. Ald. ▇ continued: "Can you give me any sense of what the compromises [were] after ▇ ▇ talked to you that you were able to make?" Mr. ▇ responded that he did not know what the Post Office was looking for and that Mr. ▇ had merely given him a "heads up" that the Post Office was having some issues. *Id*. at p. 56.

On March 24, 2017, Ald. ▇ called Ald. Burke at City Hall, and the call was transferred to Ald. Burke's cell phone. Ald. ▇ said: "I talked with ▇, and he was really happy about the meeting [with Mr. ▇] and they're looking at two options that they think they can deal with." Ald. Burke replied: "Good." *Id*. at p. 59. This was the final conversation the Government recorded between Ald. Burke and Ald. ▇ before submitting its application for authorization to wiretap Ald. Burke.

### B. The Government's Title III Surveillance.

On May 1, 2017, the Government applied to the Chief Judge for authorization to wiretap six telephone lines at the Chicago City Council Committee on Finance office. The City Hall Wiretap Affidavit purported to set forth probable cause that Ald. Burke made "efforts to take official action in his capacity as an elected official on behalf of [the Post Office developers] in return for private benefits to his law firm." Ex. A, p. 8 n.2. The Chief Judge granted the Government's Title III application, and the Government began intercepting calls over the City Hall phones on May 2, 2017.

On May 5, 2017, the Government submitted an "Amended" City Hall Wiretap application to tap the six City Hall lines, plus an unknown number of "associated extension lines." Sealed Exhibit B ("Ex. B"). The Amended City Hall Wiretap provides that when the Government commenced the initial City Hall Wiretap, "there were numerous calls being made to and from the Target Phones" that "were not being intercepted." *Id*. at 2 n.1. Apparently, this was because each of the six Target Phones "has multiple extensions lines associated with it." *Id*. The Government did not tell the Chief Judge how many total City Hall extension lines they were wiretapping, or provide additional factual information about what, if any, additional individuals, they would be intercepting on the multiple extension lines. The Government simply asserted that because it believed the extension lines *could* be used to pick up calls to the Target Phones, the lines therefore must be tapped. The Chief Judge authorized the Amended City Hall Wiretap application. In total, the Government intercepted 2,185 calls over the City Hall phones before it abandoned the City Hall Wiretap on May 31, 2017.

On May 12, 2017, the Government applied to intercept communications on Ald. Burke's personal cell phone. Sealed Exhibit C ("Ex. C"). The facts in support of probable cause contained in the initial Cell Phone Affidavit were essentially the same as those set forth in the City Hall Affidavit. The Chief Judge authorized the wiretap.

The Government applied to extend the Cell Phone Wiretap eight additional times after the initial tap.[9] Ultimately, the Government monitored Ald. Burke's Cell Phone from May 15, 2017 through February 10, 2018—the longest wiretap in the United States that concluded in 2018.[10]

---

[9] The Cell Phone Wiretap was extended on June 13, 2017 (WIRE_036-000001); July 12, 2017 (WIRE_037-000001); August 11, 2017 (WIRE_040-000001); September 11, 2017 (WIRE_042-000001); October 16, 2017 (WIRE_044-000001); November 14, 2017 (WIRE_046-000001); December 13, 2017 (WIRE_048-000001) (amended same day, (WIRE_049-000001)); and January 12, 2018 (WIRE_051-000001).

[10] *See* United States Courts, *Wiretap Report 2018* (https://www.uscourts.gov/statistics-reports/wiretap-report-2018) ("The Northern District of Illinois (IL-N) conducted the longest federal intercepts that were

During this time, the Government monitored a total of 6,726 calls. All told, the City Hall and Cell Phone Wiretaps produced a staggering volume of recorded material: 9,101 intercepted calls.

## TITLE III SUPPRESSION BASES

The Fourth Amendment strictly limits the Government's use of wiretaps to record private conversations. *Katz v. United States*, 389 U.S. 347, 353 (1967). As the Supreme Court recognized in *Berger v. New York*, 383 U.S. 41, 62–63 (1967), "[f]ew threats to liberty exist which are greater than that posed by the use of eavesdropping devices." In response to this concern, Congress enacted Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510-2522 ("Title III") to establish a "comprehensive scheme for the regulation of wiretapping and electronic surveillance," *Gelbard v. United States*, 408 U.S. 41, 46 (1972), and to codify "special safeguards against the unique problems posed by misuse of wiretapping and electronic surveillance." *United States v. Calandra*, 414 U.S. 338, 355 n.11 (1974).

To obtain wiretap authorization under Title III, the Government must demonstrate "that there is probable cause for belief that an individual is committing, has committed, or is about to commit a particular [enumerated] offense," and that "there is probable cause for belief that particular communications concerning that offense will be obtained through such interception." 18 U.S.C. § 2518(3).[11] This statutory standard is identical to Fourth Amendment standard requiring

---

terminated in 2018. One original order in IL-N was extended eight times to complete a 270-day wiretap used in a bribery investigation. Another order in IL-N was extended seven times to complete a 240-day wiretap in a corruption investigation.").

[11] Each Title III application must also include the following information: (a) the identity of the law enforcement officer making and authorizing the application; (b) a full and complete statement of the facts and circumstances relied upon, including (i) details as to the particular offense that has been, is being, or is about to be committed, (ii) a particular description of the nature and location of the facilities from which or the place where the communication is to be intercepted, (iii) a particular description of the type of communications sought to be intercepted, (iv) the identity of the person committing the offense and whose communications are to be intercepted; (c) a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried, or too dangerous; (d) the period of time for which the interception is required; (e) a full and complete

probable cause that the wiretap will produce evidence of a crime. *See, e.g.*, *United States v. Mares-Martinez*, 240 F. Supp. 2d 803, 814 (N.D. Ill. 2002) (collecting cases); *United States v. Abu-Jihad*, 639 F.3d 102, 12 (2d Cir. 2010) (citing *Dalia v. United States*, 441 U.S. 238, 255 (1979)). Accordingly, an affidavit submitted in support of the Title III application must contain facts "sufficient to warrant a [person] of reasonable caution to believe that criminal activity was afoot", and that evidence of that activity will be captured via the intercept. *United States v. Dorfman*, 542 F. Supp. 345, 359 (N.D. Ill. 1982), *aff'd sub nom. United States v. Williams*, 737 F.2d 594 (7th Cir. 1984).

Title III provides suppression remedies at 18 U.S.C. § 2518(10)(a)(i)-(iii). Any aggrieved person (*i.e.*, "a person who was a party to any intercepted wire, oral, or electronic communication or a person against whom the interception was directed" (§ 2510(11)) may move to suppress the contents of any wire or oral communication intercepted, or evidence derived therefrom on the grounds that: (1) "the communication was unlawfully intercepted"; (2) "the order of authorization was insufficient on its face"; or (3) "the interception was not made in conformity with the order of authorization or approval." 18 U.S.C. § 2518(10)(a)(i)-(iii). If the motion is granted the contents of the intercepted wire or oral communication, or evidence derived therefrom[12] shall be treated as having been obtained in violation of Title III (18 U.S.C. § 2518(10)(a)), and are therefore inadmissible. *See* 18 U.S.C. § 2515.

---

statement of the facts concerning all previous applications known to the individual authorizing and making the application; and (f) for the extension of an order, a statement of the results thus far obtained, or a reasonable explanation of the failure to obtain such results. *See* 18 U.S.C. § 2518(1)(a)-(f).

[12] The "evidence derived therefrom" provision of the statute codifies the "fruit of the poisonous tree" Fourth Amendment exclusion doctrine first articulated in *Silverthorne Lumber Company v. United States*, 251 U.S. 385 (1920) and developed further in *Wong Sun v. United States*, 371 U.S. 471 (1963).

A communication is "unlawfully intercepted" under Title III when it fails to comply with the Fourth Amendment principles articulated in *Franks v. Delaware*, 438 U.S. 154 (1978). *Mares-Martinez*, 240 F. Supp. 2d at 817–19. In *Franks*, the United States Supreme Court ruled on Fourth Amendment grounds that a defendant may challenge the veracity of a search warrant affidavit upon a "substantial preliminary showing" that: (1) the affiant made false statement(s) knowingly, intentionally or with reckless disregard for the truth, and (2) the falsehoods were necessary to the issuing judge's probable cause finding. *Franks*, 438 U.S. at 170–71. To demonstrate a *Franks* violation based on *omissions* in an affidavit, a defendant must show that the facts were intentionally or recklessly omitted, and that the affidavit—if supplemented by the omitted information—could not support a finding of probable cause. *United States v. Tate*, 524 F.3d 499, 455–56 (4th Cir. 2008). When the defendant satisfies this preliminary burden, the Fourth Amendment "requires that a hearing be held at the defendant's request." *Id.* at 454. If at the *Franks* hearing the defendant establishes by a preponderance of the evidence that the affiant deliberately or recklessly made misrepresentations that were necessary to the probable cause determination, then the court must suppress the evidence resulting from the deceptive affidavit. *Id.* at 455–56.

## ARGUMENT

The Government's surveillance of Ald. Burke conducted pursuant to Title III should be suppressed because the Affidavits did not establish probable cause that Ald. Burke solicited legal business for his law firm in exchange for his performance of official acts for the Post Office, despite the extraordinary efforts of the Government's severely compromised cooperator to make it so. The Affidavits purported to establish probable cause that Alderman Burke committed three Subject Offenses, all of which require Alderman Burke to have taken, or to have agreed to take, official acts in his capacity as a Chicago Alderman, in a *quid pro quo* exchange for private gain:

18 U.S.C. §§ 1343, 1346, 1349 (honest services wire fraud); 18 U.S.C. § 1951 (attempted extortion); and 18 U.S.C. § 1952 (Travel Act violations predicated on state bribery). The Affidavits failed to demonstrate both the official action and *quid pro quo* elements of the Subject Offenses.

Specifically, the Supreme Court's unanimous decision in *McDonnell v. United States*, which fundamentally narrowed the scope of federal bribery law, readily demonstrates that Ald. Burke's telephone calls and meeting with individuals concerning the Post Office's issues with Amtrak and the Water Department did not constitute official action. As explained below, *McDonnell*, which the Government failed to even cite, much less address for the Chief Judge,[13] provides that "merely arranging a meeting or hosting an event to discuss a matter," does not alone constitute an "official act." Instead, an official act involves taking or agreeing to take an action involving the "formal exercise of government power," regarding a "question, matter, cause, suit, proceeding or controversy," that is "specific and focused." *McDonnell*, 136 S. Ct. at 2374–75. (emphasis added). The Affidavits' generic, speculative references to future City approvals were too vague to satisfy *McDonnell*, as well.

The Affidavits also failed to demonstrate probable cause Ald. Burke intended to enter into a corrupt *quid pro quo* agreement to take official acts benefiting the Post Office in exchange for legal business from ███████, an executive of the company that was redeveloping the Post Office. The Affidavits conflated Ald. Burke's position as an Alderman with his role as an Illinois attorney when characterizing his willingness to take action in exchange for legal business. Ald. Burke is legally permitted to solicit and accept legal business and represent private parties. The

---

[13]   As explained below, this omission is particularly troubling in light of the irrelevant and inapposite materials, including case law, the Government *did present* in its submissions to the Chief Judge.

inferences and conclusions drawn from Ald. Burke's conversations with Ald. ███ regarding Ald. Burke's potential representation of the Post Office owners are divorced from this reality.

The Affidavits also did not establish probable cause that the six City Hall telephone lines or Ald. Burke's Cell Phone were being used in the commission of any criminal offenses, nor that particular communications concerning criminal offenses would be obtained through the interception of the telephone lines. *See* 18 U.S.C. § 2518(3)(b), (d). The facts marshaled in support of the Government's extremely broad wiretap of six City Hall telephone lines, far from demonstrating probable cause, included benign conversations legally insufficient to constitute criminal activity under *McDonnell* as a matter of law. As if to prove this point, the Government abandoned the City Hall wiretap after one thirty-day interception period.

Finally, the Government intentionally or recklessly withheld from the Affidavits facts highly relevant to the probable cause inquiry, including that the Government had engaged Ald. Burke in carefully choreographed ruses with Ald. ███, designed to mislead Ald. Burke and to conceal the fact that ███████ *did not* intend to hire Ald. Burke's law firm. These surprising omissions violate the Fourth Amendment principles articulated in *Franks v. Delaware*, and at a minimum entitle Ald. Burke to a *Franks* hearing. At the evidentiary hearing, Ald. Burke will be able to demonstrate that the Affidavits, if supplemented with the concealed facts, would have further undermined the finding of probable cause.

For these reasons, the Court should suppress all of the materials obtained or derived from the City Hall and Cell Phone wiretaps pursuant to the Fourth Amendment to the Constitution of the United States and 18 U.S.C. § 2518(10)(a)(i).

## I.  The Affidavits Did Not Establish Probable Cause.

To evaluate a wiretap application for probable cause, the court must examine the "totality of the circumstances," in determining whether probable cause exists. *Mares-Martinez*, 240 F.

Supp. 2d at 814. Whether probable cause to support a wiretap exists should be determined in a "pragmatic" manner. *United States v. Mancari*, 663 F. Supp. 1343, 1354 (N.D. Ill. 1987). However, there is no precise test for determining probable cause, and the Supreme Court has recognized that "it is not possible to articulate an exact definition of probable cause or reasonable suspicion" because they are "fluid concepts that take their substantive content from the particular contexts in which the standards are being assessed." *United States v. McClinton*, 135 F.3d 1178, 1183 (7th Cir. 1998) (quoting *Ornelas v. United States*, 116 S. Ct. 1957, 1661 (1996)).

Any determination of probable cause is necessarily a fact intensive inquiry, reliant upon both the legal theory posited in the affidavit and the facts supplied to support the theory. As such, to appreciate the probable cause deficits contained in the Affidavits, a short overview of the Subject Offenses alleged is necessary.

**A. Honest Services Wire Fraud, Hobbs Act Extortion, and Facilitating State Bribery in Violation of the Travel Act All Require Intent to Enter Into A *Quid Pro Quo*, and Official Action.**

The Affidavits alleged Ald. Burke participated in the attempted extortion of the Post Office developer, and participated in a scheme to defraud the citizens of Chicago of their right to his and Ald. █████'s honest services. Ex. A., p. 62. Honest services wire fraud and Hobbs Act extortion under color of official right[14] proscribe *quid pro quo* bribery; or a *quid* (payment) in exchange for a *quo* (act). *See* 18 U.S.C. §§ 1343 & 1346, §1951. To have committed these offenses, a public official must have solicited, accepted, or agree to accept a thing of value knowing the thing of value was given or would be given with an intent to influence the official in the performance of an

---

[14] Extortion is the taking of property "induced by wrongful use of actual or threatened force, violence, or fear, or under color official right." 18 U.S.C. § 1951(b)(2). Counsel have limited the motion to color of official right because the Affidavits are completely devoid of any suggestion of "actual or threatened force, violence, or fear."

*official act*. *See* Committee Comment, 7th Cir. Pattern Inst., 18 U.S.C. § 1951 (setting forth that an extortion conviction "under color of official right" requires the Government to prove that the elected official accepted or agreed to accept a thing of value knowing that it was given in exchange for the official's performance of an official act); 7th. Cir. Pattern Inst., 18 U.S.C. §§ 1341, 1343, 1346 (providing that honest services fraud in the form of a bribery scheme requires proof of the intent to influence, *i.e.*, that the "public official knew that the thing of value was offered with the intent to exchange the thing of value for the performance of the official act"). The Seventh Circuit has explained that "only bribery or kickbacks, *rather than any private gain whatsoever*, can be used to show honest-services fraud." *United States v. Nayak*, 769 F.3d 978, 981 (7th Cir. 2014) (emphasis added); *see also Skilling v. United States*, 130 S. Ct. 2896 (2010) (the honest services statute covers only bribery and kickback schemes).

The Affidavits alleged Ald. Burke used a facility of interstate commerce—an email account—to "facilitate his efforts to obtain accommodations from the City of Chicago for the Post Office project from the Water Commissioner, with the understanding that he will receive business for his firm in return," in violation of the Travel Act. Ex. A, p. 63. The Travel Act prohibits any person from using the facilities of interstate commerce to promote or carry on specified, unlawful activity, including bribery in violation of state law. 18 U.S.C. § 1952(b). In a footnote, the Affidavits note that the supposed "unlawful activity" at issue here included violations of the Illinois bribery, commercial bribery, and official misconduct statutes. Although not articulated in terms of official action like the federal offenses, the gravamen of these Illinois bribery offenses likewise require that the bribe recipient commit or agree to commit "any act related to [their] employment or function [as a] public officer," or to act in their "official capacity" or to agree that

their "conduct in relation to [their] employer's affairs" be influenced by a payment.[15] However, the references in the Affidavit to the official misconduct and commercial bribery statutes are inapposite here as the affiant only actually uses the language of the bribery statute in arguing that probable cause existed as to the Travel Act violation. *See* Ex. A, p. 63.

**B.     The Supreme Court's Unanimous *McDonnell* Decision Fundamentally Narrowed the Scope of Federal Bribery Law.**

In *McDonnell*, a unanimous Supreme Court vacated the convictions of the former Governor of Virginia because the Government's broad interpretation of the federal bribery statute, embraced by the district court's jury instructions, was textually flawed, conflicted with Supreme Court precedent, and raised "significant constitutional concerns." 136 S. Ct. at 2372. In reaching this conclusion, the Court provided critical guidance as to what constitutes an "official act."

Governor McDonnell was charged with honest services fraud (18 U.S.C. § 1346) and Hobbs Act extortion (18 U.S.C. § 1951), for accepting things of value including loans and gifts from the CEO and founder of Star Scientific, in exchange for "official act[s]" to benefit the company. *Id*. at 2364–65. Star Scientific was a Virginia-based company that developed and marketed a nutritional supplement for which the company sought to obtain Food and Drug Administration ("FDA") approval as an anti-inflammatory drug. *Id*. at 2362. Star Scientific hoped to bolster its chances of obtaining FDA approval by having Virginia's public universities undertake research studies on the health benefits of the product's underlying ingredient, anatabine. *Id*.

At trial, the Government argued that the governor committed at least five "official acts," including: (1) arranging meetings for Star Scientific's CEO with subordinate government officials to discuss and promote the company's products; (2) hosting and attending events at the Governor's

---

[15] *See* 720 ILCS 5/29A-2, 5/33-1(e), and 5/33-3(a)(4).

Mansion designed to encourage state university researchers to initiate studies of anatabine; (3) contacting other government officials in the Governor's office as part of an effort to encourage state university researchers to initiate studies of anatabine; (4) promoting Star Scientific's products and facilitating its relationships with Virginia government officials by allowing the company's CEO to invite business associates to exclusive events at the Governor's Mansion; and (5) recommending that senior government officials meet with Star Scientific executives to discuss ways the company's products could lower healthcare costs. *McDonnell*, 136 S. Ct. at 2365–66.

Following closing arguments, the district court instructed the jury, pursuant to the statutory definition contained in the federal bribery statute, that an "official act" is "any decision or action on any question, matter, cause, suit, proceeding or controversy, which may at any time be pending, or which may by law be brought before any public official, in such official's official capacity, or in such official's place of trust or profit." 18 U.S.C. § 201(a)(3); *see also McDonnell*, 136 S. Ct. at 2366. Additionally, at the Government's request and over the objection of the defense, the district court instructed the jury that the term encompasses "acts that a public official customarily performs including acts in furtherance of longer-term goals or in a series of steps to exercise influence or achieve an end." *Id.* at 2366 (internal quotations omitted). The Governor was convicted and appealed.

In a strong rebuke of the Government's position as to what constitutes an "official act," the Supreme Court unanimously concluded that that the district court's jury instructions were improper because the jury could have convicted Governor McDonnell without finding that he committed or agreed to commit an "official act," as properly defined by the Court's "more bounded interpretation." *Id.* at 2368, 2374. Specifically, the Court found that the element of official action

is cabined in two key respects ignored by the Government's interpretation of the phrase, and absent from the district court's jury instructions.

The Court first addressed the proper scope of the underlying subject matter of an "official action," rejecting the Government's assertion that "nearly any activity by a public official qualifies as a question or matter—from workaday functions, such as the typical call, meeting, or event, to the broadest issues the government confronts, such as fostering economic development." *McDonnell*, 136 S. Ct. at 2368. The Court observed that "a question, matter, cause, suit, proceeding or controversy" at issue must involve "a formal exercise of government power that is similar in nature to a lawsuit before a court, a determination before an agency, or a hearing before a committee." *Id*. at 2372. And while the Court acknowledged that it "may be difficult to define the precise reach of those terms," the Court explained that, contrary to the Government's position, "it seems clear that a typical meeting, telephone call, or event arranged by a public official does not qualify." *Id*. at 2368. The Court further explained that such a "question, matter, cause, suit, proceeding or controversy" "must also be something *specific* and *focused* that is pending or may by law be brought before any public official." *Id*. at 2372 (internal quotations omitted) (emphasis added). Importantly, the Court noted that the phrase "may by law be brought" "conveys something *within the specific duties of an official's position*—the function conferred by the authority of his office," and that "[t]he word 'any' conveys that the matter may be pending either before the public official who is performing the official act, or before another public official. *Id*. at 2369.

The Court also addressed the question of what constitutes "a decision or take an action" with respect to a specifically identified question, matter, cause, suit, proceeding, or controversy. *Id*. at 2370–71. Here again, the Court rejected the Government's position, explaining that "setting up a meeting, hosting an event, or calling an official (or agreeing to do so) merely to talk about a

[question or matter] . . . or to gather additional information . . . does not qualify as a decision or action" on that question or matter. *Id*. at 2371. Instead, a "public official must make a decision or take an action on that question or matter, or agree to do so." *Id*. at 2370. Indeed, the Court noted that even a public official's expression of support for a particular outcome of a concrete and focused matter does not constitute an official action "as long as the public official does not intend to exert pressure on another official or provide advice, knowing or intending such advice to form the basis for an "official act." *Id*. at 2371. Such prosaic interactions between public officials are not "decisions" or "actions" that fall within the narrow ambit of the statute. Similarly, the Court explained that the statute is not intended to criminalize public officials' "myriad decisions to refer a constituent to another official." *Id*.

Taken together, the Court's analysis of what constitutes an "official act" readily demonstrates the narrow focus of this element. Importantly, however, the Court did not stop there. Instead, the Court further underscored the limited scope of what amounts to an "official act" by identifying and discussing "significant constitutional concerns" raised by the Government's "expansive interpretation." *Id*. at 2372–73. The Court's stated concerns provide further pointed guidance as to why the official act element of the federal bribery statute must be read narrowly.

The Court first identified its concern regarding the potential impact the Government's "expansive interpretation" will have on the ability and willingness of public officials and citizens to interact consistent with their rights under the First Amendment. *Id*. at 2372. The Court noted that the statute prohibits *quid pro quo* corruption—the exchange of a thing of value for an "official act," but that "in the Government's view, nearly anything a public official accepts—from a campaign contribution to lunch—counts as a *quid*; and nearly anything a public official does— from arranging a meeting to inviting a guest to an event—counts as a *quo*." *Id*. The Court

demonstrated that its concern was neither abstract nor academic, citing multiple amicus briefs filed by collections of bipartisan, former federal and state officials warning that the Government's "breathtaking expansion of public corruption law would likely chill . . . officials' interactions with the people they serve and thus damage their ability effectively to perform their duties." *McDonnell*, 136 S. Ct. at 2372. The Court further noted that it could not "construe a criminal statute on the assumption that the Government will 'use it responsibly.'" *Id.* at 2372–73 (quoting *United States v. Stevens*, 559 U.S. 460, 480 (2010)). Instead, the Court plainly reiterated that "a statute in this field that can linguistically be interpreted to be either a meat axe or a scalpel should reasonably be taken to be the latter." *Id.* at 2373.

The Court next raised due process concerns implicated by the Government's broad interpretation of the statute. Specifically, the Court noted that the Government's position was not defined "with sufficient definiteness that ordinary people can understand what conduct is prohibited," or "in a manner that does not encourage arbitrary and discriminatory enforcement." *Id.* at 2373 (quoting *Skilling*, 561 U.S. at 402–403). The "standardless sweep" of the Government's reading, the Court observed, could subject public officials to prosecution, "without fair notice, for the most prosaic interactions." *Id.* (quoting *Kolender v. Lawson*, 461 U.S. 352, 358 (1983)). Here again, the Court did not mince words in conveying the gravity of its concern: "'[i]nvoking so shapeless a provision to condemn someone to prison' for up to 15 years raises the serious concern that the provision 'does not comport with the Constitution's guarantee of due process.'" *Id.* at 2373 (quoting *Johnson v. United States*, 135 S. Ct. 2551 (2015)).

Finally, the Court addressed "significant federalism concerns" raised by the Government's broad interpretation. *Id.* at 2373. Recognizing that basic notions of state sovereignty "include[] the prerogative to regulate the permissible scope of interactions between state officials and their

constituents," the Court declined to "construe the statute in a manner that leaves its outer boundaries ambiguous and involves the Federal Government in setting standards" of "good government for local and state officials." *Id*.

These "significant constitutional concerns" serve as a powerful exclamation point to the Court's analysis rejecting the Government's broad interpretation and making clear that the "official act" element must be narrowly construed.

Since *McDonnell*, courts have repeatedly recognized that the Government (and district courts, through their jury instructions) must acknowledge and adhere to the new legal landscape established by the Court's unanimous decision. *See, e.g., United States v. Boyland*, 862 F.3d 279, 290–91 (2d Cir. 2017) (holding that lower court erred in failing to use *McDonnell's* definition of an official act in jury instructions on honest services wire fraud and Hobbs Act extortion); *United States v. Menendez*, 291 F. Supp. 3d 606, 618 (D.N.J. 2018) (granting defendant's motion for judgment of acquittal on certain bribery and honest services fraud charges, and adopting "the *McDonnell* framework for identifying an official act"); *United States v. Silver* (*Silver I*), 864 F.3d 102, 119 (2d Cir. 2017) (reversing convictions where district court's jury instructions failed to meet the narrowed definition of "official act"); *United States v. Silver* (*Silver II*), 948 F.3d 538, 552–575 (2d Cir. 2020) (vacating three convictions brought under an "as opportunities arise theory," bribery theory, because jury instructions did not convey *McDonnell's* requirement that a public official "promise to take official action on a *particular question or matter*" as the opportunity to influence that question or matter arises); *United States v. Fattah*, 914 F.3d 112, 152–159 (3d Cir. 2019) (reversing convictions where jury instructions did not comport with *McDonnell*, and jury "may have convicted [the defendant] for conduct that is not unlawful," such as arranging a meeting).

**C.** **The Affidavits Failed to Satisfy *McDonnell,* or Demonstrate Probable Cause Ald. Burke Intended to Enter Into a *Quid Pro Quo.***

The Supreme Court decided *McDonnell* on June 27, 2016, two months before the Government directed Ald. ████ to record conversations with Ald. Burke, and eleven months before it applied for authorization under Title III to surveil Ald. Burke's City Hall phone lines. Although it failed to even cite, much less address *McDonnell* for the Chief Judge, the Government clearly recognized that *McDonnell* fundamentally impacted its investigation and Title III affidavits. Indeed, as explained below, the Government resorted to invoking state bribery statutes, and repeatedly directing Ald. ████ to employ loaded monologues to try to connect Ald. Burke to some formal exercise of governmental power as *McDonnell* requires. Despite these efforts, however, the conduct set forth in the Affidavits did not satisfy the narrow *McDonnell* standard. Specifically, the Government did not demonstrate probable cause that Ald. Burke "planned to take action," (Ex. A, p. 62) regarding specific and focused matters confronting the Post Office that would involve his formal exercise of governmental power. Nor did the Affidavits supply probable cause that Ald. Burke pressured any *other* public officials to exercise their formal governmental powers regarding specific and focused issues.

Instead, the Affidavits laid out a lengthy and convoluted narrative showing Ald. Burke offered to make Post Office executive ████████ a personal introduction to Amtrak Board Member ████████; reached out to Union Station President ████████; and, suggested connecting the former Water Commissioner ████████ with the current Water Commissioner, ████████. Ald. Burke's conduct involved the kind of telephone calls and meetings the Court in *McDonnell* specifically found did not constitute a decision, action, or agreement involving the formal exercise of government power. Rather, Ald. Burke's conduct fell squarely into the broad category of constitutionally protected activity *McDonnell* made clear did not implicate the narrow

concept of official action. Nor did any of Ald. Burke's conduct demonstrate that he had participated in or would engage in a *quid pro quo*.

       1.     Ald. Burke's Conversations Regarding the Post Office's Amtrak Issues Did Not Satisfy *McDonnell* or Show He Intended to Enter Into *a Quid Pro Quo*.

The Affidavits provided that Ald. Burke "expressed his willingness to take action in his capacity as an Alderman," with respect to Amtrak when he "suggested that he could ▉▉▉▉ ▉▉▉ with his Amtrak problems, based on Burke's influence with a member of the board of Amtrak [▉▉▉▉▉], who was appointed by the President of the United States to his position" and, "agreed to ask ▉▉▉, the president of the Chicago Union Station Company ("CUSCO"), about making certain accommodations for the Post Office project." Ex. A, p. 11–12.

As an initial matter, Burke, as a Chicago Alderman, does not possess formal governmental power over either Amtrak or CUSCO. Amtrak is a federally regulated corporation, and CUSCO is an Amtrak subsidiary.[16] Ald. Burke therefore could neither take nor promise to take official action as a Chicago Alderman with respect to either Amtrak or CUSCO. Accordingly, Ald. Burke's offer to facilitate discussions between non-City parties—the Post Office and Amtrak or

---

[16] Amtrak is a corporation established by federal legislation, which provides that Amtrak "[W]ill not be an agency or establishment of the United States Government." *See* Rail Passenger Service Act of 1970, Pub. L. No. 91-518, § 301, 84 Stat. 1327, 1330. The Government's Affidavit provides that because an attorney for the United States represented in "court filings," that members of the Amtrak board are appointed by the President of the United States, receive a formal commission, and take an oath to support the Constitution that "there is reasonable cause to believe that Amtrak board members," "are principal officers of the United States." Ex. A, p. 28, n.11. The Government chose not to disclose to the Chief Judge which "court filings" it was referencing. It is possible that the Government was referring to filings in the *Department of Transportation v. Ass'n of American Railroads*, in which the Supreme Court analyzed whether Amtrak was a government entity for separation of powers purposes. *DOT v. Ass'n of Am. R.R.*, 575 U.S. 43 (2015). Here, the context is clearly much different—whether Amtrak employees are public officials for purposes of federal bribery statutes. The Government's surprisingly generic citation to "court filings" did not help the Chief Judge address that question. Moreover, the Government failed to provide the Chief Judge with actual existing case law that would have assisted the Chief Judge with his assessment of Amtrak. *See, e.g., United States v. Plasser Am. Corp,* 57 F. Supp. 2d 140, 141–145 (E.D. Pa. 1999) (granting defendants' motion to dismiss count of information charging obstruction of a federal audit, because the Amtrak audit the defendants obstructed could not constitute a federal audit because Amtrak is not an instrumentality of the government).

CUSCO—did not, by definition, demonstrate that Ald. Burke was willing to take official action as defined by *McDonnell*. More generally, for the further reasons explained below, the conduct the Government described did not establish probable cause that Ald. Burke would take official action in his capacity as an Alderman, as required by *McDonnell*.



    a.    *Ald. Burke's October 27, 2016 Conversation with*      *Regarding*     

The Affidavits stated that Ald. Burke suggested he could assist ▮▮▮▮▮ with his Amtrak problems by reaching out to his personal friend ▮▮▮▮▮, who serves on the Amtrak Board of Directors. Ex. A, p. 12. Specifically, on October 27, 2016, in Ald. Burke's *sole meeting* with ▮▮▮▮▮ in Ald. ▮▮ office, a meeting Ald. ▮▮ arranged at the FBI's direction, Mr. ▮▮ mentioned that the Post Office was having difficulty "work[ing] with Amtrak." *Id*. p. 27. Alderman Burke replied that he has a "personal family relationship" with a member of the Amtrak Board of Directors, ▮▮▮▮▮, and said: "If you ever run into a problem there, ▮ can be helpful." *Id*. at p. 28. This indirect offer to simply introduce Mr. ▮▮ to a personal friend at Amtrak is precisely the kind of prosaic interaction *McDonnell* made clear does not implicate the narrow concept of official action. And it bears no resemblance to the concrete steps Governor McDonnell took to assist Star Scientific. *McDonnell*, 136 S. Ct. at 2365–66.

Additionally, Mr. ▮▮ comment that the Post Office was having "problems," in dealing with Amtrak did not constitute the kind of specific or focused "question, matter, cause, suit, proceeding or controversy" that could be the subject of an official act pursuant to *McDonnell*. Ex. A., p. 28. Ald. ▮▮ similarly failed to clarify what the Post Office needed from Amtrak, telling Ald. Burke that the Post Office merely needed Amtrak to be "more cooperative." *Id*. To support probable cause, *McDonnell* required the government to identify a "concrete" matter,

.

"similar in nature to a lawsuit, administrative determination, or hearing" that is "pending or may by law be brought before any public official." *McDonnell*, 136 S. Ct. at 2370, 2374.

Ald. Burke's October 27, 2016 meeting with Mr. ███ also highlights shortcomings in the Government's supposed demonstration of probable cause regarding the *quid pro quo* element of the alleged bribery offenses. During the meeting, Ald. Burke told Mr. ███ that he would like to present his law firm to Mr. ███. Ex. A, p. 27. Mr. ███ responded that he already had a law firm, but he could "open the door *once our terms are over with them*." *Id*. This temporal qualifier, coupled with the vagueness of Mr. ███ Amtrak issues, undermines the *quid pro quo* element of the alleged bribery offenses because this element requires a direct, causal link between a payment (the *quid*) and an official action (the *quo*).

The Government is left with its own guesswork and deceptive machinations to try to suggest that Mr. ███ would hire Ald. Burke, or that on a date uncertain and on issues uncertain, Ald. Burke would ever be in a position to vote on a matter impacting the Post Office. This cannot support a *quid pro quo*. The mere speculative potential that Mr. ███ would hire Klafter & Burke at some time in the future for some unspecified legal work in exchange for some unspecified official act is woefully insufficient to establish probable cause that Ald. Burke committed or would commit any of the Subject Offenses. As the Second Circuit recently explained in vacating honest services and Hobbs Act extortion convictions obtained under an "as opportunities arise" bribery theory: "[Under *McDonnell*] a public official must do more than promise to take some or any official action beneficial to the payor as the opportunity to do so arises; she must promise to take official action *on a particular question or matter* as the opportunity to influence that same question or matter arises." *Silver II*, 948 F.3d at 552–53. Here, there is neither an indication that Mr.

████████ offered anything nor that Ald. Burke promised anything, let alone a promise that Ald. Burke would take action on a particular question or matter.

Moreover, even the Government's skewed characterization of Mr. ████████ purported intentions—which Mr. ████████ himself rejected when he was interviewed by the Government— fails to help the Government demonstrate probable cause. The Supreme Court has specifically held that giving a public official something of value to "build a reservoir of goodwill that might ultimately affect one or more of a multitude of unspecific acts, now and in the future," is not an illegal bribe. *United States v. Sun-Diamond Growers*, 526 U.S. 398, 405–406 (1999). Nor could the receipt of the same constitute a bribe. Following *Sun-Diamond Growers*, courts interpreting bribery statutes have consistently held that a payer's intent to cultivate goodwill or to curry favor with a public official with the hope or generalized expectation of some future benefit or favorable action, is insufficient to establish the essential *quid pro quo* element of bribery.[17]

While the Government may not like it—and it certainly did not make *any* attempt to ensure the Chief Judge clearly understood as much—no state statute, municipal ordinance, or federal law barred Ald. Burke from practicing law or soliciting legal business from Mr. ████████. The Government's lack of transparency with the Chief Judge regarding the lawful nature of Ald. Burke's conduct as a Chicago Alderman is particularly troubling in light of the significant role the

---

[17] *See, e.g.*, *United States v. Bryant*, 655 F.3d 232, 245–47 (3rd Cir. 2011) (payment made in general attempt to build goodwill or curry favor with public official is not a bribe); *United States v. Siegelman*, 640 F.3d 1159 (11th Cir. 2011) ("generalized expectation of some future favorable action," is insufficient to establish *quid pro quo* bribery); *United States v. Ganim*, 510 F.3d 134, 149 (2d Cir. 2007) (federal bribery law does not prohibit attempt "to buy favor or generalized goodwill from a public official" in position to act favorably in payer's interest); *United States v. Allen*, 10 F.3d 405, 411 (7th Cir. 1993) ("[v]ague expectations of some future benefit" are insufficient to establish *quid pro quo* element of Indiana bribery statute); *see also Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 360 (2010) ("Ingratiation and access . . . are not corruption.").

City Inspector General played in this investigation, which even included advising the Government on less germane aspects of the Affidavits at issue. *See, e.g.*, Ex. A p. 19.

          b.     *Ald. Burke's mid-December 2016 Conversation with* ████.

The Affidavit cited Ald. Burke's contact with ████ as support for Ald. Burke's alleged "willingness to take action in his capacity as an Alderman" to "ensure that [the Post Office] tax work is given to his private firm." Ex. A, pp. 11–12. Ald. Burke's contact with Mr. ████ did not demonstrate probable cause to satisfy *McDonnell*, nor did it suggest a *quid pro quo*. The Affidavits showed that Ald. Burke attended a single meeting with his "good friend" ████, the president of the Chicago Union Station Company (a subsidiary of Amtrak), regarding one of Ald. Burke's existing legal clients in mid-December 2016. *Id*. at pp. 40–42. They further referenced Ald. Burke describing the substance of his meeting with Mr. ████ to Ald. ████ on December 22, 2016. *Id*. at p. 40.

Ald. Burke told Ald. ████ that according to Mr. ████, the complex history and circumstances surrounding the intersection of the Post Office and Union Station areas was the apparent cause of the difficulties the Post Office was encountering in dealing with Amtrak.[18] When

---

[18] In a lengthy and, frankly, difficult to track explanation, Ald. Burke told Ald. ████: "So the issue here is the air rights . . . . There's nine owners of the air rights going along the railroad right of way. And there's these air vents that vent the air that is in the area where the trains—" Ald. ████ said: "—are staged—" Ald. Burke: "Correct. Vedder Price is the law firm that has been representing CUSCO and they've got a consent decree over in federal court and a pending case in the circuit court where the city is suing them over building violations. So when these guys bought the . . . post office, they inherited this dilemma that nutcase [Bill] Davies [the former owner of the Post Office Property before Mr. ████ company, 601W acquired the property] created, so they're more or less stuck with it now. In fact, Davies was refusing to repair the fans that clear the air . . . [T]hey hired Jones Lang LaSalle. ████ at Jones Lang LaSalle objects to language in the agreement. ████ at CUSCO would be willing to adjust some things, but there's hundreds of trains that come in and out of there all day long and they've gotta have a flag person. It's federal law, to protect the people from trains . . . He would probably be willing to give them a five-hour window of space at night so they can do the work and there could be economies of scale. So, in other words, instead of having multiple flagmen, they could probable get away with one if the work was done at night. In November they had a meeting and CUSCO, Chicago Union Station Company, waived the management fee and the walk through fees. There's two new players, Sugarhouse, which is a chiller pipe and for those, there's no flaggers needed. . . ." Ex. A, pp. 40–41.

Ald. ▮ asked Ald. Burke "where did you leave it at with your last conversation [with Mr. ▮]," Ald. Burke responded, "I said, I'm not hired to represent them so I'm just trying to get the background here," and "if indeed I get hired, then it's a different story. . . Right now it's pro bono [sic] publica." *Id*. at p. 42.

This conversation readily demonstrates that Ald. Burke did not pressure Mr. ▮ into taking any action related to the Post Office. Ald. Burke was merely attempting to get "background," an activity the Supreme Court specifically noted does not constitute official action. *See McDonnell*, 136 S. Ct. at 2370–71 (emphasis added) ("Setting up a meeting, hosting an event, or calling an official (or agreeing to do so) merely . . . *to gather additional information*, . . . does not qualify as a decision or action on the pending question . . . .").

Ald. Burke's "pro bono" comment further demonstrates that he was focused on his private legal practice in talking with Mr. ▮. As Ald. Burke explained, if Mr. ▮ were to hire him, then he would take action—*in his capacity as Mr. ▮ lawyer, not as an Alderman*. This is one of several instances where the Government intentionally conflated Ald. Burke's dual roles in the Affidavits in an unsuccessful attempt to try to satisfy *McDonnell*. Ald. Burke's comment also undermines the Government's assertion that Ald. Burke wanted to assist Mr. ▮ with the explicit understanding that he would be rewarded with business in return—*i.e.*, a *quid pro quo*.

        c.      *Ald. Burke's January and February 2017 Conversations with Ald. ▮*

Alderman Burke's conversations with Ald. ▮ in January and February of 2017 similarly did not demonstrate that Ald. Burke intended to take official action in exchange for legal work. In fact, far from demonstrating a *quid pro quo*, these conversations demonstrate how the Government's conflation of Ald. Burke's distinct roles as an attorney and an Alderman distorted its probable cause analysis—recasting an innocent conversation as a criminal one.

The Affidavit provided that Ald. Burke and Ald. ███ met on January 25, 2017. Ex A, p. 43. During the meeting, at the Government's direction, Ald. ███ suggested that they take a tour of Union Station, and said: "I thought we were going to [] have a discussion with ███ or ███ or somebody." *Id*. Alderman Burke reiterated that he was not going to do any "lifting" for Mr. ███ unless the Post Office "signed up." *Id*. For his part, Ald. ███, apparently attempting to clarify Ald. Burke's statement replied: "Signed up for what, 'cause I think I told Mr. ███ that it would be for the taxes . . . you're not looking for anything else, the lobbying anything?" Ex. A, pp. 43–44. Alderman Burke answered: "I could represent them in negotiations with Amtrak." *Id*. at p. 44. Ald. ███ again pressed: "[T]hat's the basic thing I wanted to know. We're still focused for the law, not for the lobbying?" *Id*. Ald. Burke replied: "I could represent them in negotiations with Amtrak." *Id*. at p. 44. Ald. ███ again pressed: "[T]hat's the basic thing I wanted to know. We're still focused for the law, not for the lobbying?" *Id*. Ald. Burke responded, "No I can do that [lobbying], I mean that's law," and, "[T]hey could hire our firm if they want to lobby Amtrak. That's not a conflict for me." *Id*.

This exchange underscores the need to once again distinguish Ald. Burke's dual roles as an attorney and Alderman, and reject the Government's sleight of hand—*by way of a scripted and desperate Ald.* ███—to conflate the same. As noted above, in his capacity as a private lawyer, Ald. Burke can take actions on behalf of his clients involving the influence of public officials in the contexts their legal needs arise—whether that means filing a property tax appeal, lobbying an administrative agency, or negotiating with a private party. As this Court knows, attorneys do not make it a practice to begin work on behalf of a client *before* they are retained. Therefore, when Ald. Burke says he is not planning to do any "lifting," until he is hired, he is articulating a basic truism of legal practice. Moreover, the "lifting," he is referring to—assisting a client in negotiating

with a non-City third party like Amtrak—is entirely permissible conduct he could undertake as a private attorney.  Indeed, Ald. Burke noted, "[t]hat's not a conflict for me."  Ex. A, p. 44.

In his role as a public official, on the other hand, Ald. Burke could not accept a payment in exchange for taking official actions involving his own formal exercise of governmental power.  But that is clearly not what Ald. Burke is discussing in this conversation; he is saying that he could legally lobby Amtrak if his firm were hired by the Post Office.  The Government's distorted spin of this exchange can neither change that fact nor satisfy *McDonnell*.

Ald. ███ and Ald. Burke also met on February 10, 2017 to tour Union Station with ███ ████.  The Affidavit noted that during the tour, Mr. ███ mentioned that Union Station needed City approval for a new water access point.  *Id*.  Two weeks later, on February 27, 2017, the Government directed Ald. ███ to call Ald. Burke at City Hall, trying once again to connect Ald. Burke to some formal exercise of governmental power involving the City as *McDonnell* requires.  Ald. ███ asked: "I was wondering how far along you are with your discussions with ███ ████ about what [Union Station] needs from the City?"  Alderman Burke replied: "Not at all."  Ex. A, p. 46.

Recognizing that they failed to manufacture the kind of statements *McDonnell* requires, the Government directed Ald. ███ to offer up a highly scripted and convoluted proposal: if Ald. Burke could help Mr. ███ at Union Station with its City water connection issue, then Mr. ███ would help the Post Office resolve its issues with Amtrak, and, according to Ald. ███, "I think we'll be able to lock in the tax work."  Ex. A, pp. 47–48.  But the Government's additional machinations similarly failed.  Ald. Burke did not even respond to the misleading proposal.  Instead, he simply asked Ald. ███ to provide a "list of things [the Post Office] need[s]" related to Amtrak.  *Id*. at p. 47.

In addition to punctuating another failed attempt by the Government to use Ald. ███ to ensnare Ald. Burke, Ald. Burke's request for this information regarding what the Post Office needed readily demonstrates that as late as February 27, 2017, Ald. Burke *did not even know the specifics of what the Post Office needed*. As such, the Government strains credibility in suggesting that Ald. Burke's outreach to ███████████ and ███████ somehow demonstrated that he took official action on behalf of the Post Office or pressured other public officials to take such action when Ald. Burke did not even know what the issue was or what outcome was being sought. Thus, Ald. Burke's February 27th comments did not support probable cause.

2. Ald. Burke's Conversations and Receipt of an Email Regarding the Water Department Did Not Satisfy *McDonnell* or Show He Intended to Enter Into a *Quid Pro Quo*.

Ald. Burke's telephone calls regarding the Post Office's water access issues also failed to demonstrate that he took official action as *McDonnell* requires. Specifically, Ald. Burke's putting the Post Office project manager in touch with ███████████████████████ regarding the Post Office's complex water access issues did not involve the formal exercise of governmental power. Indeed, far from putting his thumb on the scale as to any particular outcome, Ald. Burke simply put the developer in touch with individuals who possessed the appropriate level of technical expertise to exercise their independent judgment regarding the Post Office's various issues.

The Affidavits provided that in a March 9, 2017 telephone call, Ald. ███ told Ald. Burke that the Post Office project manager, ███████, "has an issue with the water department," and that he had an email from ███ he would forward to Ald. Burke. Ex. A, p. 48. Ald. Burke asked Ald. ███ to forward the email to his private AOL email account. *Id*. at p. 49. When Ald. Burke received the email, he told Ald. ███, "Um, it's rather complicated. I don't know how a layman can understand it. That's why I think we need to meet with the commissioner. . . My suggestion

38

would be to bring ███████ in, who used to be the commissioner, and is in that business now of engineering these kinds of projects. . ." *Id.*

Regardless of whether, as Ald. ████ stated, putting the Post Office project manager in touch with ███████ would "seal the deal," connecting the developer with an independent third-party like Mr. ████ falls squarely into the broad category of constitutionally protected activity *McDonnell* made clear does not implicate the narrow concept of official action. *McDonnell*, 136 S. Ct. at 2372. Ald. Burke's reluctance to wade into the "complicated," substance of the Post Office's issues further highlights the fact that he was not in a position to advocate any particular outcome on the Post Office's behalf. This, too, underscores the permissible nature of Ald. Burke's proposal to reach out to Mr. ████.

The Affidavit alleged that Ald. Burke violated the Travel Act, 18 U.S.C. § 1952 (by facilitating state bribery), when he received the email from Ald. ████ by way of his AOL account, because AOL's web-based email system serves as a facility of interstate commerce. Ex. A, pp. 49, 62–63. As an initial matter, the very fact that the Government resorted to employing the Travel Act and Illinois bribery statute readily telegraphs *both* the Government's understanding that *McDonnell* fundamentally changed the legal landscape, and the Government's attempt to side-step it.

One need only compare the Government's pre-*McDonnell* wiretap applications with its post-*McDonnell* wiretap applications to see the deliberativeness of the Government's actions. *None* of the wiretap applications to surveil Ald. ████—which precede *McDonnell* and *are based on the same theory but with different players*—alleged Travel Act violations based on state

bribery.[19]  Instead, those wiretap applications alleged violations of the Hobbs Act and honest services fraud statutes.  Conversely, after *McDonnell*, instead of addressing or even citing *McDonnell* for the Chief Judge in any of its wiretap applications to surveil Ald. Burke, the Government included allegations regarding the Travel Act based on the Illinois bribery statute.

The Government no doubt invoked the Illinois bribery statute due to its seemingly broad and vague statutory language.[20]  However, the Government finds no respite from *McDonnell*.  The Illinois bribery statute requires no less than what the federal bribery statute requires as interpreted by the Court in *McDonnell*.  Indeed, as the Court explained, anything less would raise "significant constitutional concerns."  *McDonnell*, 136 S. Ct. at 2372.  Finally, the Government's failure to cite, much less discuss *McDonnell* for the Chief Judge is particularly egregious (and telling) given the Government's decision to provide the Chief Judge with citations to a six-year-old, inapposite state court decision regarding the Illinois Professional Rules of Responsibility, as well as a 1979 book by Judge Mikva that Ald. ▮ referenced on a recording while working as the Government's cooperating witness.  *See* Ex. A, pp. 23, 29.

        a.    *Ald. Burke's March 2017 Conversations with* ▮ *Regarding the Water Department.*

The remaining conversations set forth in the Affidavit related to the Water Department.  Specifically, the Affidavit asserted that these conversations regarding Ald. Burke's "enlistment of ▮ to contact the Water Commissioner to see what the Water Commissioner could do to

---

[19]  It is entirely appropriate for this Court to consider the Ald. ▮-related Title III Affidavits.  These Affidavits were specifically incorporated into the Government's Title III applications to monitor Ald. Burke.  *See, e.g.*, Ex A, pp. 9–10, n.3.

[20]  Counsel address the broad and vague language of the Illinois bribery, official misconduct, and commercial bribery statutes in a separate motion, Ald. Burke's Motion to Dismiss and Strike the State Bribery, Commercial Bribery, and Official Misconduct Charges.

assist the Post Office Developer," (Ex. A, p. 62), supported probable cause. Just the opposite is true.

The Affidavit provided that in a March 21, 2017 call with Ald. ▮▮▮, Ald. Burke said: "[Powers] went to talk with Barrett [Murphy]. . . . I don't think they can get a hundred percent on what they want, but I think they [can] get a situation where they'll be comfortable." *Id*. at p. 53. That same day, Ald. ▮▮▮ called Mr. Murphy, the then-current Water Commissioner. *Id*. at p. 54. Mr. Murphy told Ald. ▮▮▮ that he was meeting "tomorrow" with the Post Office's "designers and builders" and one of their "lead engineering guys," remarking: "I don't think they understand the complexities of [what] they want. I told them to bring their contractor in so we can explain the complexities. . . . I think what we've offered them is the best idea, but I'm certainly willing to listen to whatever ideas they have[.]" *Id*. at p. 55.

Taking direction from a Government straining to try to satisfy *McDonnell*, Ald. ▮▮▮ said: "Ed [Burke] gave me the impression [] your department could be helpful." *Id*. Mr. ▮▮▮ replied: "We can look at the alternatives. . . . that's why I said come on in and we'll sit down and figure out exactly what you guys are looking for and what other solutions there are." *Id*. at pp. 55–56. Ald. ▮▮▮ continued the Government's fishing: "Can you give me any sense of what the compromises [were] after ▮▮▮ talked to you that you were able to make?" Mr. ▮▮▮ responded: "I don't know what they want, Alderman. . . . I don't know what [the Post Office's] perspective is, what they're looking for. . . . [▮▮▮] just called me to give me a heads up that the Post Office was having some issues and wanted to come in to meet with me . . . [h]e doesn't know any of the specifics about what they want either. He just mentioned [] to me that they want to meet and I'm like 'just give them my phone number and have them give me a call.'" *Id*. at p. 56.

Mr. ██████ reaction to Ald. ██████ scripted statements and questions demonstrates that even though Mr. ██████ had spoken with Mr. ██████, Mr. ██████ *still* did not understand the nature of the issues or for what the Post Office was even asking. Mr. ██████ specifically repudiated twice that Mr. ██████ provided him with any "specifics" as *McDonnell* requires. Ex. A, p. 56. Moreover, Mr. ██████ did not make any "compromises," on behalf of Mr. Powers or at the behest of Ald. Burke; he was merely provided a "heads up" that the developers were in need of assistance. *Id*. This exchange cannot be construed as demonstrating that Ald. Burke asked Mr. ██████ to pressure Mr. ██████ into exercising any formal governmental power on a specific, focused and concrete issue as *McDonnell* requires.

The Government then brazenly directed Ald. ██████ to feign frustration in hopes of satisfying *McDonnell*: "So then I don't understand why Ed [Burke] called me. Did ██████ let you know that Ed [Burke] was interested in getting the work for the developer?" Ex. A, p. 56. Unfazed, Mr. ██████ said, "Yeah, what Tom told me is that Ed [Burke] called him and said: 'Hey, these guys are, these guys are having some issue with their service,' you know, 'What can you do?' And he [Powers] told Ed [Burke] yesterday, just have them call, have them call ██████ office and schedule an appointment. . ." *Id*. at pp. 56–57.

The Government once again failed. Mr. ██████ made clear to Ald. ██████—and the Government—that all Ald. Burke said was the Post Office was "having some issue with their service" (which is not specific or focused), and "what can you do?" (not, *you need to do this or that*). Ald. Burke's outreach was not a request that Mr. ██████ take any particular action. And it was clearly not the kind of inappropriate "pressure" on another public official discussed in *McDonnell*. Moreover, the result of the conversation was simply to have the developers schedule an appointment, which, on its face, does not satisfy *McDonnell*'s narrow concept of official action.

Finally, the Affidavit provided that the Chicago Tribune published an article on March 21, 2017, which described an email that Ald. ████ forwarded from Post Office project manager ████ ████ to Mayor Emanuel in October 2016. Ex. A, pp. 51–52. In the email, ████ explained that he "was seeking assistance from the alderman and anyone else who will listen to me . . ." for assistance getting access to Amtrak-controlled space beneath the building and lower fees from the rail agency. *Id*. The article posited that if the Chicago Board of Ethics found that the email constituted lobbying activity, Mr. ████ could be fined. *Id*. at p. 52. After the article appeared in the Tribune, Ald. ████ asked Ald. Burke whether he should set up a meeting with Water Commissioner ████, and Ald. Burke "expressed concern," regarding the idea of he and Ald. ████ meeting with Mr. ████. *Id*. The Affidavit portrayed this as "consciousness of guilt." *Id*. p. at 62.

Government conjecture is not evidence that satisfies probable cause. Anyone, but particularly a politician, would be sensitive to becoming embroiled in this kind of negative press suggesting wrongdoing, even if that press coverage is inaccurate. More importantly, as demonstrated above, *McDonnell* makes clear that Ald. Burke's actions *were not* improper or inappropriate, much less illegal.

Moreover, the fact that the Post Office developer was reaching out to the Mayor's Office, U.S. Senator Dick Durbin's office (Ex. A, p. 30), and the Department of Buildings, underscores the very fact that the issues confronting the Post Office were not ones in which Ald. Burke had the official capacity or ability to fix. All that Ald. Burke could do was what all public officials do when a constituent has an issue which they cannot address—direct that individual to someone else who might be able to help the constituent. Under *McDonnell*, that cannot be criminalized.

3.  The Affidavits Did Not Demonstrate Probable Cause that Ald. Burke
    Intended to Enter Into a Corrupt Agreement with Ald. ███.

The Affidavits made much of Ald. Burke's conversations with Ald. ███ regarding a potential marketing agreement. *See, e.g.*, Ex. A, pp. 23–24, 30, 34. Specifically, the Government asserted that the payment of such a fee to Ald. ███ would be "unlawful" under the Illinois Rules of Professional Conduct, citing *In re Denzel W.*, 930 N.E.2d 974, 980 (Ill. 2010), in which the "Illinois Supreme Court has held that the [Rules of Professional Conduct] have the force of law." Ex. A, p. 8, n.8.

First, the cite to *In re Denzel W.* is extremely misleading in the context of a federal wiretap application. That case was a criminal appeal of a juvenile conviction, in which the court analyzed whether a defendant had been denied the effective assistance of counsel when his attorney had failed to file the defendant's written consent to the participation of a law student under Rule 711. *In re Denzel W.*, 930 N.E.2d at 980–82. The case does not support the proposition that an attorney's purported violation of a Rule of Professional Conduct constitutes a *federal crime*.

Of course, violating the Illinois Rules of Professional Responsibility is not a federal crime, nor is it a basis for a wiretap under Title III for the Subject Offenses. *See Sorich v. United States*, 555 U.S. 1204, 1207 (2009) (Scalia, J., dissenting from denial of petition for writ of certiorari) (there is no "common-law crime of unethical conduct"); *see also Kelly v. United States*, 140 S. Ct. 1565, 1574 (2020) ("[f]ederal prosecutors may not use property fraud statutes to 'set [] standards of disclosure and good government for local and state officials'") (quoting *McNally v. United States*, 483 U.S. 350, 360 (1987)).

Moreover, the Affiant ignored or discarded Ald. Burke's repeated statements specifically repudiating any intent to engage in an illegal transaction or agreement with Ald. ███. Specifically, Ald. Burke continually stressed that any potential marketing arrangement with Ald.

44

█████ should be *legal*. *See, e.g.*, Ex. A, p. 24 (Ald. Burke told Ald. █████ any payment would have to be arranged "so that there's *no pitfalls, legally*"), p. 34 ("We can't pay a non-lawyer a percentage. We can pay a lawyer a percentage . . . we'll just figure out a way that's gonna be *above board, legal*, etc.").

The Government twisted these statements, recasting them as an attempt by Ald. Burke to circumvent the Rules of Professional Responsibility for attorneys. Ex. A, pp. 30, 34. In particular, the Affiant surmised that "Burke's claim that he is unaware of the unlawful nature of a payment to █████ is pretextual." *Id*. at p. 30. But this characterization makes little sense if Ald. Burke was engaged in a corrupt agreement with Ald. █████. If the two men are 'in on it,' so to speak, there would be no reason for Ald. Burke to articulate a pretext to Ald. █████. These men were speaking candidly, in a conversation Ald. Burke believed to be private. He had no incentive or reason to articulate a pretextual explanation to Ald. █████. Ald. Burke's statements demonstrate his genuine intent to abstain from knowingly participating in any "unlawful" conduct, let alone criminal conduct.

Instead of relying on Ald. Burke's clear statements, the Affidavit grasped at innuendo *supplied by its own desperate cooperator*. For example, during Ald. Burke's sole meeting with Mr. █████, Ald. █████ slipped the following comment into the conversation: "I'd be surprised if you [Ald. Burke] don't know somebody here. If you don't know somebody he's a nobody. There's a book, there's a book about that." Ex. A, p. 29. As noted above, the Affiant explains that Ald. █████ is referring to a book title based on "a well-known phrase made popular by Judge Abner Mikva," that is "meant to refer to Chicago politics and the imperative in Chicago politics to deal with and hire only those who are politically connected." *Id*. To infer Ald. Burke was involved in

a corrupt agreement by relying on the Governmen ████████████████████████████

████████████████████████

████████████████████████████ in the Affidavits—viewed both on an individual

basis and taken as a whole—did not establish the requisite probable cause that Ald. Burke

committed honest services wire fraud, facilitated state bribery in violation of the Travel Act, or

attempted to commit extortion under color of official right. The unifying legal flaws in the

Government's theory set forth above demonstrate that the Affidavits could not establish probable

cause as to any of the offenses. For this reason, the Court should suppress the wiretaps.

> **D.** **The Affidavits Did Not Set Forth a Reasonable Basis for Believing that the City Hall Phones Were Being Used in the Commission of Subject Offenses, or that Communications Concerning Any Offenses Would be Obtained.**

The Government's request to tap all of the phone lines in Ald. Burke's City Hall office, as

well as his cell phone, was overly broad and unsupported by the facts supplied in the Affidavits.

The City Hall Wiretap Affidavit purported to establish probable cause that six City Hall telephone

lines (Target Phones 10–15 and all associated extensions), were being used by Ald. Burke in the

commission of honest services wire fraud, Hobbs Act extortion, and state bribery in violation of

the Travel Act, and that communications concerning those offenses would be obtained through the

interception. *See* 18 U.S.C. § 2518(b), (d).

The Government set forth its analysis of toll record information collected from Target

Phones 10–15 on pp. 63–70 of the City Hall Affidavit. The Affidavit also described the telephone

calls the Government had already obtained through consensual monitoring of Ald. ████ calls.

But the calls it cited between Ald. Burke and Ald. ████ on the City Hall lines were short, and often

non-substantive contacts. Moreover, as described in detail above, mere telephone calls, in any

event, do not suffice to establish official action, a core element of the Subject Offenses alleged in

the Affidavits. *McDonnell*, 136 S. Ct. at 2369.

The sheer breadth of the request to tap six Committee on Finance telephone lines is underscored by the lack of evidence that each of those phones were regularly used by Ald. Burke. For example, the City Hall Affidavit provided substantive factual details regarding only one telephone call that occurred over Target Phone 10, placed on December 9, 2016, by a Committee on Finance staffer to Ald. ███. Ex. A, p. 35. In the call, the staffer asked that Ald. ███ return Ald. Burke's call. *Id.*

The Affidavit notes that on March 10, 2017, two calls were made over Target Phone 10 to ████████, the former Water Commissioner, but the Affidavit did not indicate who from Ald. Burke's office placed those calls. *Id.* at pp. 50–51. Regardless, as noted above, Ald. Burke's permissible outreach to Mr. ███ does not support probable cause, and therefore cannot support the conclusion that evidence of a crime would be found on a telephone line that had been used for contacts between Ald. Burke's City Hall office and Mr. ████.

Additionally, toll records showed that Target Phone 11 was used to call ████ on December 14, 2016 (Ex. A, p. 39 n.18) and to call ████████ on March 10 and 16, 2017. *Id.* at pp. 50–51. Similar to Target Phone 10, the only calls intercepted over Target Phone 11 were not substantive, and were comprised, respectively, of a December 12, 2016 call to Ald. ███ that was immediately transferred to Ald. Burke's cell phone. (*id.* at p. 37), and a March 21, 2017 call to Ald. ███ from a Committee on Finance staffer requesting for Ald. ███ to call Ald. Burke. *Id.* at p. 52. Likewise, the *only* call that the Affidavits referenced over Target Phone 13 was a December 13, 2016 call from Ald. ███ to Ald. Burke which was immediately transferred to Ald. Burke's cell phone. *Id.* at p. 60.

The Affidavits also recounted telephone calls over Target Phone 12 that, though are more numerous, are also benign. During Ald. ████ first call to Target Phone 12 on December 9, 2016,

he requested for one of the Committee on Finance staffers to ask Ald. Burke to return his call. *Id.* at p. 39. Another call from Ald. ███ to Target Phone 12 on December 14, 2016 was immediately transferred to Ald. Burke's cell phone (*id.* at pp. 39–40) while another on March 24, 2017 was immediately transferred to Ald. Burke's Ward Office telephone line. *Id.* at pp. 58–59. The only remaining calls over Target Phone 12 that were cited in the Affidavits are a February 27, 2017 call from Ald. ███ asking Ald. Burke for an update on "where you are with your discussions with ███████" (to which Ald. Burke replied: "Not at all.") (*id.* at p. 46), and a March 21, 2017 call from Ald. ███ in which Ald. Burke said he believes that Mr. ███ may have resolved the Post Office's water access issues. *Id.* at p. 52. The intercepted City Hall calls set forth in the Affidavit did nothing to establish that there was probable cause that Ald. Burke had used or would use Target Phones 10, 11, 12, and 13 in the commission of a *quid pro quo* offense.

In fact, the intercepted City Hall calls show that the Government directed Ald. ███ to call the Committee on Finance, in one case as a ruse, to establish a purported nexus to the Target Phones. *See* Ex. A, p. 15 ("[O]n or about April 25, 2017, ███, at the instruction of the FBI, placed a ruse call to Target Phone 14.").[21] The theoretical possibility Ald. Burke could use Target Phone 14 is not probable cause.

Finally, if the Government had already intercepted any calls over Target Phone 14 or Target Phone 15 that were relevant to the Post Office, or were incriminating in any way, the Government presumably would have set forth those calls in the Affidavits. Tellingly, the Affidavits did not refer to any substantive calls over Target Phones 14 and 15.

---

[21] It is noteworthy that to Government admits it engaging in a "ruse" in the context, but not with respect to even more important contexts—like its decision to deliberately mislead Ald. Burke—as set forth more fully in Section II, *infra*.

The Government's assertions that Ald. Burke was engaged in alleged criminal activity did not give the Government license to rummage through six telephone lines of a public office—intercepting all of the employees of the public office in the process. Title III demands more. Because the facts set forth in the Affidavits did not establish probable cause that Ald. Burke used the City Hall telephone lines to engage in the Subject Offenses, or that evidence of any crime would be found by intercepting the telephone lines, the evidence obtained or derived as a result of these interceptions should be suppressed. 18 U.S.C. §§ 2515, 2518(3)(b), (d).

## II. **Ald. Burke Is Entitled to a *Franks* Hearing.**

The Affidavits also deliberately, or at the very least, recklessly, withheld critical information that if supplied to the Chief Judge at the time of the Government's application, would have even *further* undermined the Chief Judge's finding of probable cause. Specifically, the Affidavits repeatedly withheld that the Government directed Ald. ▇▇ to mislead and lie to Ald. Burke about Mr. ▇▇▇▇▇ willingness to hire Klafter & Burke. The Government also concealed key conversations between Ald. ▇▇ and Mr. ▇▇▇. While the Government's use of ruses is entirely permissible, as set forth below, in this instance, the Government's failure to disclose this information to the Chief Judge constitutes a substantial preliminary showing that the Government deliberately or recklessly withheld facts from the Affidavits that would have undermined a finding of probable cause. Therefore, Ald. Burke is, at a minimum, entitled to an evidentiary hearing pursuant to *Franks*, at which he would be able to demonstrate that the totality of the circumstances, including the withheld facts, failed to support a finding of probable cause.

### A. The *Franks* Standard.

In *Franks*, the Supreme Court held that a defendant challenging the veracity of a search warrant affidavit is entitled under the Fourth Amendment to an evidentiary hearing upon a "substantial preliminary showing" that the affiant made false statements knowingly, intentionally

or with reckless disregard for the truth, and that the alleged falsehoods were necessary to the issuing judge's probable cause finding. *Franks,* 438 U.S. at 170–71. As the Court in *Franks* observed, the Fourth Amendment "would be reduced to a nullity if [a law enforcement officer] was able to use deliberately falsified allegations to demonstrate probable cause." *Id.* at 168, 170–71.

To demonstrate a *Franks* violation based on omissions in an affidavit, a defendant must show that the facts were intentionally or recklessly omitted, and that the affidavit—if supplemented by the omitted information—could not support a finding of probable cause. *Tate,* 524 F.3d at 455–56; *see also United States v. McMurtrey,* 704 F.3d 502, 511 (7th Cir. 2013) (remanding for a full *Franks* hearing and finding that defendant preliminarily showed that Government recklessly or intentionally misled the judge by omitting material "contradictory" information from search warrant affidavit). The "considerations underlying *Franks* apply with equal force to intentional or reckless material omissions," (*Dorfman,* 542 F. Supp. at 367) because "[b]y reporting less than the total story, an affiant can manipulate the inferences a magistrate will draw." *United States v. Stanert,* 762 F.2d 775, 782 (9th Cir. 1985).

To make the substantial preliminary showing necessary for a *Franks* hearing, the defendant's attack on the affidavit must be "more than conclusory." *Franks,* 438 U.S. at 171–72. However, "it is equally true that the defendant need not come forward with conclusive proof of deliberate or reckless falsity. Otherwise, there would be no need for a *Franks* hearing." *McMurtrey,* 704 F.3d at 511. The defendant must "point out specifically the portion of the warrant affidavit that is claimed to be false [and provide a] statement of supporting reasons," *Franks,* 438 U.S. at 171–72, and must show that the affiant disregarded the truth with more than "mere negligence." *United States v. Whitley,* 249 F.3d 614, 621 (7th Cir. 2001).

Courts have held that a defendant satisfies his preliminary burden with respect to the intentionality of the omission when the defendant shows that the affiant "with[eld] a fact in his ken that [a]ny reasonable person would have known that this was the kind of thing the judge would wish to know," that is, information "highly relevant" to the probable cause determination. *United States v. Jacobs,* 986 F.2d 1231, 1234–35 (8th Cir. 1993). "Clear proof of deliberate or reckless omission is not required." *Stanert*, 762 F.2d. at 781. Instead, for the court to grant a *Franks* hearing, "all that is required is that the defendant make a substantial showing that the affiant intentionally or recklessly omitted facts required to prevent technically true statements in the affidavit from being misleading." *Id*. (citations omitted).

With respect to the materiality of the omission, the court must determine "whether the affidavit, once corrected and supplemented, would provide a magistrate with a substantial basis for concluding that probable cause existed." *Stanert*, 762 F.2d. at 782; *see also United States v. Glover*, 755 F.3d 811, 886 (7th Cir. 2014) (reversing lower court's denial of a *Franks* hearing where affidavit "complete[ly] omi[tted ]known, highly relevant, and damaging information about [informant's] credibility."). No single omission need be conclusive as to the probable cause determination. Rather, "[t]he effect of misrepresentations and omissions on the existence of probable cause is considered cumulatively." *Stanert*, 762 F.2d. at 782.

When the defendant satisfies his initial burden, the Fourth Amendment "requires that a hearing be held at the defendant's request." *Franks*, 438 U.S. at 156. If at the *Franks* hearing the defendant establishes by a preponderance of the evidence that the affiant deliberately or recklessly made misrepresentations that were necessary to the probable cause determination, then the court must suppress the evidence resulting from the deceptive affidavit. *Id*. at 155–56.

**B.**   **The Government Deliberately or Recklessly Omitted Facts Highly Relevant to the Chief Judge's Probable Cause Determination.**

The Affidavits are replete with omissions of critical information highly relevant to the Chief Judge's determination of probable cause. First, the Affidavits withheld that the Government, in a calculated ruse, directed Ald. ███ to lie to Ald. Burke on December 12, 2016 that "it would really make the deal for ███" if Ald. Burke could follow up on Amtrak. Ex. A, p. 37. This was a Government-directed lie. The omission from the Affidavits that this was a Government ruse is both misleading on its face, and in light of the fact that the Government told the Chief Judge elsewhere in the Affidavits when it engaged in certain other ruses. *See, e.g.*, Ex. A, p. 15 ("at the instruction of the FBI, [███] place a ruse call . . ."). This selective inclusion of identified ruses created the false impression that the Government indicated when it was engaged in ruses.

Moreover, the Government later established that it *knew* it was consequential to identify the December 12, 2016 conversation as a ruse, because it did so in its Superseding Indictment. *See* Sup. Indict. at ¶ 10 ("On or about December 12, 2016, [███] told Burke, *as a ruse and at the direction of law enforcement*, that [███] understood that, so long as Burke and [███] helped [███] with necessary permits needed for the Post Office project, and Burke assisted with issued concerning Amtrak, [███] would retain Burke's law firm, Klafter & Burke.") (emphasis added).

The Affidavits also concealed that the Government scripted and directed Ald. ███ to tell Ald. Burke on November 7, 2016 (Ex. A, p. 32), December 12, 2016 (*id.* at p. 37), February 10, 2017 (*id.* at p. 46), February 27, 2017 (*id.* at pp. 47–48), and March 9, 2017 (*id.* at pp. 49–50) that Mr. ███ was on the verge of hiring Klafter & Burke, even though the Government knew full well that Mr. ███ had no intention of doing so. Indeed, the Government's Affidavits specifically withheld that Mr. ███ *twice told* ███ on October 27, and November 11, 2016

that he was *unwilling* to hire Ald. Burke's law firm. *See* Ex. D-1, D-2. And in the November 11th conversation the Government omitted, Mr. ██████ said "my hands are tied for the foreseeable future," when Ald. ████ raised the possibility of hiring Ald. Burke. Ex. D-2.

Mr. ██████ post-Title III interviews with the Government drive home the egregiousness of the Government's omissions. For example, Mr. ██████ described his interactions with Ald. ████ as "15 months of harassment," to push Mr. ██████ into giving the Post Office's tax work to Burke. (FD-302 re: ██████, 4.2.19, RPT_016-000252). Mr. ██████ believed "98 percent" of the pressure was from Ald. ███—or put another way, *from the Government itself. Id.* Mr. ████ believed it was Ald. ███ agenda (*i.e.*, the Government's) to get Mr. ███ to hire Ald. Burke, not Ald. Burke's agenda. Moreover, Mr. ██████ confirmed to the Government—as he had repeatedly told Ald. ███—that he had no intention of hiring Ald. Burke. (FD-302 re ██████, 3.26.19, RPT_016-000262). Mr. ██████ also stated in his interview that he in fact had not hired the law firm Worsek & Vihon for the Post Office tax work, and had made it up as an excuse not to hire Ald. Burke. *Id.*

These flagrant omissions put an entirely different gloss on the facts and circumstances, and the Government's purported justifications for seeking the wiretap. Far from showing that a bribery scheme was afoot, the omissions show that the entire scheme was a false construct that was created and pushed by the *Government* and its severely compromised cooperator, Ald. ████. Due to the Government's omissions, the Chief Judge would have concluded that Mr. ██████ was a willing participant in a bribery scheme. This was false, and the Government knew it.

The Government also omitted and concealed the nature and extent of its deliberate targeting of Ald. Burke, and its predicate for the same. The Government's use of Ald. ████ in this regard is particularly egregious. When Ald. ████ began acting as a Government informant in the summer

of 2016, he made clear to the prosecutors and FBI agents during his extensive debriefings that in the twenty-five years he has known Ald. Burke, "Burke has never offered anything of value to [████] is exchange for something else." (RPT_020-000009). Further, "When Burke did ask [████] for things in the past, [████] never asked for anything of value from Burke." *Id*. That should have been the end of the inquiry. But the Government pressed on in its single-minded pursuit of Ald. Burke, and chose to conceal Ald. ████ statements from the Chief Judge.

As another example of the Government's gamesmanship involving its targeting of Ald. Burke, the Government has refused to confirm the timing of the opening of the full investigation into Ald. Burke, the factual predicate for the opening of the investigation, or the nature of the investigation. The timing of the opening of a federal criminal investigation, the quality of the evidence derived after the opening of the investigation, and the Government's contemporaneous justifications for any intelligence gathering in connection with the same has come under increased scrutiny by the current Department of Justice administration. *See, e.g.*, Govt. Motion to Dismiss Criminal Information, *United States v. Flynn*, Case No. 17-cr-232 (D.D.C. May 7, 2020), ECF 198. Here, however, the Government's investigation seems to spring out of thin air, and it will not provide counsel with any explanation. Counsel may be able to develop this issue further at a *Franks* hearing, but cannot do so here when the Government has chosen to keep defense counsel in the dark.

As another example of the extent of the Government's targeting of Ald. Burke, the Affiant noted that "the FBI has previously utilized a cooperating individual who has been able to make recordings against Burke," but "that cooperating individual was unable to maintain consistent contact with Burke for the purpose of developing admissible evidence against Burke." Ex. A., p. 77. In fact, what the Affiant failed to note is that for *six months*, from February 2, 2015, through

August 13, 2015, the Government had a cooperator it utilized on another case in this district, contacting Ald. Burke regularly in an attempt to develop evidence against him. Here, again, the Government came up empty-handed, and yet it zealously pressed on.

The sheer extent of the Government's animus towards Ald. Burke and its efforts to try to maneuver him into criminal conduct is nothing short of extraordinary. But the Government failed to provide the Chief Judge with this context, which would have colored the Chief Judge's review of the Affidavit including consideration of the legitimacy of the Government's motives, and the biases of the FBI's Affiant. This was not a fair and impartial search for criminal conduct, but an all-out campaign to charge Ald. Burke with a crime and remove him from his office.[22]

Against this backdrop, it is clear that the Government at least recklessly—and more likely deliberately—withheld the critical facts regarding Mr. █████ willingness to hire Ald. Burke, and the government's extreme targeting of Ald. Burke. *Stanert*, 762 F.2d at 782. No reasonable person would believe that the Government withheld the above facts "mere[ly] negligent[ly]." *Whitley*, 249 F.3d at 621. It can be inferred that the Government withheld the above facts at minimum with "reckless disregard [because] any reasonable person would have known [these

---

[22] Former Supreme Court Justice Robert H. Jackson may have said it best when he cautioned federal prosecutors from first selecting an individual to target, then establishing a crime was committed—and not the other way around—when he said:

> If the prosecutor is obliged to choose his cases, it follows that he can choose his defendants. Therein is the most dangerous power of the prosecutor: that he will pick people that he thinks he should get, rather than pick cases that need to be prosecuted. With the law books filled with a great assortment of crimes, a prosecutor stands a fair chance of finding at least a technical violation of some act on the part of almost anyone. . . . It is in this realm--in which the prosecutor picks some person whom he dislikes or desires to embarrass, or selects some group of unpopular persons and then looks for an offense, that the greatest danger of abuse of prosecuting power lies.

24 J. Am. Jud. Soc'y 18 (1940), 31 J. Crim. L. 3 (1940) (address at Conference of United States Attorneys, Washington, D.C., April 1, 1940). The extent of the Government's targeting of Ald. Burke certainly calls to mind the wisdom of Justice Jackson's warning, which appears went unheeded here.

were] the kind[s] of things the judge would wish to know." *Jacobs*, 986 F.2d at 1235. The omissions are neither "peripheral[ly] relevan[t]" to the showing of probable cause (*Franks*, 438 U.S. at 163–64), nor are they "of minimal significance [that the] omission[s] could not reasonably have affected" the Chief Judge's judgment in finding probable cause. *United States v. Kimberlin*, 805 F.2d 210, 251 (7th Cir.1986), *cert. denied*, 483 U.S. 1023 (1987).

If the Government had included these facts in the Affidavits, the Chief Judge could not have reasonably found, based on a totality of the circumstances, that there was probable cause that Ald. Burke had committed or was about to commit any of the Subject Offenses. *See Mares-Martinez*, 240 F. Supp. 2d. at 816. Indeed, while *McDonnell* alone readily demonstrates that the Government failed to develop probable cause, if the Government had been honest with the Chief Judge regarding its pervasive use of scripted conversations and lies, as well as its unwarranted targeting of Ald. Burke, the Government would have powerfully underscored the full extent of its failure and the clear lack of probable cause as to Ald. Burke.

This is true for several reasons. First, the Affidavits withheld that the Government directed ███ to misrepresent to Ald. Burke that Mr. ███ was willing to hire his law firm, when the Government knew full well that was a lie. The Chief Judge should have had the opportunity to consider whether, within the context of the Government's ruses, there was in fact probable cause that Ald. Burke intended to engage in a *quid pro quo* bribery scheme, or whether Ald. Burke was simply following up on what Ald. ███ falsely led him to believe was a legitimate business prospect. This is particularly true here where the Government failed to explain to the Chief Judge that it was perfectly legal for Ald. Burke to solicit business for his law firm, that Ald. ███ had no knowledge of Ald. Burke having ever committed any crimes, and that the Government appeared to have unleashed Ald. ███ on Ald. Burke based solely on Ald. Burke's entirely appropriate

request for Ald. ██ to recommend a local wrecking company to the Post Office. Ex. A, p. 22; *see also supra* Section II(A).

If the Government had disclosed its ruses, it could well have disturbed the Chief Judge's view of whether the totality of the circumstances suggested that Ald. Burke had committed, or would commit any of the Subject Offenses in the future. *Mancari*, 663 F. Supp. at 1354. Indeed, by failing to disclose the ruses, the Government deprived the Chief Judge of the opportunity to consider important questions at the core of whether Ald. Burke had committed a crime. For example, if the Government had been candid in the Affidavits, the Chief Judge would have known that the Government controlled all of Ald. ██ conversations with Ald. Burke, including Ald. ██ remarks that the Post Office needed vague "approvals" and "necessary permits." Ex. A, pp. 32, 37. By concealing that it orchestrated Ald. ██ every attempt to lure Ald. Burke into admitting he would take official acts for the Post Office in exchange for law firm business, the Government deprived the Chief Judge of his ability to assess whether the true totality of the circumstances reasonably indicated that Ald. Burke had engaged in or would engage in an illegal *quid pro quo*.

The Government's lies to Ald. Burke regarding Mr. ██ intentions, and the intentional withholding of Mr. ██ repeated statements that he was unwilling to hire Ald. Burke, also left the Chief Judge believing that Mr. ██ and Ald. Burke were willing participants in a bribery scheme. This was not true. Importantly, the need to monitor any future calls of Ald. Burke to detect whether Mr. ██ would give Ald. Burke legal business underpins the entire basis for the Title III monitoring. Yet had the Government provided Mr. ██ concealed conversations, the Chief Judge would have known that surveillance to detect such a proposition was completely unnecessary.

Finally, the conversations between Ald. ███ and Mr. ███ that the Government chose to withhold would have also been "highly relevant" to the Chief Judge's determination of whether there was probable cause that Ald. Burke violated the Travel Act based on a state bribery predicate offense. *Jacobs*, 986 F.2d at 1234. The conversations between Ald. ███ and Mr. ███ on October 27, 2016, November 11, 2016, and December 14, 2016 that the Government chose to withhold demonstrate that Mr. ███ never intended or agreed to retain Klafter & Burke, much less expressed a willingness to do so in exchange for Ald. Burke's performance of specific official acts. This is relevant to a finding of probable cause because a person commits bribery under Illinois law when he solicits, receives, retains, or agrees to accept any property or personal advantage pursuant to an *understanding* that he shall improperly influence or attempt to influence the performance of any act related his employment or function as a public officer. 720 ILCS 5/33-1(e); *see also People v. Gralewski*, 132 Ill. App. 2d 755, 757 (2d Dist. 1971) (affirming bribery and official misconduct convictions because the "evidence show[ed] there was a *meeting of the minds* with regard to what the [bribe] money was for.") (emphasis added).[23] If the Affidavits had disclosed facts showing that Ald. Burke and Mr. ███ had no agreement, either explicit or implicit, to enter a *quid pro quo* arrangement, it would have negated one of the elements necessary to establish probable cause for the Travel Act predicate bribery offense. *Jacobs*, 986 F.2d at 1234.

The Government recklessly and deliberately withheld these critical facts. *Stanert*, 762 F.2d at 782. If the Government had supplemented the Affidavits with the withheld facts, it would have

---

[23] In *Silver II*, the Second Circuit held that neither Hobbs Act extortion under color of right nor honest services fraud require a meeting of the minds agreement or understanding between the two parties. 948 F.3d at 547–552. However, unlike the federal statutes analyzed in *Silver II*, the text of the Illinois bribery statute explicitly requires proof of an "understanding." 720 ILCS 5/33-1(e). More, the court in *Silver II* conceded that the word "understanding" "could be interpreted as requiring a collusive agreement." 948 F.3d at 551. If anything, *Silver II* only bolsters Ald. Burke's argument on the Travel Act state bribery predicate.

been *even clearer* that Ald. Burke had no inclination to perform an official act for Mr. ██ and the Post Office, and thus even more unreasonable to conclude that there was probable cause that Ald. Burke had committed or would commit any honest services fraud, extortion, or facilitating state bribery in violation of the Travel Act. *See Tate*, 524 F.3d at 455–56.

In sum, the Affidavits strategically included and excluded Ald. ██ and Mr. ██ conversations and concealed the Government's ruses. It is quite possible that Mr. ██ would have flatly declined Ald. Burke's business pitch if Ald. ██ had not directed him to feign interest during their undisclosed private conversation on October 27, 2016. Ex. A, p. 27.[24] And that may well have been that. The Affidavits put forth no evidence whatsoever that Ald. Burke pressured or threatened Mr. ██ to hire Klafter & Burke, and there is no indication that he would have done so if Mr. ██ had refused Klafter & Burke's services. To the contrary, Ald. Burke talked with Mr. ██ just one time and did not initiate any further communications with him whatsoever—or vice versa—before the Government applied to intercept the City Hall phones.

Based on the above, Ald. Burke has made a substantial preliminary showing that he is entitled to a *Franks* hearing. *McMurtrey*, 704 F.3d at 511. While Ald. Burke's preliminary showing, particularly on the issue of whether consideration of the withheld facts would have caused the Chief Judge to deny the Government's application to intercept his telephone calls, may not be "conclusive," it is far from "conclusory." *Id.* He has shown that the Government's ruses, concealment of conversations between Ald. ██ and Mr. ██, and withholding of facts showing Ald. Burke's lack of predisposition, when viewed cumulatively, were "highly relevant" to the issue of his intent. *Stanert*, 762 F.2d. at 782; *Mills v. City of Harrisburg*, 589 F. Supp. 2d

---

[24] In an interview with the FBI, ██ said that during the October 27, 2016 meeting with Ald. Burke and Ald. ██, he did not mean to give the impression or have any intention of giving Burke business. FD-302 report of interview with ██, April 2, 2019 (RPT_016-000267).

544, 552 n.4 (M.D. Pa. 2008). He has put forth concrete reasons why the withheld facts, if disclosed, would have disturbed the Chief Judge's determination of whether the totality of the circumstances established probable cause that he had or would enter a *quid pro quo* arrangement with ▉▉▉. *See Dorfman*, 542 F. Supp. at 366–67. For that reason, Ald. Burke has also shown preliminarily that the Court should infer that the Government withheld the material facts deliberately or recklessly. *Whitley*, 249 F.3d at 621. As such and at a minimum, this Court should grant Ald. Burke a *Franks* hearing.

### III. Each of the Subsequent Wiretaps Were Derived from the Unlawful City Hall and Cell Phone Wiretaps, and Must Be Suppressed.

If the Court finds the initial wiretaps that are the subject of this Motion should be suppressed—the May 1st and May 5th, 2017 City Hall wiretaps (Ex. A, B) and the May 12, 2017 Cell Phone wiretap (Ex. C)—the Court must also suppress the eight additional wiretap extensions, because each subsequent wiretap extension was *derived* from the preceding illegal wiretaps. Under both the Fourth Amendment's fruit of the poisonous tree doctrine, and 18 U.S.C. § 2515, evidence derived from an illegal wiretap must be suppressed.

Title III provides that "[w]henever any wire or oral communication has been intercepted, no part of the contents of such communication and *no evidence derived therefrom* may be received in evidence in any trial, hearing, or other proceeding in or before any court, grand jury. . . ." (emphasis added). 18 U.S.C. § 2515; *see also* 18 U.S.C. § 2518(10)(a) ("any aggrieved person. . . may move to suppress the contents of any wire or oral communication intercepted pursuant to this chapter, *or evidence derived therefrom*. . .") (emphasis added). The "evidence derived therefrom" provisions of the statute codify the "fruit of the poisonous tree" Fourth Amendment exclusion doctrine first articulated in *Silverthorne Lumber Company v. United States*, 251 U.S. 385 (1920) and developed further in *Wong Sun v. United States*, 371 U.S. 471 (1963) (excluding

narcotics and oral statements of defendant, both of which were "fruits" of an illegal search under the Fourth Amendment). *See United States v. Gonzalez, Inc.*, 412 F.3d 1102, 1115 (9th Cir. 2005) (the fruit of the poisonous tree doctrine for wiretapping evidence is codified at 18 U.S.C. § 2515).

In the wiretap context, a second (or subsequent) wiretap which is the "progeny" of a foregoing, illegal wiretap must be suppressed pursuant to 18 U.S.C. §§ 2515 and 2518(10)(a). *United States v. Roberts*, 477 F.2d 57, 60–61 (7th Cir. 1973) (affirming suppression of wiretap extension under 18 U.S.C. §§ 2515, 2518(10)(a), on the grounds that initial wiretap was unlawful under Title III, and the second wiretap was the "progeny" of the earlier illegal wiretap).

Here, after the initial City Hall and Cell Phone Wiretaps, the Government moved to extend the Cell Phone Wiretap eight times. Each of the extensions incorporate in full both the substance of the prior affidavits, as well as conversations the Government overheard pursuant to the initial wiretaps. For example, during the thirty-day interception period authorized by the initial Cell Phone wiretap, the Government overheard conversations between Ald. Burke regarding a ███████ ███████████ within Ald. Burke's ward. The Government details those conversations in its June 13, 2017 Affidavit,[25] and in subsequent extensions. Each wiretap extension builds upon and incorporates the materials obtained and derived from the preceding wiretaps. Under these circumstances, the Fourth Amendment fruit of the poisonous tree doctrine, codified at 18 U.S.C. § 2515, requires this Court to suppress all of the evidence derived from the initial wiretaps—which includes the eight subsequent wiretap extensions.

Moreover, no exception to 18 U.S.C. § 2515 or the Fourth Amendment exclusion doctrine—such as the *Leon* good faith exception—applies. The *Leon* good faith exception to the Fourth Amendment exclusionary rule provides that exclusion is inappropriate when a law

---

[25] The June 13, 2017 Wiretap is the subject of a separate motion to suppress, filed simultaneously herewith this Memorandum of Law.

enforcement officer acted in objectively reasonable, good faith reliance on a search warrant later found to be invalid. *United States v. Leon*, 468 U.S. 897, 910 (1984). The statutory suppression remedy authorized under Title III at § 2515 is mandatory and cannot be overridden by the *Leon* good faith exception. *See, e.g.*, *United States v. Rice*, 478 F.3d 704, 712 (6th Cir. 2007) (the good faith exception does not apply to Title III violations, citing the text of the statute, which is "clear on its face," and "does not provide for any exception"); *United States v. Patrick*, 842 F.3d 540, 552 (7th Cir. 2016) (Wood, J. dissenting) (noting circuit split and collecting cases). Though the Seventh Circuit has yet to weigh in, the court noted that the Sixth, Second, and First Circuits have each come to the conclusion that the good faith exception *does not apply* in the Title III context.[26] Counsel agree with these circuits' reasoning, and submit that the good faith exception is inapplicable.

In any event, the *Leon* good faith exception cannot obviate a *Franks* violation, regardless of whether it is couched as a statutory violation of Title III. Indeed, as the Supreme Court in *Leon* recognized, *Franks* suppression "remains an appropriate remedy if the magistrate or judge in issuing a warrant was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth." *Leon*, 468 U.S. at 923 (citing *Franks*, 438 U.S. 154 (1978)). *See also United States v. Hammond*, 351 F.3d 765, 773–774 (6th Cir. 2003) (the *Leon* good-faith exception to the exclusionary rule does not apply when the

---

[26] *Patrick*, 842 F.3d at 552 (Wood, J. dissenting) ("Compare *United States v. Rice*, 478 F.3d 704, 711 (6th Cir. 2007) (good-faith exception does not apply); *United States v. Spadaccino*, 800 F.2d 292, 296 (2d Cir. 1986) (using this same rationale and reaching the same conclusion in analyzing whether the *Leon* good-faith exception applied to a state wiretapping statute); *United States v. Vest*, 813 F.2d 477, 484 (1st Cir. 1987) (rejecting judicially created exception); with *United States v. Moore*, 41 F.3d 370, 376 (8th Cir. 1994) (good-faith exception applies); *United States* v. *Malekzadeh*, 855 F.2d 1492, 1497 (11th Cir. 1988) (same, although without analysis); *United States v. Brewer*, 204 Fed. App'x 205, 208 (4th Cir. 2006) (same). No court of appeals has found that the attenuation rule applies to the Title III suppression remedy. In fact, *United States v. Giordano*, 416 U.S. 505, 528 [ ] (1974), seems to suggest it does not.").

supporting affidavit contained knowing or reckless falsity). That is because in *Franks*, implicit in the analysis of whether or not a violation occurred is a finding that the officer *did not act in good faith*, but rather with reckless disregard for the truth or falsity of information in the affidavit. *Franks*, 438 U.S. at 170–71. Therefore, if the Court finds suppression is warranted, the character of the Fourth Amendment violation—whether statutory or under *Franks*—does not permit the Court to examine the applicability of the good faith exception articulated in *Leon*. For all of these reasons, counsel respectfully submit that each of the extensions of the initial wiretaps should be suppressed as well.

## CONCLUSION

For all of the reasons set forth above, the Court should grant Ald. Burke's Motion to Suppress.

Dated: August 20, 2020                    Respectfully Submitted,

**LOEB & LOEB LLP**                       **JENNER & BLOCK LLP**

By: /s/ Joseph J. Duffy                   By: /s/ Charles B. Sklarsky
    Joseph J. Duffy                          Charles B. Sklarsky
    Andrew R. DeVooght                        Anton R. Valukas
    Robin V. Waters                          E.K. McWilliams
    321 N. Clark Street, Suite 2300          353 N. Clark Street
    Chicago, IL 60654                        Chicago, IL 60654
    Tel: (312) 464-3100                      Tel: (312) 222-9350
    jduffy@loeb.com                          csklarsky@jenner.com
    adevooght@loeb.com                       avalukas@jenner.com
    rwaters@loeb.com                         emcwilliams@jenner.com

                                         *Attorneys for Alderman Burke*