<pre>
 1                  IN THE UNITED STATES DISTRICT COURT
                  FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                            EASTERN DIVISION

 3   UNITED STATES OF AMERICA,        )  Docket 19 CR 00322-1, 2, 3
                                      )
 4                   Plaintiff,       )  Chicago, Illinois
                                      )  September 20, 2023
 5             v.                     )  9:36 a.m.
                                      )
 6   EDWARD M. BURKE, PETER J.        )
     ANDREWS and CHARLES CUI,         )
 7                                    )
                     Defendants.      )
 8

 9           TRANSCRIPT OF PROCEEDINGS - Motion Hearing
            BEFORE THE HONORABLE VIRGINIA M. KENDALL
10

11   APPEARANCES:

12

13   For the Government:      UNITED STATES ATTORNEY'S OFFICE by
                              MS. DIANE MACARTHUR
                              MS. SARAH E. STREICKER
14                            MS. SUSHMA RAJU
                              Assistant United States Attorneys
15                            219 South Dearborn, 5th Floor
                              Chicago, IL  60604
16

17

18

19

20

21

22   Court Reporter:         GAYLE A. McGUIGAN, CSR, RMR, CRR
                              Official Court Reporter
23                            219 S. Dearborn Street, Room 2504
                              Chicago, IL 60604
24                            312.435.6047
                              gayle_mcguigan@ilnd.uscourts.gov
25
</pre>

```
 1    APPEARANCES:  (Continued)

 2

 3    For Defendant Burke:      GAIR EBERHARD NELSON
                                   DEDINAS LTD. by
 4                             MR. CHRIS C. GAIR
                               One East Wacker, Suite 2600
 5                             Chicago, IL  60601

 6                             LOEB & LOEB LLP by
                               MR. JOSEPH J. DUFFY
 7                             MS. ROBIN VALENTINA WATERS
                               321 North Clark, Suite 2300
 8                             Chicago, IL  60654

 9                             JENNER & BLOCK LLP by
                               MS. KIMBERLY RHUM
10                             353 North Clark Street
                               Chicago, IL  60654
11

12    For Defendant            BLEGEN & GARVEY by
      Andrews:                 MR. PATRICK W. BLEGEN
13                             53 West Jackson, Suite 1437
                               Chicago, IL  60604
14
                               BREEN & PUGH by
15                             MR. TODD S. PUGH
                               53 West Jackson, Suite 1550
16                             Chicago, IL 60604

17    For Defendant Cui:       MORGAN LEWIS & BOCKIUS LLP by
                               MR. TINOS DIAMANTATOS
18                             MS. MEGAN ROSE BRADEN
                               110 North Wacker, Suite 2800
19                             Chicago, IL  60606

20

21

22

23

24

25
```

1          (In open court.)

2               THE CLERK:  19 CR 322, Defendants 1, 2, and 3,

3     U.S. versus Edward Burke, Peter Andrews, and Charles Cui.

4               MS. RAJU:  Good morning, your Honor.  Sushma Raju,

5     Sarah Streicker, and Diane MacArthur on behalf of the

6     United States.

7               THE COURT:  Good morning.

8               MR. GAIR:  Good morning, your Honor.  Chris Gair and

9     Joe Duffy on behalf of Mr. Burke.

10              THE COURT:  Good morning.

11              MR. BLEGEN:  Good morning, Judge.  Pat Blegen and Todd

12    Pugh on behalf of Mr. Andrews.

13              THE COURT:  Good morning.

14              MR. DIAMANTATOS:  Your Honor, good morning.  Tinos

15    Diamantatos on behalf of Defendant Cui.

16              MS. BRADEN:  Good morning, your Honor.  Megan Braden

17    on behalf of Defendant Cui.

18              THE COURT:  Good morning.

19              And is there someone behind you or no?

20              MS. WATERS:  Good morning, your Honor.  Robin Waters

21    on behalf of Mr. Burke.

22              THE COURT:  Thank you.

23              Anyone else?

24              MS. BROWN:  Good morning, your Honor.  Kimberly --

25              COURT REPORTER:  I'm sorry, I can't hear you.

1          MS. BROWN:  Good morning, your Honor.  Kimberly Brown

2    on behalf of Alderman Burke.

3          THE COURT:  Very well.  Thank you.

4          I was going to start with the government's response,

5    but why don't you just give an oral presentation for your

6    motion that I've read, of course, and tell me your concerns.

7          MR. DUFFY:  You're talking about our motion for

8    discovery, your Honor?

9          THE COURT:  Yes.

10         MR. DUFFY:  So, your Honor, briefly, when Mr. Solis

11   started to cooperate with the government, he had no history

12   with Alderman Burke, even though they had been aldermen for a

13   long time.  And so when the government decided to engage in

14   activity directing Alderman Solis to engage with Alderman

15   Burke, there was no historical conduct to talk about.

16         And to be brief, your Honor, they -- the government

17   then created certain scenarios and directed their cooperator to

18   carry out these scenarios.  Very quickly -- it relates to the

19   post office issue.

20         So you have this new developer from New York, and then

21   you have Alderman Burke, and you have Solis in the middle.

22         The developer from New York, who has not been indicted

23   and is not even a co-schemer, has been interviewed, and his

24   information was totally exculpatory.  He did not want to get

25   involved with Alderman Burke, and he didn't need anything from

1   Alderman Burke and thought he was irrelevant.

2          So what happened here, Judge, was the government

3   created these false scenarios or ruses, and Solis would take it

4   to Burke, and then he would go back to the developer and

5   provide false information to the developer, telling the

6   developer Burke wanted this, you have to do this for Burke,

7   which was false, and then go back to Burke.

8          So the simple issue is, Judge, that in order to carry

9   that out, the government had to give Mr. Solis a script and, at

10  times, wrote out for him what he should say to either side.

11  And we just asked the government in discovery that we think

12  we're entitled to that.

13         One is Solis adopted them as a statement.

14         Second, the agents prepared them, and they're going to

15  be witnesses as well.

16         So we've gone back and forth on that.

17         And it's simply -- it's that, Judge.  I honestly don't

18  know how many pieces of paper we're talking about.  The

19  government does.  They're not willing to give us the agents'

20  notes.

21         I will tell your Honor, the agents gave them the

22  direction, but the agents didn't put those directions in their

23  written reports.

24         So we have all the reports, but the directions are not

25  in there.

1          So it's simply that question.

2          And we're fine if the government wants the Court to

3    look at the notes and decide whether we're entitled to them.

4          THE COURT:  Okay.  Who wants to address this?

5          MS. RAJU:  I'll address it, your Honor.

6          Just to level set and add to some of the background

7    that Mr. Duffy just provided, the fact of Mr. Solis'

8    cooperation with the government is something that the defense

9    has known since 2019.  It's detailed in the indictment.

10         These discovery requests, which there are two parts --

11   first, to ask for the production of all the written statements

12   from the agents to Mr. Solis, and, second, to ask for all agent

13   notes of meetings with Mr. Solis -- those discovery requests

14   are not well-founded, nor are they based on any new information

15   that the defense is just learning.

16         To specifically engage with the back and forth that

17   we've had with the defense so far, we put in writing that it

18   was the general practice of the FBI agents to provide verbal

19   directives to Mr. Solis.

20         There was one instance in which Mr. Solis recalled

21   that he saw agents looking at paper when they were providing

22   instructions, and on one -- excuse me.  On one instance, he

23   took a picture of those notes.  Those notes were in his

24   possession.  We produced those to the defense.

25         And then with regard to the agent notes that the

1   defense is now seeking, there is a leap there that is being

2   made.  They're saying that because the directives to Mr. Solis

3   were not documented by the agents, that they're now entitled to

4   all of the agent notes from the meetings with Mr. Solis, which

5   cover a number of years.  They cover a number of different

6   investigations.  And the leap between those two things is

7   simply not well-founded.

8          As we put those things in writing, and we think that

9   since the time we responded in writing, the goalposts here have

10  shifted, and they're a little bit different in the defense's

11  motion than they were at the time they were raised for the

12  first time in July.

13         So we would ask to respond in writing more fully to

14  each of those arguments.

15         THE COURT:  So is it accurate -- is it an accurate

16  assessment to say that the 302 or the agent report -- I don't

17  know if it's FBI -- if the agent report existed, wouldn't the

18  report have said what they told Solis to do that day?  Or is

19  that not accurate?

20         MS. RAJU:  So our position is that the 302s are there,

21  as your Honor knows, to document what the witness is saying to

22  the agents.  The defense has those reports, and those reports

23  document the information that was provided to the agents by

24  Mr. Solis.

25         THE COURT:  Right, but does it document what the

1     agents told Mr. Solis to do that day?

2          MS. RAJU:  No.  No, they're not documenting what the

3     agents were saying; rather, what the witness was saying.

4          THE COURT:  Is it an accurate assessment to say the

5     agents were giving him directions that had some type of ruse

6     or, you know, created facts for him to respond to?

7          MS. RAJU:  Certainly in some instances, and the

8     defense is well aware of that based on information that's in

9     the indictment, that's been in briefing, that there were times

10    at which Mr. Solis was providing information at law

11    enforcement's direction.

12         THE COURT:  Okay.  And is there a separate pile of

13    documents that comprise the directions given to Mr. Solis

14    separate from the 302s?

15         MS. RAJU:  So specifically meaning are there

16    documents --

17         THE COURT:  Kind of like the one that he took a

18    picture of.

19         MS. RAJU:  So the documents that are discussing some

20    of the potential directions to be given to Mr. Solis, those,

21    among other things, are -- include agent and attorney notes,

22    internal discussions about the investigation, about strategy,

23    and so on and so forth.  We notified the defense we believe

24    those are covered by work product and the deliberative process

25    privilege.

1          THE COURT:  Got it.  All right.

2          Well, I will take your answer in writing so that I can

3     analyze it more fully, and I'm sure you'll want to reply, but

4     we need to do it quickly because if I'm going to review

5     something *in camera*, I have work other than you on my plate.

6          So how quickly can you respond to this motion?

7          MS. RAJU:  Your Honor, we would ask for September 29,

8     next Friday.

9          THE COURT:  That's fine, that's fine.

10         And then can you give me a reply in a week?

11         MR. GAIR:  We can.

12         MR. DUFFY:  Absolutely, Judge.

13         THE COURT:  Sure, okay.

14         In your response, please help me to understand what

15    the world is, because there seems to me to be a difference

16    between agents' notes and potentially, using Mr. Duffy's

17    description, a script or directions that may have been written

18    out and handed to Mr. Solis or shown to Mr. Solis.  Maybe not.

19    Maybe they're one in the same.  I don't know.  But if you know,

20    that would be helpful to understand as far as my review.  Okay?

21         All right.  What else do we have on our plate today?

22         MR. DUFFY:  Your Honor, a couple things, if I may.

23         One is the trial schedule, the length of trial.  You

24    asked us -- you said you were going to hold the week of

25    December 11th.

1        THE COURT:  Yes.

2        MR. DUFFY:  I'm hoping you're still holding that.

3        THE COURT:  I am, I am, and for a couple reasons.  I'm

4   glad you're here today.

5        I do -- I'm a member of one of the Judicial Conference

6   Committees, and we have our biannual meeting in November, so I

7   have to miss a day -- let me just -- I put it down.  Let me

8   check so you know.

9        You're missing the day after Thanksgiving, too,

10  because the Court will be closed for that.  Let me give you

11  that date.

12       So I thought, oh, they might go into that week.  Hold

13  on.

14     (Pause in proceedings.)

15       THE COURT:  So you've got a few holes there.  It's

16  kind of a mess in November.

17       So you have Veterans Day, which the Court is closed.

18  That's the 10th of November.  It's a Friday.  I need to leave

19  Monday night.  We'll get a full trial day on the 13th, but

20  we'll be off on the 14th and the 15th for this committee

21  meeting that I have out of state.

22       Then you would have -- so you would have three days

23  that week, four days the week before, then you only have three

24  days the week of Thanksgiving, and then you finally get a full

25  five-day trial week the last week of November, and a five-day

1    trial week the 4th of December.

2          So I'll hold the 11th -- the week of the 11th as well.

3    Does that make sense?

4          MR. DUFFY:  Please, Judge.

5          THE COURT:  I don't know if that changes, with my two

6    days off, if that changes your mind if you need to -- I don't

7    have something the week of the 18th either right now.  I was

8    trying to stay away from the week of the 18th.

9          MR. DUFFY:  Understood, Judge.

10          THE COURT:  Okay?  All right.  Just so you all know,

11    those are -- and that will be helpful for you for scheduling

12    your witnesses as well.  Okay?  In case anybody is out of town.

13          MR. PUGH:  Previously you had said the 17th.  Is

14    that -- we're back on that day?  My notes reflect you said 17th

15    was an off day.

16          THE COURT:  We'll have to be on that day because of

17    that meeting that I didn't remember.  It's -- we only meet

18    twice a year, so we are expected to be there.  So I will see

19    you on the 17th, yes.

20          All right.  Anything from the rest of you?

21          MR. DUFFY:  Yes, your Honor.  Your Honor, your orders

22    have been very helpful because you understand the complexity of

23    the case and the probably more than 10,000 tapes that are

24    involved in this case.

25          THE COURT:  Right.

1          MR. DUFFY:  So the government -- you gave the

2     government a date to submit their transcripts to us, and they

3     did, and it was I think last week or so.

4          THE COURT:  Okay.

5          MR. DUFFY:  The volume -- they gave us about 137

6     transcripts --

7          THE COURT:  Okay.

8          MR. DUFFY:  -- which would be a lot of tapes to play,

9     and we have to go through those.

10          In our back and forth with the government, we asked

11     them to identify for us, of that universe of 137, how many do

12     they expect to play in the case-in-chief, because we have got

13     to go back and listen to all these tapes, as your Honor knows.

14     And some of these tapes, Judge, are long meetings, and the

15     government is offering let's say a 30-second snippet of a

16     meeting.  So this is very labor-intensive for the defense to go

17     back and play those recordings.

18          So the government is unwilling at this point, or maybe

19     they don't know, but the universe of tapes I think they're

20     going to offer at trial is much smaller than 137.  And I

21     appreciate, you know, their openness in saying, well, this is

22     the universe, but they even acknowledge they're not going to

23     offer all those in their case-in-chief.  And, obviously, we're

24     not going to hold them to an exact number; but in order to get

25     ready for trial, to the extent the government could give us a

1    better idea of what the number is for their case-in-chief and

2    identify them, it would make our workload much easier, Judge,

3    and make sure we get ready for this trial on the date certain.

4          THE COURT:  How are you going to do the transcripts?

5    Are you going to do old-fashioned binders?  Are you going to

6    have it streaming on a screen?

7          MS. RAJU:  We're going to do binders, your Honor.

8          THE COURT:  Okay.

9          MS. RAJU:  So if I may respond?

10         THE COURT:  Yes, go ahead.

11         MS. RAJU:  So several clarifications there.

12         So as Mr. Duffy correctly noted, we've gone from

13   thousands of recordings to the 138 transcripts that we have

14   given to the defense.  That's a significant reduction in the

15   number.

16         THE COURT:  I would say so.

17         MS. RAJU:  And they have asked us to commit to exactly

18   which recordings we intend to play in our case-in-chief.  We

19   let them know that we are continuing to make those decisions,

20   of course, and prepare for trial, but some of those decisions

21   will turn on your Honor's rulings as well as the defenses that

22   they intend to raise during their case and arguments that are

23   made during opening arguments.

24         So at this point, especially given the number --

25         THE COURT:  Opening statements.  We don't argue in --

1    opening statement.

2            MS. RAJU:  Opening statements, excuse me.

3            So some of those decisions are yet to be made.  And at

4    this point, we have offered to -- if they are willing to

5    identify which specific transcripts they object to, we have

6    offered to meet and confer with them.  We are told that they

7    are not interested in meeting and conferring.

8            We are still willing to do that if there is a change

9    of heart on the other side.

10           THE COURT:  So how many hours do you think there

11   are -- do you have a sense of how many hours the 136 are?

12           MS. RAJU:  I would not want to say how many hours

13   there are.  I can tell you comfortably that of the 138, the

14   lengthy meetings that Mr. Duffy referenced, those are the

15   minority, by far, of the recordings.  Most of the recordings

16   are phone calls, and many of them are under five minutes long.

17   And they've had these recordings for years.  I understand

18   they're going to have to re-review them, but it's not things

19   that they're receiving for the first time.

20           MR. GAIR:  That kind of misses the point, Judge.

21           We've had thousands of recordings for years.  Now we

22   know apparently the universe of what they are going to offer.

23           What we have to do is, even if it's a snippet in an

24   hour-long conversation, we have to listen to the whole thing.

25   We have no ability -- because they haven't provided us the

1    clips that they want to play, only the transcripts, we have to

2    listen to the whole tape, and we have to make important

3    decisions, including what else needs to be offered in that

4    conversation for context or completeness and so forth.  So it

5    is a massive task.  And I and a number of my colleagues have

6    been working on this very diligently.  And I can tell you,

7    Judge, that there are tapes in there that no responsible lawyer

8    should think are relevant to anything.

9           There are two clips that have to do with Mr. Burke and

10   his secretary talking about speaking with a *Chicago Tribune*

11   reporter.

12          It's just -- the government -- the whole point behind,

13   I thought, behind this Court's order was to make the government

14   focus on what they were really going to do so the defense could

15   focus.  And I don't think that's happened.

16          And trying to put the burden on us by saying, well,

17   you tell us which transcripts you don't think are relevant or

18   should be admitted, it misses the point.

19          We -- what we are being faced with is a massive task

20   of review and trying to make our own calls about what should

21   come in.

22          So I do think that Mr. Duffy's point is well taken.

23          MR. DUFFY:  If I may, Judge.  When we had this

24   discussion earlier about the tapes and we talked about these

25   possibilities happening, your Honor gave us a date in early

1    October to allow us the opportunity to comb through these

2    tapes, come back and tell you what our position is, what's

3    missing, what's -- et cetera.  That's going to be a tough task

4    if we have to do all 138 between now and that date.

5            THE COURT:  Boy, Ladies, "no responsible lawyer"

6    standing in front of me, huh?  Maligning the AUSAs here, huh?

7            MR. GAIR:  Well, I certainly -- I certainly -- I

8    certainly wasn't intending to malign anybody.  I said no

9    responsible lawyer should think that.

10           THE COURT:  First, I'd say they've culled out quite a

11   bit for you to get down to 138 from a thousand or whatever it

12   is.

13           I mean, one way to look at this would be as you're

14   preparing for trial and you actually get to a point with a

15   witness that you're pretty confident that you're going to be

16   playing a certain portion of an hour-long tape, you can send

17   over a note to them to do that while you're preparing.  I don't

18   feel it's appropriate to make them do that by a deadline.  And

19   I certainly would never hold them to it.  And I wouldn't let

20   you stand up and then say to me, "Well, Judge, they didn't tell

21   us they were going to play this portion."

22           MR. DUFFY:  We agree, Judge.  We agree with that.

23           THE COURT:  That's not appropriate.

24           MR. DUFFY:  No.

25           THE COURT:  So, I mean, as -- I'm thinking right now

1  in terms of just trial preparation, they're probably bringing

2  in witness after witness and preparing and going through the

3  tape recordings with those witnesses.  You know, maybe by the

4  end of the week, you can give them some sense of a group, you

5  know, just on a rolling basis.  But I wouldn't give them a

6  deadline to do that because I think it's too difficult.  It's

7  too -- they'd have to have everything tied up in a bow for you.

8  And you've had those tape recordings.  So I don't think that's

9  appropriate.

10          MR. DUFFY:  And I agree with your Honor.  And we're

11  not asking, you know, some kind of "I gotcha" later on because

12  you didn't identify this tape.

13          THE COURT:  Yes, I'd never hold you to that.

14          MR. DUFFY:  No, and that's fair.  And I don't have any

15  criticism of the government on anything they're doing here.

16  We -- each side appreciates the complexity of this.  We're just

17  trying -- and they must have a pretty good idea of those 138.

18  And, again, we're not going to hold them to it.  But if they

19  identify these 40 or 50 for sure will be paid -- excuse me,

20  played, then we can shift our resources to those 40 or 50, so

21  when we come back to you in October --

22          THE COURT:  Right.  And what I'm not doing today is

23  saying cull out the 40 or 50 that you're certain are going to

24  be played.  What I'm saying is while you're moving along, you

25  reach a Friday and you say, "We're for sure playing these five

1    based upon our review," and the next week you say, "We're for

2    sure playing these ten."

3              And I'm never going to hold you to what portion it is

4    because that's not fair.

5              MR. DUFFY:  Understood.

6              THE COURT:  So hopefully on a rolling basis you can do

7    that as you're doing your preparation.

8              And this is for the purposes of making sure that the

9    trial moves smoothly and that we don't have them stopping every

10   two seconds in the middle of the trial and delaying us because

11   they -- "Judge, we need more time to go over this," or

12   something, okay?

13             So if you can help with that, it would be very

14   beneficial to the --

15             MS. RAJU:  Yes, your Honor.  And just to offer two

16   small pieces of clarification, a number of these recordings are

17   the ones that are identified in the indictment, so I think

18   those --

19             THE COURT:  Well, that's helpful, too, so you know --

20             MS. RAJU:  Yes.

21             And one additional clarification.

22             When there are lengthy meetings, we have identified

23   the specific clips we intend to play.  Those are in the

24   transcripts, and the defense has them, so it's not --

25             THE COURT:  Oh.

1          MS. RAJU:  -- a matter of look at the whole thing and

2     figure it out --

3          THE COURT:  So the big, long, hour-long meeting, you

4     know where the section is?

5          MR. DUFFY:  We do.  That is -- excuse me.

6          Your Honor, we do.  The problem is these topics get

7     discussed several times in an hour-long meeting.  We now have

8     to go back and play the hour-long tape to pick up additional --

9     that's our responsibility.  I understand.  No, I understand.

10         THE COURT:  I do think so.  I do think so.

11         MR. DUFFY:  I agree.  And I'm just sharing with your

12    Honor the task --

13         MR. GAIR:  But we are -- we are dependent on the

14    government, Judge.  We're going to need to then go -- decide

15    what more needs to be played of the hour-long tape for

16    completeness and context and so forth.

17         THE COURT:  Sounds like what a defense attorney should

18    be doing.

19         MR. GAIR:  Absolutely.  But -- but we don't have

20    the -- for instance, our tapes don't have times on them, the

21    versions they gave us, so we're going to have to be dependent

22    on the government, I think --

23         THE COURT:  Doesn't -- when you play a tape, doesn't

24    it automatically have some kind of timing mechanism on the

25    bottom?  No?

 1              MR. GAIR:  Not that would coordinate with the

 2     transcripts.

 3              THE COURT:  Okay.  I think I've given you some help.

 4              MR. GAIR:  Okay.

 5              THE COURT:  And I think that they are willing to work

 6     with that process.

 7              And I think as human beings, you're not going to be

 8     able to cull through everything yourself.  So if you've got a

 9     rolling basis of information coming in --

10              MR. DUFFY:  That would be helpful, your Honor.

11              THE COURT:  -- you can work with that.  And that will

12     make the trial go more efficiently.  And that doesn't put a

13     deadline on you to have it all complete, and it doesn't put you

14     getting everything at once as well.  I think it should work.

15     Okay?

16              Are you popping up to come say something?  No?

17              MR. PUGH:  I was just standing next to Pat.

18          (Laughter.)

19              THE COURT:  He makes you look good?

20              MR. PUGH:  It's hard to look good next to Diamantatos

21     so ...

22          (Laughter.)

23              THE COURT:  All right.  What else, Mr. Duffy?

24              MR. DUFFY:  We -- so two things, Judge.

25              One is I think with so many emails going back and

1       forth on the October -- next status with your Honor --

2               THE COURT:  Okay.

3               MR. DUFFY:  -- so now that we have everybody gathered,

4       I thought maybe we could come up with a date.

5               THE COURT:  Sure.  As far as when we're meeting?

6               MR. DUFFY:  In October for our next status.

7               MR. GAIR:  October is the final pretrial --

8               MR. DUFFY:  I'm sorry.  I apologize, Judge.  The final

9       pretrial.

10              THE COURT:  So I have written down October 20.  Is

11      that not accurate?

12              MR. PUGH:  We had sent some emails around.  That was a

13      conflict day --

14              THE COURT:  Oh, okay.

15              MR. PUGH:  -- for us and Mr. Diamantatos.  We're

16      now --

17              THE COURT:  Oh, that's right.  I remember that now.

18              MR. PUGH:  The 16th seems to work, if it works for

19      Team Burke.

20              MR. GAIR:  Yeah, we can make it --

21              MR. DUFFY:  We'll make it work.

22              THE COURT:  The 16th of October?

23              MR. DIAMANTATOS:  It's the Monday of that week, your

24      Honor.  I apologize for my travel schedule and Ms. Braden's as

25      well.

1          THE COURT:  No, that -- I will be around, so that

2    works.

3          We'll have to change that sentencing.  If we could

4    move that, that would be helpful.

5          THE CLERK:  Okay.

6          THE COURT:  Okay?

7          THE CLERK:  Okay, uh-hum.

8          THE COURT:  And the other thing we're going to have to

9    change is the MDL, Economics Day, probably, which is in

10   December, on December 8th --

11         THE CLERK:  Okay.

12         THE COURT:  -- for that antitrust MDL.

13         THE CLERK:  Oh, uh-hum.

14         THE COURT:  Yes.

15         Talk about herding cats.  They've got a lot more

16   lawyers than you on that one.

17         MR. DUFFY:  Not even close.

18         THE COURT:  I'm telling you.

19         MR. GAIR:  Judge, I'm a dog person.  I resent the

20   reference to herding cats.

21         THE COURT:  Well, I have a dog right here if you'd

22   like to see the court dog.

23      (Laughter.)

24         THE COURT:  She has been doing her work, calming

25   jurors and people in the courthouse, for a number of years,

1    which is -- really, she's adopted by our courthouse, first

2    through Judge Castillo and then Rebecca Pallmeyer.  And they

3    visit jurors, and they visit -- I have two of them, but one is

4    at the vet today.  And they calm everyone down.

5         But your office, unfortunately, just got new guidance

6    from the Executive Office about therapy dogs for victims.  And

7    they have, like, a whole set of criterion that I have to review

8    now, because Junebug, the big one, has been working with

9    victims for seven and a half years in the courthouse.  The

10   victim witness coordinator calls them in and then they sit, but

11   now there's, like, some requirements, so I've got to review it

12   and see.  I have been a little busy and not looking at that.

13   But we had to cancel her for this week for a victim, which is a

14   shame because, clearly, she does a good job if she's brought in

15   all the time.

16        So your jury will have the benefit of calm court dogs.

17        And the lawyers usually need them, too.

18   (Laughter.)

19        MR. DUFFY:  I'm sure we will, Judge.

20        THE COURT:  Okay.  Anything else today?

21        MR. DUFFY:  Judge, one other housekeeping matter.

22        THE COURT:  Okay.

23        MR. DUFFY:  Just we -- when the parties submitted to

24   your Honor a proposed schedule here, we had the date of October

25   6th as a deadline for submitting *voir dire* questions and to

1    supplement any kind of questionnaire.  I don't think it made it

2    into a minute order.  If it did, I apologize.

3              THE COURT:  Okay.  We can put that on the docket if it

4    didn't get into the minute order.

5              And that will be discussed at the final pretrial

6    conference as well.  So -- we can at least get your proposals.

7              And, remember, for *voir dire*, for my court, I ask the

8    main questions, but then you have the absolute ability to ask

9    questions yourselves.  So be ready to be lawyers and not let

10   the judge just, you know, do everything.

11             You have the sidebar system.  So what happens is that

12   the prospective juror will sit there and then answer my

13   questions in open court, and then you put these on if you want

14   to ask your own questions, follow up, rehabilitate, cross,

15   whatever you want to do.  So as far as those *voir dire*

16   questions, the ones that I say will be more neutral, but you'll

17   have the ability to be lawyers and work on your jury.  Okay?

18             All right.  What else?  Anything?

19             MR. DUFFY:  That's it.

20             THE COURT:  How about from the prosecution?

21             MS. RAJU:  Two additional requests, your Honor.

22             First, the government, on September 6, pursuant to the

23   Court's deadline, notified the defense that we do not intend to

24   call Mr. Solis, with the exception of two scenarios, the first

25   being that the Court determines that his testimony is necessary

1    to admit the recordings that he made, and the second being that

2    the defense raises an entrapment argument.

3           As to the first one, as you may already know, on

4    September 7, the government filed a motion to admit those

5    recordings.  I understand the Court has been very busy with the

6    criminal trial, but, from our perspective, that is

7    uncontroversial given the state of the law in this district.

8           And with regard specifically to the entrapment

9    defense, we have inquired whether that is something that the

10   defense intends to do.  We have not received a response.  As

11   you can imagine, if there is an entrapment defense --

12          THE COURT:  There's an obligation to disclose it in a

13   timely fashion, so if there's going to be an entrapment

14   defense, I need to know.

15          MR. DUFFY:  Understood.  I don't believe it's in the

16   rules, but I understand, your Honor.  And quite frankly --

17          THE COURT:  Isn't it in the new revised criminal rule?

18          MR. DUFFY:  I'll have to check, Judge.  But we're --

19   just so your Honor knows, there won't be any surprises.  I

20   don't know that there's going to be any entrapment defense.

21   But as by our motion before you today, we're still trying to

22   get the discovery to find out what happened here on these

23   various what they call ruses and scenarios.

24          THE COURT:  I see the link.  Okay.  All right.

25          MR. DUFFY:  Yeah.

1          THE COURT:  Did you respond to their motion to admit

2     the tapes?

3          MR. GAIR:  We will, by September 29th, with our

4     motion *in limine* deadline.

5          THE COURT:  You'll file a response to --

6          MR. GAIR:  Yes, your Honor.

7          THE COURT:  -- their motion?  All right.

8          It would probably be better to get that one in the

9     queue earlier.

10          MR. GAIR:  We'll do it then, Judge.

11          THE COURT:  Then I can look at the tape recording

12     issue, okay?

13          MR. GAIR:  Yes.  We will respond earlier.

14          THE COURT:  What else from anyone over here?

15          MR. BLEGEN:  Judge, for Mr. Andrews, we filed a

16     response to the government's *Santiago* proffer.  I think there's

17     a reply date scheduled for that.

18          THE COURT:  Yes, there is.

19          MR. BLEGEN:  We also filed a renewed motion for

20     severance.

21          Back before you were in the case, there was a lot of

22     litigation about severance in front of Judge Dow.  Not to

23     belabor the point, but essentially what he said was, well, the

24     motions are denied but without prejudice because I don't know

25     some things.  One, I don't know whether, as we had been saying

1    in our motions, all of the other evidence in the case will

2    be -- some of it might be admissible against Mr. Andrews.  We

3    now know, based on the *Santiago* proffer, that it's not.  The

4    only thing that would go against Mr. Andrews is the discrete

5    Restaurant 1, I think, whatever the unnamed restaurant issue.

6    There's the other aspects of the case.  All three of the other

7    alleged incidents are not admissible against Mr. Andrews.  We

8    know that now because of the *Santiago* proffer.

9              THE COURT:  Got it.

10             MR. BLEGEN:  Judge Dow also wanted to know, well, you

11   know, this might be too soon to decide, there might be 404(b)

12   evidence that is admissible against Mr. Andrews.  We now know

13   from the 404(b) notice that there is not.  They did not seek to

14   introduce any 404(b) evidence against Mr. Andrews or any of the

15   other incidents they did not allege as 404(b) as to

16   Mr. Andrews.  So we now know for certain, which Judge Dow did

17   not know at the time --

18             THE COURT:  Right.

19             MR. BLEGEN:  -- that the only evidence that's

20   admissible against Mr. Andrews is related to that restaurant

21   issue.

22             Further complicating matters is the transcripts that

23   we've been talking about or Mr. Duffy and Gair have been

24   talking about with the government, the vast majority of

25   those -- so we all know the ones that they -- we knew that they

1    were going to intend to admit on the actual charged subjects

2    of --

3                THE COURT:  Sure.

4                MR. BLEGEN:  -- the indictment, but what we didn't

5    know was what other things are they thinking of doing.

6                There is a giant swath of stuff that has nothing to do

7    with Mr. Andrews whatsoever.  But if they're seeking to admit

8    it, it should go into the prejudice analysis for severance.

9                Essentially what we're going to have here is,

10   potentially, at the moment, if their 404(b) motion is granted,

11   is we'll have six areas of alleged unlawful conduct out of

12   seven, only one of which, the seventh one, has anything to do

13   with Mr. Andrews at all.  And if these other tapes are

14   admitted, which I don't -- I do not know what the basis for

15   admissibility are -- I'm not saying that's a criticism, I can't

16   figure it out -- but I know they're not admissible against

17   Mr. Andrews because they have nothing to do with Restaurant 1.

18   If those come in, then we have maybe even more than seven areas

19   of alleged, I guess, criminal activity completely unrelated to

20   Mr. Andrews, and that amount still to be determined by what the

21   government wants to put in and your rulings.

22               THE COURT:  Now, if I heard you correctly, you put

23   this in your response to the *Santiago* proffer, or you renewed

24   your motion for severance --

25               MR. BLEGEN:  Renewed motion -- separate renewed motion

1    for severance.

2            THE COURT:  Okay.  And then do you have a response on

3    file yet for that?

4            MS. RAJU:  No, Judge.  We would like a response date.

5            THE COURT:  You definitely need that, so let's say two

6    weeks for that?  Or -- okay.  Because I'm giving you one week

7    for the other one.  So two weeks for the severance.  And then

8    one week for reply.

9            So can you give me those dates, Lynn?

10           THE CLERK:  Of course, your Honor.

11           That's October 4 for the response.

12           Reply is due October 11.

13           THE COURT:  When am I seeing you for the final

14   pretrial conference?

15           MR. PUGH:  16th.

16           THE COURT:  Okay.  So you'll be able to address that.

17   I'll be all briefed up on that then.

18           Okay.  So that's very interesting because I haven't

19   looked at that more recently, and I will do so now.

20           MR. BLEGEN:  Understood.

21           THE COURT:  Mr. Diamantatos?

22           MR. DIAMANTATOS:  Yes.  Thank you, your Honor.

23           On behalf of Mr. Cui, we are in a similar boat, which

24   Mr. Blegen described for your Honor.  We do plan on filing --

25   we have I think two brief motions *in limine* that are going to

1    be filed by the deadline next Friday.  We also plan on filing a

2    renewed motion for severance.  And I'm hoping we can actually

3    get that on file this week for your Honor to be able to kind of

4    take them in tandem.

5              THE COURT:  I think that would be really helpful to

6    me.  So can you get it by Friday, do you think?

7              MR. DIAMANTATOS:  Yes.

8              THE COURT:  If you can get it by Friday, then you will

9    have both of them, and you can do a joint response, just

10   addressing them, though, individually.

11             MS. RAJU:  Understood.

12             MR. DIAMANTATOS:  For purposes of the record, we're in

13   the same camp as -- the majority of the government's

14   case-in-chief doesn't affect Mr. Cui in the ways that

15   Mr. Blegen described, maybe a little different in terms of

16   which narrative applies to which defendant.  And in the same

17   vein of Mr. -- Judge Dow's ruling as related to our motion to

18   dismiss and motion for severance, given the new information --

19             THE COURT:  Do you have the same concerns about the

20   admissibility of the tapes as to your client?

21             MR. DIAMANTATOS:  We do.  Our review of the *Santiago*

22   proffer appears that the government is not intending to seek

23   introduction of any --

24             COURT REPORTER:  I'm sorry, of any?

25             MR. DIAMANTATOS:  I'm sorry, co-conspirator statements

1    as they relate to our client, Mr. Cui.

2            Similarly, the 404(b) motion focuses on prior --

3    alleged prior bad acts of Defendant Burke, not Mr. Cui.  So we

4    have the same concerns of the issue that that creates, the

5    spillover effect.  And if the government is not introducing any

6    co-conspirator statements that would be attributable to

7    Mr. Cui, in a four-week trial where, arguably, three or four

8    days of that trial, that narrative only applies to our client

9    and the rest of the trial does not, we have heightened concerns

10   now, after review of the *Santiago* proffer and the 404(b)

11   motion, aside from the issues that we raised with His Honor,

12   Judge Dow, when we filed our motions to dismiss the

13   indictment --

14           THE COURT:  Some defense attorneys don't mind that

15   situation.

16       (Laughter.)

17           MR. DIAMANTATOS:  Sure.  It's a balance, your Honor --

18           THE COURT:  I understand.  I'm joking with you for

19   that --

20           MR. DIAMANTATOS:  We did want to raise it with your

21   Honor.

22           THE COURT:  Okay.

23           MR. DIAMANTATOS:  And, finally, one last point.

24           I know the government mentioned the meet-and-confer.

25   From our camp, Mr. Cui's camp, we're more than happy to let the

1    government know, we're happy to meet and confer on any issue.

2              The tape issue, again, for the reasons we've just been

3    discussing, don't really affect our client much --

4              THE COURT:  Right.

5              MR. DIAMANTATOS:  -- and we don't have a battle there,

6    candidly.

7              THE COURT:  Okay.  All right.

8              Defense?  Anybody else need anything to say?

9              Okay.  Why is it that the female attorneys are the

10   ones behind you writing down everything?

11             MR. DUFFY:  I don't know.

12             THE COURT:  Is that the brain power?

13        (Laughter.)

14             MR. DUFFY:  There's no question about that, Judge.

15             THE COURT:  That's right.

16             Anything from the prosecution?

17             MS. RAJU:  One additional issue, your Honor.

18             As you might remember from a couple of status hearings

19   ago, the defense made a very forceful argument that they needed

20   to know about the government's intent to call Mr. Solis as a

21   witness.  We've obviously met that deadline.

22             In the discovery motion, they have flagged that they

23   may call him in their own case.

24             We obviously would appreciate a similar opportunity to

25   prepare.  There are likely going to be additional motions *in*

1  *limine* that we would need to file if he is a witness to be

2  called by the defense.

3        Currently, October 30th is the deadline that's set for

4  the defense's witness list, but we would ask for an earlier

5  deadline in October for them to disclose to the government

6  whether they intend to call him as a witness.

7        THE COURT:  Well, let's bring it at the final pretrial

8  conference, if you are able, okay?

9        MR. DUFFY:  We'll take it up then, Judge.

10        THE COURT:  All right.  That's the 16th.

11        Anything else?

12        MR. DIAMANTATOS:  And thanks to the Court for

13  accommodating the 16th.  I really appreciate --

14        THE COURT:  Oh, it's not a problem.

15        Here, I'll let you meet the court dog.  Then while you

16  are -- before you leave.

17     (Laughter.)

18     (Off-the-record discussion.)

19        THE COURT:  Is there anything else that anyone needs

20  to raise on the case?

21        MS. RAJU:  Apologies, your Honor.  Just one more

22  thing.

23        Back to that last issue that we were discussing --

24        THE COURT:  Yes.

25        MS. RAJU:  -- about the defense's intent to call

1    Mr. Solis, we would respectfully ask for an earlier date.

2         THE COURT:  Earlier than the 16th?

3         MS. RAJU:  Specifically, the 9th, if that's acceptable

4    to the Court, to allow for the additional motions *in limine*

5    briefing that would come out of that decision.

6         MR. DUFFY:  Judge, we'll do the best we can.  We're

7    still waiting for discovery.  And how can -- I don't know how

8    we're going to be able to make this decision before we even

9    start trial.  Government's case-in-chief is going to go, what,

10   four weeks at least, probably longer now with these tapes.

11        I don't know that we're going to call Mr. Solis.  If

12   we do, I represent to your Honor and the government, we'll give

13   them sufficient notice.

14        This is their cooperator.  They've had him, I don't

15   know, since 2016.

16        Why do we have to have a deadline, which we don't even

17   know that we can meet, Judge.

18        THE COURT:  Yes.

19        MR. DUFFY:  I --

20        THE COURT:  I don't know if you would know when you

21   were going to call him unless you had it -- I'm going to keep

22   it at the 16th as a discussion regarding it, because I don't

23   think that the defense has to be put to that same burden, but

24   let's just talk about it on the 16th.

25        MR. DUFFY:  That would be fine, Judge.

```
1              THE COURT:  Okay?  And we'll figure out whether you
2    have some inclination or not based upon what you have.
3              MR. DUFFY:  Right.
4              THE COURT:  All right.
5              MR. DUFFY:  And, hopefully, we'll have some more
6    discovery on the topic as well.
7              THE COURT:  Right, okay.  Well, we'll see.  We'll see
8    what I get.
9              All right.  I will turn all my attention -- this trial
10   is wrapping up, the one that I'm on, and then we'll be able to
11   focus 100 percent, although I've got a couple other little
12   trials, but not as demanding.  Okay?
13             All right.  Thank you, everyone.  Have a good day.
14             MULTIPLE SPEAKERS:  Thank you, your Honor.
15             THE COURT:  Just a reminder to me, did we exclude time
16   until the trial?
17             MS. STREICKER:  We did.
18             THE COURT:  Okay.  Just making sure.  Thank you.
19             Have a good day, folks.
20        (Concluded at 10:10 a.m.)
21
22
23
24
25
```

1                        C E R T I F I C A T E

2         I certify that the foregoing is a correct transcript of the

3    record of proceedings in the above-entitled matter.

4

5    */s/ GAYLE A. McGUIGAN*                          *September 22, 2023*
     GAYLE A. McGUIGAN, CSR, RMR, CRR
6    Official Court Reporter

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25