IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| v. | ) 19 CR 322 |
| | ) |
| EDWARD M. BURKE, PETER J. ANDREWS and CHARLES CUI, | ) Judge Virginia M. Kendall |
| | ) |
| Defendants. | ) |

**MEMORANDUM OPINION AND ORDER**

For the reasons below and those stated in open court on October 16 and 18, 2023, the Court rules on Defendant Edward Burke's Second Consolidated Motions *in Limine* [247] as follows.[1]

**A.      Motion *in Limine* A**

First, in Burke's motion A, he objects to the admission of certain of Daniel Solis's recorded statements as hearsay. (Dkt. 247 at 7–10). The general objection is overruled. "[S]tatements providing context for other admissible statements are not hearsay because they are not offered for their truth." *United States v. Jackson*, 940 F.3d 347, 352 (7th Cir. 2019) (quoting *United States v. Foster*, 701 F.3d 1142, 1150 (7th Cir. 2012)); *see also United States v. Wright*, 722 F.3d 1064, 1067 (7th Cir. 2013) (observing that "statements are admissible when they make a defendant's recorded statements intelligible for the jury or when brief and essential to bridge gaps in the trial testimony that might significantly confuse or mislead jurors" (quoting *United States v. Walker*, 673 F.3d 649, 657–58 (7th Cir. 2012))) (cleaned up). The "exception is not limited to conversations between two parties so long as the out-of-court statements provide context." *United States v. Norton*, 893 F.3d 464, 467 (7th Cir. 2018).

---

[1] The Court assumes familiarity with the facts and posture of this case. (*See* Dkts. 196, 287, 301).

1

For instance, recorded conversations between defendants and informants are admissible if the "informant's statements provide context for the defendant's own admissions." *Jackson*, 940 F.3d at 352 (quoting *Foster*, 701 F.3d at 1150). Indeed, statements of non-conspirators are admissible "'to give *context* to the coconspirators' ends of the conversations,' even when being introduced against a conspirator not included in the conversation." *United States v. Quiroz*, 874 F.3d 562, 570 (7th Cir. 2017) (quoting *United States v. Zizzo*, 120 F.3d 1338, 1348 (7th Cir. 1997)). "[C]oncrete and understandable" limiting instructions will help ensure that the jury uses context statements properly. *See Wright*, 722 F.3d at 1068; *Norton*, 893 F.3d at 467–68 (citing *Zizzo*, 120 F.3d at 1348). Of course, "context" has limits: the exception does not permit parties to sneak in statements for their truth. *Wright*, 722 F.3d at 1067 (citing *United States v. Nettles*, 476 F.3d 508, 517 (7th Cir. 2007)); *see also* (Dkt. 302). As the Court continues its careful review of objections to the recording transcripts, some statements offered for "context" may not make the cut.

**B.**     **Motion *in Limine* B**

Second, Burke's motion B seeks to exclude consensually recorded conversations between Solis and Harry Skydell. (*Id.* at 10–11). The Government indicates that it will only seek to introduce the recordings if they become relevant for a non-hearsay purpose—for instance, if Burke raises a defense based on Skydell's statements in government interviews which are purportedly exculpatory of Burke. (Dkt. 286 at 12–14). Thus, the Court reserves ruling on these recordings' admissibility. The parties will not mention the Solis–Skydell recordings in opening statements. Should a party intend to introduce evidence of or relating to the Solis–Skydell recordings, they will seek permission from the Court in advance.

2

C. **Motion *in Limine* C**

Third, Burke's motion C for a limiting instruction if Solis recordings are admitted is granted in part. (Dkt. 247 at 11–12). The Court will give the Government's proposed instruction:

> You have heard recordings that included statements made by Daniel Solis during his cooperation with the government. The statements Solis made in these recordings may not be considered as evidence that what he said is actually true. You can consider Solis's statements in these recordings only to place in context and help you understand the conversations and the statements made by others in these recordings.

(Dkt. 286 at 14–16). Defense counsel will remind the Court to repeat the instruction when appropriate.

D. **Motion *in Limine* D**

Fourth, Burke's motion D, to exclude evidence or argument on the unethical nature of fee-splitting is denied. (Dkt. 247 at 12–14). At issue are tape-recorded conversations between Burke and Solis about a possible marketing arrangement if Solis brought clients to Burke's law firm. (*Id.* at 12). Despite Burke's objections, the evidence is not offered for an off-limits propensity inference. *See* Fed. R. Evid. 404(b)(2); *United States v. Ferrell*, 816 F.3d 433, 444 (7th Cir. 2015) (evidence relevant to "another purpose" through "some propensity-free chain of reasoning" is admissible, subject to Rule 403 balancing (quoting *United States v. Gomez*, 763 F.3d 845, 856 (7th Cir. 2014) (en banc)). Rather, it is probative of Burke's knowledge and state of mind—going to the Government's theory that Burke's intent to create a sham marketing arrangement with Solis reflects his awareness of wrongful conduct. Since Burke is a lawyer, presumably aware of his ethical obligations, evidence of unethical conduct has particular relevance. Nor is the probative value of the evidence substantially outweighed by the dangers of unfair prejudice or confusing the jury. *See* Fed. R. Evid. 403. To the extent there is some risk of prejudice or confusion, a limiting instruction will help ensure the jury understands the proper use of the evidence. The parties are

directed to propose a limiting instruction to accompany the admission of the marketing-arrangement conversation.

### E. Motion *in Limine* E

Fifth, Burke's motion E, to exclude evidence argument about alleged misuse of City resources and personnel, is denied without prejudice. (Dkt. 247 at 14–15). Evidence that Burke misused City resources or personnel is direct evidence of action without the consent of Burke's employer—an element the Government must prove as to several of the charges, including the predicate offense of commercial bribe receiving. *See, e.g.*, 720 ILCS 5/29A-2. Burke may re-raise this objection in response to specific evidence offered at trial if appropriate.

### F. Motion *in Limine* F

Sixth, in Burke's motion F, joined by Andrews, he seeks to exclude 23 emails as hearsay, not admissible under the business-records exception. (Dkt. 247 at 15–28; Dkt. 248 at 2). This motion is taken under advisement.

### G. Motion *in Limine* G

Seventh, Burke's motion G seeks to exclude all references to the Chicago Ethics Ordinance, particularly (1) the duty to report provision, Chi. Mun. Code § 2-156-018; (2) the duty not to participate provision, *id.* § 2-156-030(a); and (3) the duty not to contact or participate in discussion provision, *id.* § 2-156-030(b). (Dkt. 247 at 28–34). At the outset, the Court agrees with Judge Dow that Burke's compliance with these latter two provisions, §§ 2-156-030(a) and (b), speaks to whether Burke's efforts to solicit business for his law firm were "not authorized by law"—relevant to predicate racketeering acts under state law. (Dkt. 196 at 185–86 (denying request to strike the Indictment's references to the ethics ordinance)); *see* 720 ILCS 5/33-1(d), 5/33-3(a)(4). That reasoning extends to the duty to report provision, § 2-156-018. These

4

provisions' relevance is not substantially outweighed by the risk of prejudice or juror confusion, especially with the aid of appropriate limiting instructions. *See* Fed. R. Evid. 403.

Focusing on Burke's Fifth Amendment challenge to the duty to report provision, § 2-156-018, he argues that mention of the ordinance at trial would offend his right against self-incrimination by inviting the jury to convict him due to a failure to self-report. (Dkt. 247 at 30; Dkt. 290). The duty to report provision states:

> Every city employee or official shall report, directly and without undue delay, to the inspector general any and all information concerning conduct which such employee or official knows or should reasonably know to involve corrupt or other unlawful activity (i) by another city employee or official which concerns such employee's or official's employment or office; or (ii) by any person dealing with the city which concerns the person's dealings with the city. Any employee or official who knowingly fails to report a corrupt or unlawful activity as required in this section shall be subject to employment sanctions, including discharge, in accordance with procedures under which the employee may otherwise be disciplined.

Chi. Mun. Code § 2-156-018(a).

In considering a statutory obligation to disclose potentially self-incriminating information, the Fifth Amendment requires "balancing the public need on the one hand, and the individual claim to constitutional protections on the other." *California v. Byers*, 402 U.S. 424, 427 (1971) (plurality opinion). Both interests are weighty. *Id.* In determining whether the duty to report ordinance here gives rise to "substantial hazards of self-incrimination," factors of particular importance are the extent to which it (1) targets a "highly selective group inherently suspect of criminal activities," rather than the general public; and (2) delves into "an area permeated with criminal statutes," rather than an "essentially noncriminal and regulatory area." *Id.* at 428–30 (quoting *Albertson v. Subversive Activities Control Bd.*, 382 U.S. 70, 79 (1965), and *Marchetti v. United States*, 390 U.S. 39, 48 (1968)); *see also United States v. Turner*, 480 F.2d 272, 277 (7th Cir. 1973)

("[C]onsideration must be made of both the nature of disclosure required and the regulatory purpose for which it is required.").

Despite Chicago's long history of battling public corruption, City employees are not "inherently suspect of criminal activities." *See Byers*, 402 U.S. at 430–31 (drivers are not "inherently suspect"); *Baltimore City Dep't of Soc. Servs. v. Bouknight*, 493 U.S. 549, 560–61 (1990) (parents are not "inherently suspect"); *see also United States v. Sullivan*, 274 U.S. 259 (1927) (taxpayers). *But cf. Albertson*, 382 U.S. 70 (members of the Communist Party); *Marchetti*, 390 U.S. 39 (gamblers); *Grosso v. United States*, 390 U.S. 62 (1968) (gamblers); *Haynes v. United States*, 390 U.S. 85 (1968) (firearm owners). At least, this Court is not so pessimistic. Nor has Burke offered any evidence that violations of the duty to report provision often result in criminal liability. *See Byers*, 402 U.S. at 431. Quite the opposite of "inherently suspect," City employees—and public officials in particular—voluntarily assume a delicate position of trust. By choosing to become an alderman, Burke accepted the accompanying ethical obligations to his constituents. *Cf. In re Wiest*, 719 F. App'x 485, 491 (6th Cir. 2017) ("[T]he Fifth Amendment's protections do not relieve an attorney of his ethical duty to communicate with his client."). If anything, Chicago's struggles with public corruption underline the City's strong noncriminal interest in promoting integrity among its officials and employees by requiring them to report corrupt and unlawful conduct.

In that vein, the duty to report provision, by its terms, does not threaten criminal prosecution but disciplinary action—enforceable through civil proceedings. *See* Chi. Mun. Code § 2-156-018(a) (punishing knowing failures to report with "employment sanctions, including discharge"); *see also id.* §§ 2-156-385, 392, 465 (describing procedure and penalties). To Burke's point that § 2-156-018 may overlap with a criminal statute punishing public officials for failing to

6

report offered bribes, 720 ILCS 5/33-2, the former reaches much further than the latter. In contrast to § 5/33-2, the duty to report provision requires reporting of any "corrupt or other unlawful activity"—sweeping in even minor infractions. Mere overlap with criminal statutes does not mean that the reporting requirement's purpose is limited to prosecuting criminal activity. *See Byers*, 402 U.S. at 431; *see also Turner*, 480 F.2d at 277. The duty to report provision serves a far broader regulatory purpose: expecting public officials to hold each other, and themselves, to a high ethical standard. *See* Chi. Mun. Code § 2-156-005 (describing the ethics ordinance's goals, including to remind City officials and employees to "place loyalty to the federal and Illinois constitution, laws, and ethical principles above their private gain or interest" and "put forth honest effort in the performance of their duties"); *see also Bouknight*, 493 U.S. at 556 ("[T]he Fifth Amendment privilege may not be invoked to resist compliance with a regulatory regime constructed to effect the State's public purposes unrelated to the enforcement of its criminal laws.").

Of course, some risk inheres in disclosing corrupt or unlawful activity. *See Byers*, 402 U.S. at 431. Yet, the duty to report provision promotes an important, noncriminal purpose, and it focuses on a group that is not "inherently suspect." Burke has not shown that the provision's disclosure requirements create "substantial hazards of self-incrimination." *See id.* at 430. Accordingly, evidence of Burke's noncompliance with the duty to report provision will not violate Burke's right against self-incrimination. Burke's motion to exclude references to the ethics ordinance is denied.

**H.     Motion *in Limine* H**

Eighth, Burke's motion H, adopted by Andrews, objects to the admission of testimony that individuals were afraid of, intimidated by, or felt pressured by Burke or Andrews. (Dkt. 247 at 34–38; Dkt. 248 at 2). Acknowledging that victims' perceptions of a defendant's power are relevant to the extortion charges, Burke contends that, as to corporate victims, such statements are only

7

relevant from the lips of a decisionmaker—not an employee. (Dkt. 247 at 36). Burke argues further that testimony about Burke's perceived influence has no bearing on the bribery-related counts. (*Id.*) Both arguments are unconvincing.

First, the Hobbs Act prohibits extortion, defined as "the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right." 18 U.S.C. § 1951(b)(2). The measure of victimhood is a reasonable fear to person or property: "It is not necessary that this fear be a consequence of a direct threat." *United States v. DeMet*, 486 F.2d 816, 819–20 (7th Cir. 1973) (collecting cases); *cf. United States v. Balistrieri*, 778 F.2d 1226, 1232 (7th Cir. 1985) ("[T]he evidence clearly supports the conclusion that [the defendant] sought to induce [the victim] to surrender a financial interest in and control over Best Vending Company, and that he did so by attempting to generate and exploit [the victim's] fear of injury to his person and property."). It follows that a corporate victim's employee can also be a victim where, for example, the defendant threatens the employee's financial interest in the corporation. *See United States v. Agnes*, 753 F.2d 293, 302 (3d Cir. 1985) ("Because having a financial interest in a business is sufficient for one to be a victim of Hobbs Act extortion, the trial court did not err in suggesting that any of the employees of Crescent (who obviously had a financial interest in the continuing operation of the business) could be deemed victims of the alleged extortion."). So long as the Government lays sufficient foundation, testimony by Tri City Foods and Field Museum employees about their perceptions of Burke's and Andrews's power may be relevant if the employees are themselves victims, or to show the reasonableness of a corporate victim's fear.

Second, Burke's influence or clout is relevant to the bribery-related offenses. Focusing on the federal-funds bribery statute, it prohibits corruptly soliciting, demanding, accepting, or

8

agreeing to accept a bribe or gratuity "intending to be *influenced* or rewarded in connection any business, transaction, or series of transactions of such organization, government, or agency involving any thing of value of $5,000 or more." 18 U.S.C. § 666(a)(1)(B) (emphasis added). Evidence of Burke's own and witnesses' perceptions of his power, or clout, is relevant to Burke's charged conduct—in particular, leveraging that clout to obtain business for his law firm. *See, e.g.*, *United States v. Gee*, 432 F.3d 713, 715 (7th Cir. 2005) ("One does not need to live in Chicago to know that a job description is not a complete measure of clout. The evidence permitted a reasonable jury to find that [a state official] had plenty of clout and used it to [the bribe-giver's] benefit, for which he was well paid."). Plus, testimony about Burke's power and influence may have further relevance in showing that Burke used his official position to pressure other officials into taking official action in exchange for personal gain. *McDonnell v. United States*, 579 U.S. 550, 572–73 (2016).

The Government does not offer the challenged testimony to demonstrate Burke's propensity to intimidate; as explained, it is relevant for other purposes. *See* Fed. R. Evid. 404(b)(2); *Ferrell*, 816 F.3d at 444. To that end, limiting instructions will be available at Defendants' request to cure any potential for prejudice. In the context of specific testimony during trial, the Court will entertain specific objections under Rule 403. For now, Burke's objections, joined by Andrews, are overruled.

I. **Motion *in Limine* I**

Ninth, in his motion I, Burke moves to exclude his comments regarding ethnic affiliations as overly prejudicial. (Dkt. 247 at 38). In several recorded conversations, Burke made remarks such as: "Jews are Jews. And they'll deal with Jews to the exclusion of everybody else unless . . . unless there's a reason for them to use a Christian." (Dkt. 286 at 53). In the context of a motion to

strike allegations based on Burke's comments about Jewish people from the indictment, Judge Dow previously found the comments to be highly probative of Burke's intent to overcome Company A's perceived preference for Jewish lawyers by leveraging official action—outweighing his "risk of embarrassment." (Dkt. 196 at 185). Seeking a rebalancing, Burke urged at oral argument that current events—particularly the October 7, 2023 attack on Israel, sparking the Israel–Hamas war—have altered the Rule 403 calculus by creating a heightened sense of sympathy toward Jewish people, making Burke's comments much more prejudicial. But that sympathy is not universal; in fact, there is evidence of a rise in antisemitic incidents following Hamas's attack. *See ADL Records Dramatic Increase in U.S. Antisemitic Incidents Following Oct. 7 Hamas Massacre*, ADL, https://www.adl.org/resources/press-release/adl-records-dramatic-increase-us-antisemitic-incidents-following-oct-7 (Oct. 25, 2023) (reporting 312 antisemitic incidents in the U.S. between October 7 and October 23—a 388% increase compared to the same period last year—with 190 of those incidents being linked to the Israel–Hamas war). Now as ever, prejudices may cut in any direction. The Court will instruct the jury not to make decisions based on sympathy or prejudice. The motion is denied.

**J.     Motion *in Limine* J**

Tenth, Burke's motion J, which Andrews adopts, moves to exclude lay opinion testimony by a victim, Individual B-1 about the meaning of Burke's words or his intent. (Dkt. 247 at 38–41; Dkt. 248 at 2). Individual B-1's expected testimony on Burke's motive for requiring Company B to get a driveway permit is rationally based on Individual B-1's perception, helpful in understanding Burke's motivations, and not overly technical. *See* Fed. R. Evid. 701. So the objection is overruled.

**K.**     **Motion** *in Limine* **K**

Eleventh, Burke's motion K, to exclude testimony by George Reveliotis, is denied as moot. (Dkt. 247 at 41–43).

**L.**     **Motion** *in Limine* **L**

Twelfth, Burke's motion L, to exclude evidence relating to alleged misconduct by Defendant Charles Cui, is taken under advisement, to be addressed in a separate written order along with Cui's related motion *in limine*. (Dkt. 247 at 43–46; *see* Dkt. 253 at 4–6).

**M.**     **Motion** *in Limine* **M**

Thirteenth, in his motion M, Burke seeks to exclude evidence concerning his interactions with Amtrak, the Water Commissioner and the Building Commissioner as irrelevant. (Dkt. 247 at 46–50). Burke relies on *McDonnell v. United States*, 579 U.S. 550 (2016). There, the Supreme Court defined the phrase "official act," under 18 U.S.C. § 201, to mean "a decision or action on a 'question, matter, cause, suit, proceeding or controversy,'" which must (1) "involve a formal exercise of governmental power"; and (2) "be something specific and focused that is 'pending' or 'may be brought' before a public official." *Id.* at 574 (quoting 18 U.S.C. § 201(a)(3)). The *McDonnell* Court refused to adopt a broader definition, which would make "nearly anything a public official does—from arranging a meeting to inviting a guest to an event"—a *quo* for purposes of § 201's prohibition on *quid pro quo* bribery. *Id.* at 574–75.

Motivating *McDonnell*'s construction of "official act" were free speech, due process, and federalism concerns. *Id.* at 575–77. First, without a clear definition, "[o]fficials might wonder whether they could respond to even the most commonplace requests for assistance, and citizens with legitimate concerns might shrink from participating in democratic discourse." *Id.* at 575. Second, relatedly, to comport with due process, "official act" must be sufficiently definite "that

11

ordinary people can understand what conduct is prohibited" and to avoid "encourag[ing] arbitrary and discriminatory enforcement." *Id.* at 576 (quoting *Skilling v. United States*, 561 U.S. 358, 402–03 (2010)). Third, considering federalism principles, the Court declined to read § 201 "'in a manner that leaves its outer boundaries ambiguous and involves the Federal Government in setting standards' of 'good government for local and state officials.'" *Id.* at 576–77 (quoting *McNally v. United States*, 483 U.S. 350, 360 (1987)).

With that understanding of "official act," the Supreme Court held that the district court's jury instructions on the requirement were inadequate. *Id.* at 577–80. Yet, the Court was careful to hedge that "setting up a meeting, hosting an event, or making a phone call" may still constitute relevant "evidence of an agreement to take an official act." *Id.* at 573. To that end, a public official may take official action if he uses his official position (1) "to exert pressure on *another* official to perform an 'official act,'" or (2) "to provide advice to another official, knowing or intending that such advice will form the basis for an 'official act.'" *Id.* at 572.

In Burke's view, *McDonnell*'s reasoning extends to bribery under 18 U.S.C. § 666 and 720 ILCS 5/33-1(d) and (e). (Dkt. 247 at 48–50). From the jump, the phrase "official act" appears in neither statute. Section 666(a)(1)(B) makes it unlawful for

> an agent of an organization, or of a State, local, or Indian tribal government, or any agency thereof, [to] corruptly solicit[] or demand[] for the benefit of any person, or accept[] or agree[] to accept, anything of value from any person, intending to be influenced or rewarded *in connection with any business, transaction, or series of transactions of such organization, government, or agency* involving any thing of value of $5,000 or more.

18 U.S.C. § 666(a)(1)(B) (emphasis added). Then, § 5/33-1 provides:

> A person commits bribery when . . .
>
> (d) He or she receives, retains or agrees to accept any property or personal advantage which he or she is not authorized by law to accept knowing that the property or personal advantage was promised or tendered with intent to cause him

12

or her to influence the performance of *any act related to the employment or function of any public officer, public employee, juror or witness*; or

(e) He or she solicits, receives, retains, or agrees to accept any property or personal advantage pursuant to an understanding that he or she shall improperly influence or attempt to influence the performance of *any act related to the employment or function of any public officer, public employee, juror or witness*.

720 ILCS 5/33-1(d), (e) (emphases added).

Despite the textual differences, Burke contends that *McDonnell*'s reading of "official act" must likewise limit the italicized phrases in these statutes. From there, he argues that his interactions with Amtrak, the Water Commissioner, and the Building Commissioner were lawful, and therefore, irrelevant. Not so. The Government intends to introduce evidence of Burke's calls to an Amtrak official and the Water Commissioner about helping the Post Office project's developer get access to Amtrak tracks and City water. The Government would also present evidence of Burke's calls to the Building Commissioner to help Cui get a pole-sign permit. Even if *McDonnell* required reading an extratextual "official act" element into every bribery statute— and the Court doubts as much—the disputed interactions are at least probative of attempts to influence official action by other public officials. *See McDonnell*, 579 U.S. at 572–73.

True, *McDonnell*'s free speech and due process concerns may favor definiteness in the jury instructions on the "any business" and "any act" phrases in 18 U.S.C. § 666 and 720 ILCS 5/33-1, respectively. *See McDonnell*, 579 U.S. at 575–77; *see also Seventh Circuit Pattern Criminal Jury Instructions* § 666(a)(1)(B), Committee Comment (2023) ("[L]awyers and judges should consider the potential impact of *McDonnell* on § 666 cases"). *McDonnell*'s federalism concerns, however, might shake out differently as to § 666 and § 5/33-1. *See McDonnell*, 579 U.S. at 576 ("A State defines itself as a sovereign through 'the structure of its government, and the character of those who exercise government authority.' That includes the prerogative to regulate the permissible

13

scope of interactions between state officials and their constituents." (quoting *Gregory v. Ashcroft*, 501 U.S. 452, 460 (1991))); *see also United States v. Lindberg*, 39 F.4th 151, 170 (4th Cir. 2022) ("18 U.S.C. § 666 does not raise the same federalism concerns as 18 U.S.C. § 201 because Congress 'clearly intended' § 666 to 'alter[] the existing balance of federal and state powers.'" (quoting *Salinas v. United States*, 522 U.S. 52, 59 (1997))); *United States v. Ng Lap Seng*, 934 F.3d 110, 138 (2d Cir. 2019) (reasoning that Congress "did not impermissibly intrude on a State's own policy choices when, in keeping watch on recipients of federal funding, it did not limit § 666 bribery to the 'official act' definition of § 201(a)(3)" (citing *Sabri v. United States*, 541 U.S. 600, 608 (2004))); *United States v. Ferriero*, 866 F.3d 107, 128 (3d Cir. 2017) (reasoning that federalism concerns were absent in rejecting a *McDonnell* challenge to a New Jersey bribery statute).

The Court will take up the parties' disputes over jury instructions soon. As a preview of coming attractions, this Court is disinclined to import § 201's "official act" requirement wholesale into § 666. The weight of post-*McDonnell* circuit precedent suggests that the *quo* in § 666 is broader than § 201's. *See Lindberg*, 39 F.4th at 165–69; *Ng Lap Seng*, 934 F.3d at 131–34 ("[T]he *McDonnell* 'official act' standard, derived from the *quo* component of bribery as defined by § 201(a)(3), does not necessarily delimit the *quo* components of other bribery statutes, such as § 666 or the FCPA."); *United States v. Roberson*, 998 F.3d 1237, 1246–47 (11th Cir. 2021) (refusing to "read into section 666 limitations unsupported by the language of the statute"); *United States v. Porter*, 886 F.3d 562, 565–66 (6th Cir. 2018) (declining to import "official act" into § 666); *United States v. Carrasco*, 79 F.4th 153, 161 (1st Cir. 2023) (collecting cases); *see also United States v. Donagher*, 520 F. Supp. 3d 1052–55 (N.D. Ill. 2021) (rejecting constitutional challenge to § 666, assuming no "official act" requirement); *Ferriero*, 866 F.3d at 127 ("[W]e see

14

no reason for transplanting the conclusions in *McDonnell* that stem solely from the Court's application of general statutory-construction principles to the particular statute at issue in that case."); *cf. United States v. Johnson*, 874 F.3d 990, 1001–02 (7th Cir. 2017) (reaffirming that "reward" under § 666 reaches "bribes *and* gratuities" (citing *United States v. Hawkins*, 777 F.3d 880, 881 (7th Cir. 2015))). For now, Burke's motion to exclude evidence of his interactions with Amtrak, the Water Commissioner, and the Building Commissioner is denied.

### N.     Motion *in Limine* N

Fourteenth, Burke's motion N, to exclude evidence regarding the Trilla Drum Factory, is denied as moot. (Dkt. 247 at 50–52).

### O.     Motion *in Limine* O

Fifteenth, in Burke's eight-part motion O, he seeks to exclude evidence or argument about normal political activity under Rules 402, 404(b) and 403. (*Id.* at 53–64). As to parts 1, 2, and 3—concerning evidence (1) that Burke recommended Heneghan Wrecking for demolition work; (2) that Burke supported Sterling Bay as the master developer for Union Station's redevelopment; and (3) of conversations with his brother Daniel Burke—the motion is denied as moot. (*Id.* at 53–57). Then, the Court reserves ruling on parts 4 and 5—regarding evidence of (4) fundraising calls; and (5) Burke's calls regarding aspirants to judicial office—in light of the parties' efforts toward stipulations. (*Id.* at 57–62). The motion in part 6 seeks exclusion of five calls in which Burke discussed recommending people for jobs or helping them in other ways. (*Id.* at 62). As to four of those calls, the motion is moot. The motion is denied as to the fifth call, in which Burke discusses a job application for Individual E-1's sibling. The fifth call is relevant to Burke's intent and motive to help the Gabinski family, and it is not overly prejudicial. Next, the motion in part 7, concerning a call about Dunkin Donuts, is denied as moot. (*Id.* at 62–63). As to part 8, Burke's motion to

15

exclude an August 1, 2017 recorded conversation between Burke and a consultant about a tax increment funding (TIF) matter is denied without prejudice. (*Id.* at 63–64). The call is relevant to show Burke's power over TIF matters and is not offered for a propensity inference. Nor does it appear overly prejudicial. Burke may re-raise the objection in the context of trial.

**P.     Motion *in Limine* P**

Sixteenth, Burke's motion P seeks to exclude three taped conversations relating to his efforts to develop legal business or represent clients. (*Id.* at 64–66). As to the third conversation, the motion is moot. (*Id.* at 65–66). The motion is denied as to the other two. (*Id.* at 64–65). First, Burke's calls with a car dealer—in which the dealer offers business to Burke's law firm, acknowledging "we have to play ball"—are offered to demonstrate Burke's alleged motive, intent, and *modus operandi*: soliciting private business through his official position. (*Id.* at 64; Dkt. 286 at 72). The evidence is not offered to inspire propensity inferences. *See* Fed. R. Evid. 404(b)(2); *Ferrell*, 816 F.3d at 444. Nor does any danger of unfair prejudice substantially outweigh the probative value. In the same vein, Burke's calls with Solis—asking Solis to help him solicit clients for his law firm—reflect Burke's intent and *modus operandi* to use his official position to gain private business from property developers like Company G subject to his (or Solis's) aldermanic authority. Again, the evidence's probative value is not outweighed by any risk of prejudice.

**Q.     Motion *in Limine* Q**

Seventeenth, Burke's motion Q seeks exclusion of evidence concerning the alleged attempted extortion of the Field Museum. (Dkt. 247 at 66–68). Burke argues that the Government's evidence of his efforts to help Individual E-1 get an interview for a full-time job is irrelevant to the Hobbs Act's "property" element. *See* 18 U.S.C. § 1951(b)(2). Judge Dow already ruled, and this Court agrees, that wages may constitute "property" under the Act. (Dkt. 196 at 160 (citing

16

*United States v. Brissette*, 919 F.3d 670, 682–86 (1st Cir. 2019), and *United States v. Kirsch*, 903 F.3d 213, 227 (2d Cir. 2018))). Although the interview itself may not be transferable property, evidence that Burke helped someone get a job interview is probative of an attempt to obtain that job. It is direct evidence of the charged conduct. In essence, Burke raises a factual dispute over the sufficiency of the Government's evidence of his attempt to obtain a full-time job (which is property) for Individual E-1. That does not make the evidence irrelevant. The motion is denied.

**R.     Motion *in Limine* R**

Eighteenth, Burke's motion R, to exclude references to his representation of Donald Trump and Trump's company, is denied as moot. (Dkt. 247 at 68–69).

**S.     Motion *in Limine* S**

Nineteenth, in motion S, Burke and Andrews ask to prove up impeachment of Government witnesses immediately following their testimony. (*Id.* at 69–71; Dkt. 248 at 2). This motion is denied; Burke and Andrews may prove up impeachment during their own cases.

**T.     Motion *in Limine* T**

Twentieth, Burke's motion T, also joined by Andrews, to preclude improper bolstering of impeached witnesses' testimony with prior consistent statements, is denied as moot. (Dkt. 247 at 71–72; Dkt. 248 at 2).

## **CONCLUSION**

For these reasons, and those explained in open court, the Court so rules on Burke's Second Consolidated Motions *in Limine* [247].

_____
Virginia M. Kendall
United States District Judge

Date: October 28, 2023