Patrick McDonough
1351 West Catalpa
Chicago, Illinois 60640
312.685.4333
captpaddy@msn.com

**FILED**

MAY 28 2024 KG

THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

Honorable U.S. District Judge Virginia M. Kendall
Eastern Division Everett McKinley Dirksen
Courtroom 2503, Chambers 2588
United States Courthouse
219 South Dearborn Street
Chicago, Illinois 60604

May 21, 2024

**Re: U.S. v. Burke 1:19CR-00322**

Dear Honorable Judge Virginia M. Kendall,

Please consider my information before sentencing former Alderman Edward M. Burke.

I was a City of Chicago Department of Water Management plumber. During my City of Chicago employment I blew the whistle on the "Hired Truck" program," "job rigging" or patronage scandal, Water Management's racism and discrimination, and the City of Chicago's unlawful and incompetently managed workers compensation program. Everything I blew the whistle on ended up in federal court either as a criminal or civil matter. As a third-generation Chicago city worker, I experienced swift and severe retaliation for my actions.

Because of two serious work injuries in 2011 and 2013, I applied and received workers' compensation benefits when Alderman Burke was Chicago's workers compensation administrator. Mr. Burke did not distribute workers compensation benefits based on need and merit. What mattered was political clout. Injured city employees with political connections received workers compensation benefits without question—some for as long as 9 years. Injured

1

city workers without political connections would get their benefits denied or cutoff because they were without political clout or did not campaign for Alderman Burke's or his allies favored candidates.

Alderman Burke blocked former assistant U.S. attorney and City of Chicago Inspector General Joe Ferguson from auditing Chicago's workers compensation program. After Burke was removed from the chair of the City Council of the Finance Committee, an independent audit concluded that the majority of Chicago's workers compensation cases during Burke's workers compensation administration were not in compliance. (See Executive Summary in the enclosed audit). If Mr. Burke spent less time enriching himself from his private law practice and more time administering workers compensation, then maybe more of Burke's workers compensation cases would have been in compliance.

Alderman Burke administering Chicago's workers compensation program is a prime example of what one of your judicial colleagues once said—"Chicago government is designed for corruption." Why was Alderman Burke administering Chicago's $120 million a year workers compensation program? Administration of a program is a function of the executive branch. Besides, Illinois law restricted Chicago alderman to "purely legislative duties."

My injuries left me bedridden and immobile on several occasions. A forklift ran over my left foot, leaving it permanently deformed. I spent a month and a half staring at the ceiling, unable to move, go to the bathroom, or shower. Chicago City doctors permanently restricted me from ever working again. I now suffer from multiple serious medical issues.

My friend Jay Stone and I filed a federal pro se lawsuit which sought two primary remedies. One, we sought the moving of workers compensation from Burke's Chicago City

2

Council Committee on Finance to the executive branch of government. Two, we pursued an independent audit of workers' compensation cases. Before our case concluded, the City of Chicago transferred the administration of workers compensation to the executive branch and independent auditors started its workers compensation audit. No one had conceived of moving the administration of Chicago's workers compensation program to the executive branch until we did. Honorable Judge Robert Dow Jr. let us withdraw our lawsuit without prejudice.

When Mr. Burke was charged, he and his wife were earning close to $300,000 per year just from their government salaries. Mr. Burke strong-armed potential clients for his law firm to earn additional income. Mr. Burke abused his aldermanic power and position to earn money he did not need, nor would he spend.

The Oxford Dictionary defines *greed* as, "intense and selfish desire for something, especially wealth, power, or food." Greed characterizes Mr. Burke's mind and motivation when he was an alderman. Mr. Burke's crimes were not victimless. Mr. Burke's selfish desire for wealth and power hurt a lot of people, including me. Mr. Burke should receive a harsh sentence because the more Mr. Burke selfishly focused on his wealth and power, the less he served his constituents and City of Chicago.

Edward M. Burke's political allies and friends will write letters on his behalf. Most of these letters will come from people who benefitted from Mr. Burke's abuse of power. Those who got city jobs, contracts, permits, rezoning, inspectors to disappear, etc. will write glowing letters of support. When you decide Mr. Burke's sentence think of the politically unconnected city employees or businesses that he hurt. Think of what a former injured city worker who was denied workers compensation benefits by Mr. Burke's City Council Committee said to me. "I

3

lost my wife, I lost my children, I lost my home, I lost my car. I live with my mother. What do you want to know?" Mr. Burke treated injured city workers the same mean-spirited, hardball way that he shook down money from those who sought to do business with the city.

Sincerely,

Patrick McDonough

Encl.

The contents of this document were prepared solely for the use of the City of Chicago Corporation Counsel in the normal course of discharging their duties. It is not to be used, relied upon or referred to by any other party for any purpose.



 CITY OF CHICAGO DEPARTMENT OF LAW

# CITY OF CHICAGO

# Summary of Workers' Compensation Program Assessment

# MAY 16, 2019

INTRODUCTION AND ASSIGNMENT OBJECTIVES ........................................................................................ 1

EXECUTIVE SUMMARY .................................................................................................................................. 2

BACKGROUND ............................................................................................................................................... 3

FINDINGS AND RECOMMENDATIONS ......................................................................................................... 4

FRAUD RISK ASSESSMENT .......................................................................................................................... 4

    Recommendations ....................................................................................................................................... 7

DATA ANALYTICS ......................................................................................................................................... 11

CLAIMS TESTING ......................................................................................................................................... 14

PEER JURISDICTION ANALYSIS ................................................................................................................. 15

CONCLUSION ............................................................................................................................................... 16

APPENDIX ..................................................................................................................................................... 17

    Definitions .................................................................................................................................................. 17

    Key Sources of Information ......................................................................................................................... 18

    Claims Testing Attributes ........................................................................................................................... 20

LIMITATIONS AND DISCLAIMERS .............................................................................................................. 21

The contents of this document were prepared solely for the use of the City of Chicago Corporation Counsel in the normal course of discharging their duties.  It is not to be used, relied upon or referred to by any other party for any purpose.

## INTRODUCTION AND ASSIGNMENT OBJECTIVES

Grant Thornton LLP ("Grant Thornton") was retained by the City of Chicago ("City") jointly through its Corporation Counsel ("Counsel"), Office of Inspector General ("OIG"), Chairman of Committee On Finance, and Comptroller, to assist the City in planning for future operations of the Workers' Compensation Program ("Program") by conducting a review and audit[1] of the Program for calendar years 2017 and 2018.

The City engaged Grant Thornton to assist the City with a review of the Program to identify potential patterns or instances of fraud, waste, and abuse ("FWA") within the Program. Pursuant to the terms of the solicitation for this work, Grant Thornton conducted:

1) The analysis of workers' compensation benefits administered in 2017 and 2018 to assist the City in determining whether the Program:
    a. provided workers' compensation benefits in compliance with governing statutes, rules, and policies;
    b. resulted in costs comparable peer jurisdictions; and
    c. provided any indication of possible FWA by employee claimants, medical providers, and law firms.
2) An assessment of the Program's operations and processes, including any fraud prevention and detection processes and protocols.

Grant Thornton undertook this project in four broad workstreams:

(1) fraud risk assessment,

(2) analytics (data analytics),

(3) testing (claims testing), and

(4) research (peer jurisdictional analysis)

<u>Note:</u> The scope of Grant Thornton's assignment did not include investigative procedures designed to determine the root causes or a quantum of potential FWA. Grant Thornton did not conduct interrogative interviews seeking admission of guilt of perpetrating potential FWA, did not conduct electronic discovery (e.g., computer forensic imaging of Program employee work computers, obtaining forensically sound email populations of Program personnel and conducting a targeted search for information), or attempt to quantify the potential financial impact to the City's financial statements or the Program of any of its adverse findings and observations.

---

[1] The use of the word "review" or "audit" in the scope of services of this assignment was not undertaken or performed as any form of assurance or attestation as defined by the American Institute of Certified Public Accountants ("AICPA"). Grant Thornton as a firm is neither providing an opinion on any financial statements or other information nor providing an attestation or other form of assurance with respect to its work. Further, Grant Thornton did not apply procedures to determine the Program's financial reporting was in compliance with any specified requirements from the AICPA, generally accepted accounting principles ("GAAP"), or other pronouncements, regulations, or guidelines on accounting. The parameters of this assignment were determined pursuant to the City's request for proposals.

The contents of this document were prepared solely for the use of the City of Chicago Corporation Counsel in the normal course of discharging their duties. It is not to be used, relied upon or referred to by any other party for any purpose.

## EXECUTIVE SUMMARY

Based upon the procedures Grant Thornton performed and information made available to it as of the date of this disclosure, the City's Workers' Compensation Program is in need of substantial improvement to operate more effectively as well as prevent and detect potential fraud, waste, and abuse ("FWA"). While Grant Thornton was not tasked with nor did it investigate potential instances of fraud, it did identify significant control deficiencies and weaknesses that would create an environment where FWA could be present.

Of the workers' compensation claims Grant Thornton tested, the majority were not in alignment with governing rules, policies or the Program's internal claim administration guidelines in varying degrees of severity. Contributing factors to these results included the Program not maintaining its operations based on commonly accepted workers' compensation industry best practices and an inadequately trained workforce. In addition, the Program likely did not consistently administer workers' compensation benefits in full compliance with governing rules, or the Program's internal claim administration guidelines.

Grant Thornton attempted to obtain comparable claims data from 19 peer agencies and jurisdictions, including major metropolitan areas. The data Grant Thornton received from seven different sources is not specifically comparable to that of the City's Program for a variety of reasons. Any attempt to determine whether the City's workers' compensation costs are or are not in line with those comparable peer jurisdictions would require additional data that was not available to Grant Thornton to analyze. Some jurisdictions provided limited data and others were non-responsive.

In all, Grant Thornton interviewed or interfaced with nearly 50 individuals including 28 current or former employees of the Program, City executives and other departmental personnel, third parties providing claims administration services to the Program, and outside counsel to which the Program referred some workers' compensation claims.

Grant Thornton advised the City that it should evaluate whether it should invest the resources to substantially improve the Program to enhance its control environment and its operations, or whether the City should invest the resources to outsource the Program's administration of workers' compensation benefits to a third party that specializes in the administration of workers' compensation benefits. Either course of action will likely result in cost savings to the City over time, but in conjunction with its evaluation of the best course of action to take, the City will estimate the likely cost savings and whether that cost savings can be achieved within a timeframe acceptable to the City.

The contents of this document were prepared solely for the use of the City of Chicago Corporation Counsel in the normal course of discharging their duties. It is not to be used, relied upon or referred to by any other party for any purpose.

## BACKGROUND

Prior to April 1, 2019, the Program was administered by the Committee on Finance ("COF") of the City Council, which is a part of the Legislative Branch of the City government. As of April 1, 2019[2], the Program has been administered by the Department of Finance ("DOF"), which is a function of the Executive Branch of the City government.

The Program administers workers' compensation benefits for four City employee groups – Civilian, Police and Fire, Aviation, and Federally Funded Civilian[3] – as follows:

- *Aviation and Federally Funded Civilian* personnel have all aspects of workers' compensation claims (hereinafter referred to as "workers' compensation claims" or "claims") administered by a third-party administrator, Cannon Cochran Management Services, Inc. ("CCMSI") (https://www.ccmsi.com/);
- *Police and Fire*[4] personnel have managed medical and medical claims administered through the Program. Indemnity and life reserves claims[5] are administered by the individual departments, the Police Department and the Fire Department, respectively; and,
- *Civilian* personnel have all aspects of workers' compensation administered by the Program.

Program employees functioned under the following organizational structure: a Director of Workers' Compensation, Assistant Director, Civilian Workers' Compensation Manager, Claims Counsel, claims adjusters (segregated by claim type), Investigators, and administrative support. Also, Coventry Healthcare Workers' Compensation, Inc. ("Coventry") reviewed and adjusted medical bills for Civilian and Police and Fire workers' compensation claims.

The City's Department of Law ("DOL") Torts Division is responsible for handling workers' compensation claims that involve arbitration or litigation proceedings as part of the claim adjudication process. Certain claims are referred to one of several external law firms to assist with the claim adjudication process including subrogation (e.g., Hennessy & Roach, P.C., Coghlan Law LLC, and others).

The Program operated for many years with little to no monitoring and oversight by any other City departments. Some of these departments requested access to the Program's records for review, including the City of Chicago Office of Inspector General ("OIG"), but it is Grant Thornton's understanding the Program or the COF may not have always produced a complete set of responsive information, may have denied the request, or not fulfilled the request.

The following sections represent a summary of Grant Thornton's findings and recommendations in each of its four identified workstreams.

---

[2] Unless otherwise noted, all Grant Thornton findings and observations were based on the Program's operations from January 1, 2017 through March 31, 2019.
[3] Federally Funded Civilian describes those employees whose salaries are paid through federal funding sources.
[4] Police and Fire as a term used in this disclosure is inclusive of sworn police officers and firefighters as well as the civilian employees who work within the Police and Fire Departments, respectively.
[5] Claim types are classified as follows: a) indemnity, b) managed medical, c) life reserves, and, d) medical only.

The contents of this document were prepared solely for the use of the City of Chicago Corporation Counsel in the normal course of discharging their duties. It is not to be used, relied upon or referred to by any other party for any purpose.

## FINDINGS AND RECOMMENDATIONS

### FRAUD RISK ASSESSMENT

Grant Thornton performed fraud risk assessment procedures over the Program to identify potential fraud risks and make actionable recommendations for improvement. Grant Thornton utilized the five principles introduced in the Committee of Sponsoring Organizations of the Treadway Commission ("COSO") Fraud Risk Management Guide ("COSO Guide"):

1. Fraud Risk Governance

2. Fraud Risk Assessment

3. Fraud Control Activities

4. Fraud Investigation and Corrective Action

5. Fraud Risk Management Monitoring Activities

Overall, Grant Thornton determined the Program's fraud risk maturity aligned with *Level One (Ad Hoc)* of its fraud risk maturity model (see **Figure 1**). Grant Thornton evaluated and rated the Program's fraud activities across each of these principles. Detailed findings and recommendations are included below.

4

The contents of this document were prepared solely for the use of the City of Chicago Corporation Counsel in the normal course of discharging their duties. It is not to be used, relied upon or referred to by any other party for any purpose.

## GRANT THORNTON'S FRAUD RISK MATURITY MODEL



| | AD HOC LEVEL ONE | INITIAL LEVEL TWO | REPEATABLE LEVEL THREE | MANAGED LEVEL FOUR | LEADERSHIP LEVEL FIVE |
|---|---|---|---|---|---|
| **FRAUD RISK GOVERNANCE**  | • Undocumented and in a state of dynamic change, tending to be driven in an ad hoc, uncontrolled, and reactive manner by users or events | • The organization is aware of the need for a more formal fraud risk management approach | • There are sets of defined and documented standard processes established. Approaches are standardized and repeatable | • Fraud risk management activities across the organization are aligned with controls and performance indicators | • The organization's focus is on continually improving fraud risk management through both incremental and innovative changes/ improvements |
| **FRAUD RISK ASSESSMENT**  | • Fraud risk management processes are disorganized, even chaotic | • Processes are repeatable, possibly with consistent results | • Fraud risk management is aligned with the organization's external and internal environment and integrates with the organization's enterprise risk program | • Performance and quality are defined and can be measured | • Management discusses fraud risk with a goal of strategic, operational, and profitability improvements |
| **FRAUD CONTROL ACTIVITIES**  | • Success is likely to depend on individual efforts, and is not considered to be repeatable because processes would not be sufficiently defined and documented to allow them to be replicated | • Fraud risk definitions often vary across the organization. Fraud risk is assessed and/or managed in silos, and enterprise-wide risks are not routinely considered | • Senior levels and the board of directors receive fraud risk overviews or reports | • Information on fraud risks is aggregated and analyzed and is easily available to management. A process for notifying management in changes to fraud risk profiles is established and operating | • Fraud risk tolerance has been established and fraud risk assessments are designed to inform the board and management when thresholds have been exceeded |
| **FRAUD INVESTIGATION & CORRECTIVE ACTION**  | | • Risks are managed largely in a reactive way | • Roles, responsibilities, and performance measurements are defined and documented | • Full integration of the fraud risk principles into management processes has been achieved | |
| **FRAUD MONITORING ACTIVITIES**  | | | | | |

**Figure 1: Grant Thornton's Fraud Risk Maturity Model**

5

The contents of this document were prepared solely for the use of the City of Chicago Corporation Counsel in the normal course of discharging their duties. It is not to be used, relied upon or referred to by any other party for any purpose.

**Maturity Assessment Results**

Grant Thornton determined the Program's overall fraud risk maturity aligned with *Level One (Ad Hoc)* of its maturity model. This overall maturity level represents the aggregate score across all five COSO principles outlined in **Figure 2**. Grant Thornton evaluated and rated the Program's fraud risk activities across each of these principles. Detailed findings and recommendations are below-noted.



**Figure 2: Fraud Risk Maturity Assessment Results**

**COSO Principle 1: Fraud Risk Governance**

Based on Grant Thornton's evaluation, it determined the Program was operating at *Level One (Ad Hoc)* for this principle.

Grant Thornton noted the Program had no formalized governance or oversight structure, which contributed to an overall lack of activities and controls to prevent FWA, and it made the following key findings:

- The Program did not have a comprehensive enterprise fraud risk policy, including defined roles and responsibilities.
- The Program did not offer antifraud training.
- The Program did not conduct fraud awareness initiatives.

**COSO Principle 2: Fraud Risk Assessment**

6

The contents of this document were prepared solely for the use of the City of Chicago Corporation Counsel in the normal course of discharging their duties. It is not to be used, relied upon or referred to by any other party for any purpose.

Grant Thornton determined the Program was operating at *Level One (Ad Hoc)* for this principle, and made the following key finding:

- The Program had not performed a fraud risk assessment to identify and respond to fraud risks.

**COSO Principle 3: Fraud Control Activities**

Grant Thornton determined the Program operated at *Level Two (Initial)* for this principle because it did have some internal controls in place. For example, the Program employed segregation of duties controls for the claim adjudication, investigation, and review/approval roles. Additionally, the Program had a documented best practices guide, which included red flags to document indicators to help Program adjusters identify potential FWA. Grant Thornton made the following key findings:

- The Program did not have any documented policies or procedures other than the Claims Management Guide.
- The Program had limited fraud control activities.
- The Program did not employ proactive data analytics.
- The Program was not able to produce – and so it can be presumed the Program did not maintain – fully executed contracts with third parties.

**COSO Principle 4: Fraud Investigation and Corrective Action**

Grant Thornton determined the Program operated at *Level Two (Initial)* for this principle, and made the following key findings:

- The Program did not maintain an anonymous fraud tip hotline to facilitate internal or external referrals for potential fraud.[6]
- The Program's investigations function did not have documented policies or procedures to ensure consistent, reliable investigations.

**COSO Principle 5: Fraud Monitoring Activities**

Grant Thornton determined the Program operated at *Level One (Ad Hoc)* for this principle, and made the following key finding:

- The Program did not perform monitoring evaluations to determine whether each of the five principles of fraud risk management were present and functioning.

**Recommendations**

Overall, Grant Thornton assessed the Program's fraud risk maturity level at *Level One (Ad Hoc)*. Grant Thornton assessed the Program at Level One because its fraud risk management processes were largely missing or undocumented, and its fraud risk work was being performed in an ad-hoc, reactive manner by Program personnel.

---

[6] Grant Thornton noted the Program received anonymous fraud tips related to the Program or claims through the OIG.

The contents of this document were prepared solely for the use of the City of Chicago Corporation Counsel in the normal course of discharging their duties. It is not to be used, relied upon or referred to by any other party for any purpose.

**The sections below provide targeted recommendations from Grant Thornton to help the Program address its specific findings and achieve a higher level of antifraud program maturity to help ensure taxpayer resources are safeguarded against FWA.**

1. **Fraud Risk Management Policy.** The Program should:

   - Establish a comprehensive fraud risk management policy that includes broad policies and principles that guide personnel conduct.
   - Document the defined roles and responsibilities of all Program personnel as they relate to fraud risk governance within the fraud risk policy.
   - Define and distinguish internal and external fraud definitions within training materials and within the future antifraud program.

2. **Antifraud Training.** The Program should develop a comprehensive in-person antifraud training and require all Program employees attend the training on an annual basis. The Program should also develop tailored training content for specific roles and levels, such as claims adjusters and investigators, which require specific knowledge of antifraud policies, processes, and control activities. As a starting point, Grant Thornton recommended the development of Program-wide training reflecting best practices including:

   - Define external fraud
   - Provide examples of past schemes, other unethical behavior, and red flags
   - Instruct individuals on how to report potential FWA
   - Inform of disciplinary action for policy violation
   - Develop a training plan documenting what employees will receive training, which training applies to each job, and a schedule for training by level and job function

   Lastly, Grant Thornton recommended the Program should keep records of training completion enabling them to monitor employees who are not compliant.

3. **Fraud Awareness Initiatives.** Promoting fraud awareness throughout the Program from the top down is vital to creating a strong antifraud culture and demonstrating Program leadership's commitment to proactively addressing fraud risks. Grant Thornton recommended the Program:

   - promote awareness through training, codes of conduct, fraud discussions at recurring team meetings, and frequent communications (e.g., town hall/department meetings, fraud email newsletters), and
   - coordinate with the OIG to publicize information about antifraud efforts and successfully resolved FWA cases to raise awareness about the consequences of committing fraud to act as a deterrent to potential perpetrators of fraud.

4. **Develop and Implement a Recurring Fraud Risk Assessment.** The Program should develop and implement a fraud risk assessment methodology based on the following COSO leading practices:

   - Involve appropriate levels of management
   - Involve staff from across all roles and levels of the Program

8

The contents of this document were prepared solely for the use of the City of Chicago Corporation Counsel in the normal course of discharging their duties. It is not to be used, relied upon or referred to by any other party for any purpose.

- Analyze both internal and external fraud risks and their impact on the achievement of objectives
- Consider various types of fraud beyond the typical financial fraud schemes
- Continue to mature and incrementally improve the process with each iteration
- Estimate the likelihood and significance of risks identified
- Establish a fraud risk tolerance which considers the balance between risk and reward
- Develop risk responses based on the Program's risk tolerance
- Incorporate controls into the risk assessment and identify and prioritize remediation activities
- Establish a schedule to re-examine fraud risks periodically or as changes occur that could affect the Program

The Program should begin its risk assessment with a fraud risk map, and develop control activities to address known vulnerabilities. City and Program personnel should regularly revisit the fraud risk map and add new fraud schemes identified through experience, research of similar workers' compensation programs, and cross-departmental fraud risk brainstorming sessions.

5. **Periodically Update Current Claims Management Guide.** The Program should continue updating its Claims Management Guide with best practices, red flags, and other useful resources (e.g., checklists, external reference material). Fraud schemes are dynamic in nature and organizations must adapt to new schemes and perpetrators to stay ahead.

6. **Incorporate the Use of Proactive Data Analytics.** As documented in further detail in the **Data Analytics** section below, Grant Thornton recommended the Program should implement a system of data analytic processes and procedures to identify anomalous transactions or events for further investigation. The Program should also develop a process for investigating and taking action for anomalous transactions including the application of treatments (e.g., additional reviews for suspicious providers or types of medical services) to reduce the likelihood of FWA. The Program should consider using data analytic software to detect and prevent potential FWA.

7. **Develop Policies and Procedures with Documented Fraud Control Activities.** The Program should develop policies and procedure guides for key business processes to ensure consistent application of fraud control activities across all Program staff. The policies and procedures should formally document key preventative and detective control activities.

Additionally, Grant Thornton recommended the Program should establish a periodic assessment process, including reviews performed by the OIG, to determine whether staff are performing the controls as defined in the policies and procedures and evaluate their effectiveness at preventing and detecting FWA.

8. **Periodically Review Contracts with Third Parties.** The Program should continually monitor compliance with third party contracts. This will allow City and Program management to identify any risks of FWA that may be result from these relationships. The Program should also ensure that any future procurement be well documented and in compliance with any applicable law.

9. **Develop and Implement an Anonymous Fraud Tip Hotline.** Hotlines are consistently the most effective method in fraud detection. Therefore, Grant Thornton recommended establishing an effective fraud tip hotline platform with 24/7 availability, multilingual capability, the option for

9

The contents of this document were prepared solely for the use of the City of Chicago Corporation Counsel in the normal course of discharging their duties. It is not to be used, relied upon or referred to by any other party for any purpose.

anonymous reporting, and multiple reporting channel options (e.g., phone, email, etc.). Such hotline should be accompanied by publication of clear whistleblower protections for any City employees that report internal fraud tips.

10. **Document Policies and Procedures for Investigations.** Grant Thornton noted the Program operated an investigations group that was staffed by former Chicago Police officers with experience performing criminal investigations. However, investigations into potential workers' compensation benefits FWA requires special investigative skillsets, processes, and procedures that may not be part of the law enforcement training or experience of former police officers. Grant Thornton recommended the Program consider the benefit of using investigative resources experienced in investigating potential workers' compensation benefits FWA that are not former Chicago Police officers to avoid potential conflicts of interest. To the extent that Chicago Police Department officers continue to serve as investigators, Grant Thornton recommended the Program work with the OIG to document formal policies and procedures for establishing when FWA case should be referred to the OIG's Investigations team and to avoid potential conflicts of interest.

11. **Incorporate Analytics and Establish Appropriate Measurement Criteria.** The Program should explore opportunities to incorporate data from the claims administration process as well as from medical claims and other key areas to develop performance metrics to better monitor effectiveness. In line with the COSO Guide, establishing appropriate benchmarks and metrics to guide Program management's decision making process will elevate the Program's maturity level.

12. **Consider Factors for Setting the Scope and Frequency of Evaluations.** Consistent with the COSO Guide, as fraud risks are prioritized, the Program should continuously consider the scoping and frequency of antifraud monitoring activities. For instance, changes in the Illinois State workers' compensation laws would potentially require a limited scope risk assessment to determine the impact of the changes on the Program's fraud risks.

13. **Evaluate, Communicate, and Remediate Deficiencies.** As the Program is still in the early stages of developing and implementing monitoring activities, Grant Thornton recommended developing formal processes for evaluating, communicating, and remediating identified deficiencies to ensure roles, responsibilities, and processes are clear and well-defined.

The contents of this document were prepared solely for the use of the City of Chicago Corporation Counsel in the normal course of discharging their duties. It is not to be used, relied upon or referred to by any other party for any purpose.

## DATA ANALYTICS

In addition to its Program review and interviews, Grant Thornton was asked to analyze Program data for any indications of potential FWA. Grant Thornton performed multiple analyses to identify outliers within data extracted from the CCMSI's claims administration system and iVOS claims system, and developed a set of business rules to guide its analyses based on knowledge gained from interviews with Program and City personnel and Grant Thornton's collective experience with FWA data analytics and the workers' compensation industry.

Grant Thornton performed the following analyses to provide the City and the Program with example analyses that support the detection of potential signs of FWA impacting the Program. Going forward, the Program can benefit from regularly conducting similar analyses to aid in monitoring and reviewing claims throughout their lifespan.

Year to Year Analysis

Grant Thornton analyzed the difference in number of claims and total amount paid out between the relevant years for analysis. A 56 percent decrease in the total amount paid out through the Program from 2017 to 2018 for both Civilian and Police and Fire and Federally Funded Civilian claims was observed. **Recommendation:** the City should consistently perform year over year analyses for claims data to identify anomalies or red flags of FWA.

Timeframe Analysis

Analyzing claim frequency relative to the calendar year revealed spikes in claims that correspond to the week of or immediately following a holiday recognized by the City. A high number of claims immediately following a holiday could suggest anomalous outside of work injuries and is often indicative of FWA in workers' compensation claims. **Recommendation:** the City should implement controls within the Program specifically targeting the weeks of and following holidays, to identify spikes in the number of claims filed and guide whether further review of claims opened in those weeks is appropriate.

Payments Analysis

Grant Thornton performed a boxplot analysis for each claim type, identifying an individual claim's percentile ranking, measured by the total amount in dollars paid by claim, and recommended claims with a total amount above the 75th percentile be considered for further review. Due to the large number of claims ranked above the 75th percentile for Managed Medical and Medical Only claim types, for Civilian and Police and Fire claims, as well as Indemnity claim types for Aviation claims, Grant Thornton further analyzed these claim types with scatterplots, which allowed for identification of additional outliers for both Managed Medical and Medical Only claims.

**Recommendation:** where possible, the City should develop visualizations to track claim payments and detect potential outliers, which should be considered for review as potential instances of overpayment, exaggerated injury, and other FWA.

Geospatial Analysis

Grant Thornton performed a geospatial analysis of payments made to medical providers through the Program. Through this analysis Grant Thornton observed over 25 percent of all payments made to medical providers were billed by providers outside of the State of Illinois. This high level is due in part to the Program's preferred medical prescription company encompassing over 98 percent of payments

11

The contents of this document were prepared solely for the use of the City of Chicago Corporation Counsel in the normal course of discharging their duties. It is not to be used, relied upon or referred to by any other party for any purpose.

made to providers in the State of Arizona. However, adjusting to exclude Arizona from the analysis, providers outside of Illinois still accounted for roughly 10 percent of bills paid to medical providers. This geographic makeup of payments to medical providers was consistent across 2017 and 2018.

Payments to providers with billing addresses outside of the State of Illinois should be considered for further review. **Recommendation:** the Program should create a system control for review of new providers added with a billing address outside of the State of Illinois.

Adjuster Analysis

The average total amount paid per claim across Program claim adjusters for Civilian and Police and Fire claims was $15,090 during 2017 and 2018. Comparing each Civilian and Police and Fire adjuster's individual average amount paid to the overall average identified several individual adjusters whose average payout per claim was above average. (Similar analyses were completed for Aviation claims, but no similar outliers were identified.) Grant Thornton performed an identical, but more granular analysis to analyze average claim payment by adjuster by claim type, which identified several "Record Only" claims with one or more payments. Generally, Record Only claims should not have associated benefit payments; this review suggests a potential misunderstanding of Program payment requirements, inadequate training, or insufficient attention to detail. **Recommendation:** the City should develop system controls within the Program to flag when a payment has been made for a Record Only claim.

Prescription and Procedure Analysis

Grant Thornton calculated the average value of prescription payments and procedure payments per claim was $289 and $321, respectively, for Civilian and Police and Fire claims during 2017 and 2018. Grant Thornton conducted an outlier analysis for both types of payments, identifying claims that were more than two standard deviations away from the average (which is the statistical definition of an "outlier")[7]. There were numerous claims which stood out as outliers in regards to average prescription and procedure payment; such outliers could indicate inflation of costs by providers or over-prescription of medications to claimants. **Recommendation:** the City should establish process controls to periodically test for outlier claims with prescriptions and procedures bill amounts that exceed recent billed amounts (e.g., average billed amounts over last two years) and consider further review into the claims associated with these bills.

Legal Spend

Through conversations with the City and Program personnel, Grant Thornton learned that Hennessy & Roach, P.C. ("Hennessy & Roach") was the law firm most frequently referred workers' compensation claim legal support by the Program; however, this only represented a small portion of all claims requiring legal support. After reviewing the claims year detail of those claims referred to Hennessy & Roach, Grant Thornton identified 23 claims filed prior to 2013 for which the related case was opened by Hennessy & Roach between 2017 and 2018. **Recommendation:** develop a framework for identifying applicable criteria for referring claims to outside counsel, and establish a bidding process to build a list of approved external law firms to which the Program can refer claims for legal support.

---

[7] Grant Thornton was unable to perform similar analyses for Aviation and Federally Funded Civilian claims as the medical billing data through CCMSI was unavailable for review.

The contents of this document were prepared solely for the use of the City of Chicago Corporation Counsel in the normal course of discharging their duties. It is not to be used, relied upon or referred to by any other party for any purpose.

*Other Findings*

In Grant Thornton's efforts to join claim payment data with claim log data, it observed a number of claims incurred in previous years were still being paid out during 2017 and 2018.  With further analysis, Grant Thornton observed that approximately five (5) percent of claims were opened ten (10) years ago or longer and are still receiving payments.  **Recommendation:**  regularly review data for old claims that are still receiving payment as possible claims for further review.

The contents of this document were prepared solely for the use of the City of Chicago Corporation Counsel in the normal course of discharging their duties.  It is not to be used, relied upon or referred to by any other party for any purpose.

## CLAIMS TESTING

Grant Thornton tested 109 claims on a sample basis, made up of both judgmentally and randomly selected samples (59 Civilian, 25 Police and Fire, 20 Aviation, and five (5) Federally Funded Civilian). Grant Thornton tested these claims against several attributes that aligned to the Program's Claims Management Guide, rules and regulations promulgated by the Act, workers' compensation insurance industry recognized best practices, and where applicable, processes and procedures in place at CCMSI. Claims administered on behalf of the Police and Fire departments had specific performance attributes due to requirements instituted by their respective CBAs. There were also specific performance attributes for CCMSI's administration of Aviation and Federally Funded Civilian claims. A list of all attributes considered is attached in the **Appendix.**

Grant Thornton tested 84 Civilian and Police and Fire claims administered by the Program, and 100 percent of those claims failed at least three (3) testing attributes (i.e., failed the test). Grant Thornton tested 25 claims administered by CCMSI; of these, seven (7) claims (28 percent) passed all of the testing attributes in its testing; six (6), or 33 percent, failed at least three (3) testing attributes.

### Recommendations

Grant Thornton identified three broad areas for improvement that may lead to more robust claims administration:

(1) developing thoroughly documented policies and procedures that encompass the entire claim administration process and include monitoring and oversight mechanisms,

(2) instituting a formalized training regimen for all Program employees, and

(3) performing a continual assessment of the systems, protocols, and inter-departmental communication channels for operational effectiveness and efficiency to support the Program's ultimate goal of returning employees to work as quickly and safely as possible.

While the financial impact of implementing these three areas of improvement may initially appear cost prohibitive, the long term financial and operational benefits would be greater than the initial resource investment. Alternatively, Grant Thornton recommended the City consider if maximum benefits would be achieved by outsourcing the Program's administration of workers' compensation benefits to a third party that specializes in the administration of workers' compensation benefits.

14

The contents of this document were prepared solely for the use of the City of Chicago Corporation Counsel in the normal course of discharging their duties. It is not to be used, relied upon or referred to by any other party for any purpose.

## PEER JURISDICTION ANALYSIS

Grant Thornton was tasked with collecting, aggregating, and analyzing workers' compensation program data from requested peer jurisdictions and comparing that data to the City's Program data to determine if insights could be gleaned to develop strategies for increasing the Program's operational effectiveness and efficiency.

### Findings:
For several reasons, Grant Thornton was unable to perform an "apples to apples" comparison of Program costs to those of peer jurisdictions. Grant Thornton was unable to determine or confirm from the large metro jurisdictions whether their respective programs included all city workers or if separate programs administered claims for different departments (e.g., police, fire, aviation, or civilian). Further, any findings and observations about peer data comparison based on the data that were available could be readily subject to challenge and inconsistent interpretation. Such factors may include, but would not be limited to: varying population sizes, geographies[8], municipal services provided via employees covered by local jurisdictional workers' compensation benefit plans, and governing laws and regulations applicable to each jurisdiction.

Accordingly, Grant Thornton concluded that a peer benchmarking exercise involving jurisdictions outside the State of Illinois would likely not provide the City with an equivalent baseline for comparison due to differing State laws, statutes, or rules governing workers' compensation benefits. Furthermore, a comparison between the City's Program and workers' compensation benefits programs administered by "sister" City agencies presents difficulty when trying to draw comparisons due to varying employee workforce sizes and work performed by those employees.

### Recommendations

Grant Thornton recommended the City form a core group of fiscal leadership with responsibilities related to administering and accounting for the City's Program that can periodically connect with and network with peers in other jurisdictions to learn what other jurisdictions are finding to be best practices to prevent and detect FWA. Finally, Grant Thornton recommended the Program should consider performing a three (3) to five (5) year rolling analysis of the Program's financial performance with consideration of the Program' performance statistics.

---

[8] Geographies includes consideration for general weather patterns in each metro jurisdiction. For example, jurisdictions in the State of California may encounter less severe weather (i.e., snow and ice) compared to jurisdictions like Boston, the City, and New York City.

15

The contents of this document were prepared solely for the use of the City of Chicago Corporation Counsel in the normal course of discharging their duties. It is not to be used, relied upon or referred to by any other party for any purpose.

## CONCLUSION

Grant Thornton's review found the City's Workers' Compensation Program in need of substantial improvement to operate more effectively and prevent and detect potential waste, fraud, and abuse. By implementing formal fraud risk procedures and engaging in regular data analysis and claims testing, the Program will be better positioned to promptly identify and respond to anomalies or other concerns, and will be able to mitigate the risk of fraud waste and abuse. Going forward, the City should evaluate whether it wishes to invest the resources to improve in-house management of the Program to enhance its operations and control environment, or whether it should consider outsourcing the administration of workers' compensation benefits to a third party that specializes in such work. Either course of action will likely result in cost savings to the City over time.

The contents of this document were prepared solely for the use of the City of Chicago Corporation Counsel in the normal course of discharging their duties. It is not to be used, relied upon or referred to by any other party for any purpose.

## APPENDIX

## Definitions

CCMSI – CCMSI manages all claims submitted by employees whose positions are Federally Funded Civilian and those who are employed by the Department of Aviation. CCMSI uses a combination of Program-issued Client Service Instructions and its internal Corporate Claims Best Practices to manage claims.

Coventry – Using its own medical bill review system called Coventry Connect, Coventry adjusts bills according to Illinois Worker's Compensation Commission Medical Fee Schedule ("fee schedule"). Coventry also provides Nurse Case Management, Utilization Review, and Independent Medical Exam services to the Program.

Indemnity claims – Claims for medical expenses and Total Temporary Disability ("TTD" or "Total Disability" or "TD") benefits that are due to the claimant (employee) while they miss work because of the subject injury (ies).

iVOS – The claims management system of record for the City of Chicago's Workers' Compensation Program.

Life Reserves claims – Claims for lifetime medical expenses due to catastrophic injury. The claimant will most likely be unable to seek any other employment because of the extent of the subject injury (ies).

Managed Medical claims – Claims for complex medical care that require a higher level of care oversight, coordination, and resources.

Medical Only claims – Claims for only medical expenses that are generally related to simple injuries requiring simple medical care and no time off work, meaning no TTD benefit liability.

Record Only claims – Claims that are filed with the Program, but do not result in medical expense or TTD liabilities. It is in the best interest of employers to adequately manage Record Only claims in the event the claimant decides to seek medical treatment after the fact, or the injury contributes to complications in the future. Record Only claims should not have any associated benefit payments.

Subrogation – This is a term describing a legal right to pursue a third party that caused a loss (e.g., a workers' compensation claim expense) incurred by the City, which then makes its own claim against others who may have caused the loss, insured the loss, or contributed to the loss. This is done in order to recover the amount of the claim paid by the City for the loss it incurred.

Temporary Total Disability ("TTD") and Temporary Disability ("TD") – Benefit put forth by the Illinois Workers' Compensation Act ("Act") designed to temporarily compensate the injured worker during the duration of his or her disability.

The contents of this document were prepared solely for the use of the City of Chicago Corporation Counsel in the normal course of discharging their duties. It is not to be used, relied upon or referred to by any other party for any purpose.

## Key Sources of Information

To understand the organizational structure, processes, and history of the City's Program, Grant Thornton requested, gathered, and analyzed several sources of information. While this is not an exhaustive list of information obtained and reviewed, the items below represent key sources of information Grant Thornton relied upon during the course of its assignment:

1. An organization chart for the Program as of February 1, 2019, provided by the DOF:



2. Individuals interviewed by Grant Thornton (unless otherwise noted, all individuals listed were from the Program):
   a. Director of Workers' Compensation
   b. Assistant Director
   c. former Assistant Director
   d. two Claims Counsel
   e. Administrative Manager
   f. Civilian Workers' Compensation Manager
   g. Chief Investigator
   h. eleven Civilian Adjusters (overseeing indemnity, medical, managed medical, and life reserves claims)
   i. three Police and Fire Adjusters
   j. two Clerical Staff
   k. one Information Technology ("IT") employee (System Administrator)
   l. three DOL Torts Division lawyers
   m. Inspector General, OIG

18

The contents of this document were prepared solely for the use of the City of Chicago Corporation Counsel in the normal course of discharging their duties. It is not to be used, relied upon or referred to by any other party for any purpose.

    n.  Deputy Inspector General for Audit, OIG
    o.  Deputy Inspector General for Investigations, OIG
    p.  General Counsel for OIG
    q.  Deputy General Counsel for OIG

3.  iVOS claims data for Civilian and Police and Fire for 2017 and 2018
4.  CCMSI claims data for Federally Funded Civilian and Aviation for 2017 and 2018
5.  Coventry medical data for Civilian and Police and Fire for 2017 and 2018
6.  Program employees' payroll data for 2017 and 2018
7.  Current Program employees' resumes
8.  The DOL's historical list of workers' compensation claims requiring litigation support
9.  Hennessy & Roach, P.C. list of workers' compensation claims referred to the firm
10. COF's list of claims referred externally for legal services
11. The OIG's list of workers' compensation claim complaints received and those resultant claim complaints the OIG referred to the Program for its review
12. A sample of an OIG investigative report regarding a workers' compensation claimant
13. Copy of an *unsigned* agreement between the COF and Coventry from 2008
14. Correspondence from the COF and Jenner & Block LLP regarding the OIG's requests for documentation from the Program
15. Program employee list given to the OIG by the Department of Human Resources
16. Background documents provided by the OIG:
17. Collective bargaining agreements ("CBA") for the Police and Fire departments
18. CCMSI policies and procedures for Federally Funded Civilian claims management and Aviation claims management
19. Claims Management Guide utilized by the Program
20. Peer jurisdiction workers' compensation data from select peer agencies and jurisdictions including the City's Program data from years 2014-2018

Grant Thornton requested documents that were not provided as of the date of this disclosure including:

- The COF's policy on contracting with third parties
- Coventry's policy on medical bill review and payment processes
- Risk Console user guide and sample reports
- List of claims handled by Coghlan Law LLC and other applicable law firms for legal support and subrogation

The contents of this document were prepared solely for the use of the City of Chicago Corporation Counsel in the normal course of discharging their duties. It is not to be used, relied upon or referred to by any other party for any purpose.

## Claims Testing Attributes

| Claim Administration Categorical Steps | Attribute |
|---|---|
| File Administration | Supervisor/Director Review |
| | File Assigned within 24 Hours |
| | Average Weekly Wage (AWW)/Total Disability (TD) Calculated |
| Initial File Review | Initial File Analysis within (IFA) 24/48 Hours |
| | Recorded Statement |
| | Witness Statement Taken |
| | Action Plan Provided |
| | Compensability Determination Performed |
| Benefit Delivery/Wages | AWW/TD Rate Verified |
| | Stop TD Letters |
| | Overpayment on File |
| Medical Review | Medical Analysis Completed |
| | Medical Authorization Request Sent |
| | Medical Canvas Performed (including OFAC Screening) |
| | Drug Test Performed |
| Forms | FROI Filed |
| | Delay Letter Sent within 14 Days |
| | Denial Letter Sent within 14 Days |
| | Settlement/Reserve Analysis |
| Reserves | Reserves Set Timely (5-14 Business Days) |
| | Reserve Exposure Set |
| | Stair-stepping (Reserve Set as Bills are Received |
| Subrogation | Third Party Potential Assessed |
| | Liability Analysis Provided |
| | Recovery Received |
| Litigation | IFA Litigation Summary |
| | Budget |
| | Settlement Authorization Requested |
| Closure | File Aggressively Handled |
| | All Bills Paid |
| | Claim Closed Timely |
| Miscellaneous | Return To Work Addressed (RTW) |
| | Surveillance Assigned |
| | Medicare Verified |
| | Diary Completed |

The contents of this document were prepared solely for the use of the City of Chicago Corporation Counsel in the normal course of discharging their duties. It is not to be used, relied upon or referred to by any other party for any purpose.

## LIMITATIONS AND DISCLAIMERS

Grant Thornton's scope of work is as set out in its engagement letter with the City, or otherwise agreed to, which is quoted in this disclosure. Grant Thornton's analysis of the affairs of the Program does not constitute an audit, review, or compilation in accordance with auditing and attestation standards and, consequently, Grant Thornton did not express an opinion on the figures included in this disclosure. Because Grant Thornton's services were limited in nature and scope, they cannot be relied upon to have discovered all documents and other information or performed all analyses that may be of importance in this matter. Accordingly, Grant Thornton makes no representations regarding the sufficiency of its procedures for the City's purposes. Grant Thornton's services were provided in accordance with the Statement on Standards for Consulting Services promulgated by the American Institute of Certified Public Accountants and, accordingly, neither constituted a rendering by Grant Thornton or its partners or staff of any legal advice, nor did they include the compilation, review, or audit of financial statements, as defined by the AICPA. Grant Thornton's project planning was conducted at the direction of Counsel and execution of its work was performed with objectivity and integrity; however, Grant Thornton's work was not intended to be performed in accordance with the AICPA's generally accepted audit standards ("GAAS")[9]. Unless specifically stated herein, Grant Thornton did not validate the accuracy or completeness of any data or information provided to perform its procedures. The scope of the assignment was limited to analyses of documents and data, along with information provided in interviews that were provided by the City, City employees, or City contractors. As such, Grant Thornton cannot be relied upon to have discovered all documents and other information or performed all analyses that may be of importance to the operations and administration of the Program. Grant Thornton's responsibility for the assignment was not specifically to conduct an investigation into possible fraudulent activity perpetrated within or against the Program. Grant Thornton neither concluded on the existence of possible fraudulent activity nor did it attempt to define what the whole population of possible FWA occurrences could be.

This disclosure contains sensitive and confidential information proprietary to the City. Grant Thornton has not and shall not be deemed to assume any duties or obligations to any third party. Grant Thornton's assignment was limited to the specific scope and activities agreed to with Counsel. In conducting its assignment, Grant Thornton relied upon the information provided by the City and other sources for its analysis. No representation or warranty, express or implied, is made by Grant Thornton as to the accuracy or completeness of the information relied upon for its assignment.

---

[9] GAAS is intended to serve as the authoritative guidance in an assurance engagement, in which "the objective of the ordinary audit of financial statements by the independent auditor is the expression of an opinion on the fairness with which they present, in all material respects, financial position, results of operations, and its cash flows in conformity with generally accepted accounting principles" (*AU 110 "Responsibilities and Functions of the Independent Auditor"*). Grant Thornton's assignment was a consulting engagement as defined by its professional guidance.

The contents of this document were prepared solely for the use of the City of Chicago Corporation Counsel in the normal course of discharging their duties. It is not to be used, relied upon or referred to by any other party for any purpose.



UNITED STATES
POSTAL SERVICE.

**G**

USPS GROUND ADVANTAGE™

Retail

US POSTAGE PAID

**$6.00**

Origin: 34231
05/22/24
1184320302-78

0 Lb 5.00 Oz

RDC 01

Hon. U.S. District Judge Virginia M. Kendall
Eastern Division Everett McKinley Dirksen
Courtroom 2503 Chambers 2588
UNITED STATES Court house
219 South Dearborn Street
CHICAGO IL 60604

McDonough
151 West Catalpa
CHICAGO IL 60640



SHIP
TO:
RM 2503
219 S DEARBORN ST
CHICAGO IL 60604-1825

USPS TRACKING® #

9500 1139 5098 4143 2798 79

C005



