UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>EDWARD M. BURKE | No.   19 CR 322-1<br><br>Hon. Virginia M. Kendall |

## GOVERNMENT'S SENTENCING MEMORANDUM

The UNITED STATES OF AMERICA, by MORRIS PASQUAL, Acting United States Attorney for the Northern District of Illinois, hereby submits this sentencing memorandum concerning defendant Edward M. Burke. The government respectfully represents as follows:

## PRELIMINARY STATEMENT

Defendant Edward M. Burke, the powerful leader of the City Council's Committee on Finance, and the longest serving Alderman in Chicago history, was steeped in corruption. He abused and exploited his office by pursuing his own personal and financial interests over a course of years. Again and again, Burke used his significant political power to solicit and receive bribes from entities with business before the City of Chicago—all so he could obtain legal business for his private law firm and financially benefit his close personal associates.

The jury heard and saw a mountain of evidence proving that, from approximately 2016 through 2018, Burke used his position in the upper echelons of City government to engage in a pattern of racketeering activity involving bribery and extortion. To this day, Burke has expressed no remorse for his crimes; indeed, he

continues to deny he did a single thing wrong. Given the seriousness and extent of Burke's corruption, the need to promote respect for the law and provide just punishment, and the strong need to deter other public officials and their accomplices from similar crimes, a Guideline-sentence of 121 months' imprisonment is reasonable, just, and warranted.

## I.  FACTUAL BACKGROUND AND OFFENSE CONDUCT

Having presided over the trial in this matter last fall, the Court is well familiar with the evidence the jury heard. As proven at trial, between 2016 and 2018, Burke:

a.    corruptly solicited the developer of the Old Post Office, a New York-based real estate company known by the name "601W," as a property tax client for his law firm in return for taking action benefitting the Post Office project on a variety of matters, including approvals from the Chicago Water Department, a favorable tax designation, and tax increment financing (TIF) monies;

b.    attempted to extort law firm business from Tri-City Foods, which owned numerous fast-food restaurants in Illinois, including a Burger King located in Burke's Ward that was being remodeled and needed permits from the City;

c.    received business for his law firm from co-defendant Charles Cui, knowing that Cui intended to influence him and others in connection with the issuance of a permit for a pole sign at 4901 West Irving Park Road in Chicago; and

d.    attempted to extort The Field Museum for a paid position for Molly Gabinski, the child of a long-time friend and former colleague on the City Council.

Burke's illegal conduct is more fully detailed in the presentence investigation report and the government's version of offense conduct ("Government's Version"), and is briefly summarized below.

### The Old Post Office Shakedown

In 2016, 601W purchased the Old Post Office, a prominent but at that time unused building in Chicago, and planned an extensive redevelopment of the building. As Burke well knew, Daniel Solis, the Alderman of the 25th Ward, in which the Old Post Office was located, had significant influence over the redevelopment project. Burke used that influence to benefit himself. Indeed, Burke initiated the Old Post Office episode by asking Solis to recommend Burke's private law firm specializing in real estate property tax abatement, Klafter & Burke, to 601W, and enticed Solis to work with him in that effort by offering Solis a portion of Burke's profits (what Burke called a "marketing agreement") if Solis assisted in bringing the 601W business to the table.

Thereafter, Burke corruptly solicited legal business from 601W, either directly himself or through Solis, in return for Burke's and Solis's official assistance with the redevelopment and financing of the Post Office project. This official assistance included helping 601W with the City of Chicago Water Department, and Amtrak, and passing ordinances in the City Council for Class L and TIF monies, both of which had to go through Burke's Committee on Finance before being voted on by the full City Council. Burke had significant leverage over 601W given 601W's dependence on City

approvals and City-based tax and financing incentives, and Burke used that leverage to push 601W to hire his law firm.

In March 2017, among other efforts Burke took to secure 601W's law firm business, Burke assisted 601W with resolving pending issues with the City of Chicago Department of Water Management. Similarly, in June 2016, for the same reason, Burke reached out to an Amtrak official about ongoing issues between Amtrak and 601W in obtaining Amtrak's approval for 601W to gain access to the track area under the Old Post Office to perform renovation work.

In January 2018, Harry Skydell, a principal for 601W, promised Burke that 601W would hire Burke's law firm to conduct property tax work for a large commercial building owned by 601W known as the Sullivan Center. Soon thereafter, in February 2018, Burke's Committee on Finance recommended that the Class L for the Post Office (which Burke valued at $100 million) pass the City Council. The City Council, upon Burke's motion, then voted to pass the Class L, with Burke voting in favor it. In August 2018, 601W and Burke formally signed a contingent fee agreement under which Klafter & Burke would handle property tax appeals for the Sullivan Center. Several months later, in September 2018, Burke's Committee on Finance recommended that the City Council pass an $18 million TIF agreement for the Post Office project. Again, the City Council, upon Burke's motion, voted to pass the TIF for the Post Office, with Burke voting in favor it. The next month, in October 2018, 601W hired Klafter & Burke to perform property tax appeals for another large commercial property in Chicago known as One South Wacker.

Recordings of conversations between Burke and Solis played during the trial laid bare Burke's greed. As Burke stated, in his own words, by trading his official assistance to 601W for private law firm business, Burke expected the "cash register" to ring (GX11) and said that he was "not motivated" (GX291) to assist the Old Post Office developers without the promise of legal business. Burke sought to line his own pockets by using his public position.

### The Burger King Shakedown

Burke used his position as Alderman to corruptly solicit and extort legal business from Tri-City Foods, the owner of a Burger King restaurant in Burke's Ward, through the use of a building permit and a driveway permit needed at the restaurant site.

As Burke knew, Tri-City Foods owned hundreds of Burger King franchise locations. Thus, when Tri-City Foods had a Burger King in Burke's ward that needed a City of Chicago building permit, Burke saw an opportunity to leverage his power as Alderman to shake down Tri-City Foods for legal business for Klafter & Burke. After the owner of Tri-City Foods, Shoukat Dhanani, sought Burke's help with the issuance of the building permit, Burke arranged to meet in person with Shoukat Dhanani and his son, Zohaib Dhanani, who oversaw the remodeling project.

On June 14, 2017, Burke had an in-person meeting with the Dhananis at the Burger King restaurant. After the meeting, Burke took the Dhananis to lunch at Burke's country club. Burke used the lunch as an opportunity to pitch his law firm to the Dhananis. Burke boasted to the Dhananis about his firm's successful work for

a high-profile client. The pitch was entirely unsolicited. During a subsequent call with Zohaib Dhanani on June 27, 2017, Burke explicitly linked his assistance with the issuance of a City permit with the Dhananis hiring his law firm:

BURKE:      Hello my friend in Houston, how are ya?

DHANANI:    Good Mr. Burke, how are you?

BURKE:      Good. Um, I haven't heard back. I'm just checking in with you.

***

BURKE:      Good. And um, we were gonna talk about the real estate tax ah, representation and ah, you're gonna have somebody get in touch with me so we can expedite your permits.

DHANANI:    I'm sorry, Mr. Burke, what was that last part?

BURKE:      You were gonna have somebody call me uh, so we could help you make sure you get your permits for the remodeling.

See GX59.

However, the Chicago Department of Buildings (CDOB) issued the building permit to Tri-City Foods, as it turned out, without the Dhananis hiring Burke's law firm. In October 2017, Tri-City Foods began construction. Burke saw the construction and expressed frustration to Peter Andrews, who worked for Burke, that he had "played nice" with the Dhananis, even taking them to lunch at the country club, and yet the Dhananis had not hired his law firm. GX106. Burke then interfered with the remodeling work on the pretext that the Burger King did not have a necessary driveway permit. GX105. On October 25, 2017, at Burke's direction, Andrews shut down the remodel. GX106.

6

Construction remained shut down at the Burger King through December 2017, leaving only the restaurant's drive-through operational. As a result, as of approximately December 5, 2017, sales at the Burger King nose-dived (GX345) and Tri-City suffered lost profits of $65,000. *See* PSR at 63; *see* Gov. Version at 36; Gov. Version Exhibit A at 6-7.

On December 12, 2017, Burke met with Shoukat and Zohaib Dhanani at the Union League Club. Burke pressed the Dhananis on why they had not yet hired his law firm. The Dhananis, concerned that they would face more trouble from Burke at the restaurant in Burke's Ward, assured Burke that he would get the tax business and that a Tri-City Foods employee would contact him.

With the promise of the legal business in hand, Burke allowed the construction to continue. Indeed, the next morning, on December 13, 2017, at Burke's direction, Burke's assistant emailed Jimmy Wachaa of Tri-City Foods for the purpose of arranging tax work for Klafter & Burke (GX348). Burke's assistant advised Tri-City Foods that the outstanding issues with the driveway permit had been cleared up.

On December 19, 2017, at Burke's direction, Burke's assistant emailed Wachaa stating that Burke should receive the tax business for *all* of Tri-City Foods' Illinois locations—more than 150 restaurant locations. GX350. Burke then caused an attorney at Klafter & Burke to contact Wachaa about the tax work. GX386. The very same day, the City of Chicago approved Tri-City Foods' application for three driveway permits, which were issued several weeks later. GX438-A. Ultimately, in mid-2018, Tri-City Foods decided not hire Klafter & Burke.

7

*The Pole Sign Permit Bribe*

In 2017, Burke corruptly accepted legal business from Charles Cui, a real estate developer who needed Burke's official assistance with the permitting of a pole sign at a property that was part of a larger commercial redevelopment that Cui was undertaking on the northwest side of Chicago. The property, which was located at 4901 West Irving Park Road (the "property"), was not located in Burke's Ward.

Cui entered into a lease with Binny's Beverage Depot under which Binny's would operate a commercial business at the property. *See* GX407 (lease agreement). In 2016, Cui also secured a commitment for $2 million in TIF funding from the City of Chicago for the larger redevelopment project. The TIF agreement required that Cui's company complete the entire redevelopment project before the funding would be released.

In April 2017, Binny's filed an application with the CDOB for a permit to use a large pole sign that stood in front of the property, and had last been in use long before Cui undertook the redevelopment project. CDOB denied the permit based upon an intervening zoning reclassification that made use of the sign illegal. In July 2017, Cui entered into a lease amendment with Binny's. The lease amendment provided, among other things, that, unless Cui could procure by October 31, 2017, permission allowing Binny's to use the pole sign, then Binny's would receive a rent reduction. GX424. In a contemporaneous email, Cui expressed his belief that he stood to lose $750,000 in rental income and that the loss of the pole sign would cause "extreme financial strain." GX304. In the same email, Cui explained that the loss of rental

8

income due to the pole sign permit denial might impair his ability to continue receiving funds from his lender and therefore prevent him from completing the redevelopment project "as originally agreed with [the] City." *Id*. Since completion of the project was a necessary condition to receive the TIF funds, the pole sign permit denial likewise jeopardized those funds.

In August 2017, Cui sought Burke's help to reverse the permit denial, offering a bribe to Burke in in the form of Cui hiring Klafter & Burke to do tax appeal work for the entire redevelopment project. Burke accepted the legal business, knowing that it was being given to him in exchange for his help with reversing the permit denial. In fact, on the same day that Burke's law firm reached out to Cui regarding the firm's representation of the redevelopment project for purposes of property tax appeals (August 30, 2017), Burke directed his Aldermanic staff to follow up with CDOB Commissioner Judith Frydland to see if Frydland could help with Cui's pole sign issue. The next day, August 31, 2017, Burke called Frydland and advised her to look into the pole sign permit denial to see if there was any way to reverse the decision. It was clear from the evidence that Burke was seeking reversal of the earlier decision to deny the permit.

In a phone call on September 13, 2017, Frydland informed Burke's Aldermanic assistant that Frydland would not be able to assist with the pole sign permit, and noted that Cui submitted a doctored image to CDOB to support the request. Frydland recommended that Burke contact Zoning Administrator Patricia Scudiero for a possible solution. GX95. Burke's assistant communicated these details to Burke,

9

including that Cui submitted a doctored image to CDOB. *Id.* Nevertheless, Burke then spoke to Scudiero and asked her to review the pole sign permit denial. Scudiero did so, but likewise determined that there was no basis to reverse the determination.

### The Field Museum Shakedown

Burke abused his position as Alderman by threatening to derail a proposed admission fee increase by The Field Museum ("the museum") due to the museum's failure to respond to Burke's inquiry about a paid internship position for the daughter of a close friend and former colleague of Burke's on the City Council.

In July 2017, Burke agreed to assist his close personal friends, Terry and Celeste Gabinski, with an application their daughter (Molly Gabinski) had made to the museum for a paid internship in the public relations department of the museum. The museum failed to respond to Burke regarding Molly Gabinski's application.

On Friday, September 8, 2017, the head of government relations for the museum, Deborah Bekken, called Burke's office to schedule a meeting with him regarding the museum's admission fee proposal, which was pending before the Chicago Park District Board of Commissioners. GX90 and GX91. Burke had a long history of opposing admission fee increases at Chicago's museums and had previously tried to use his official position to interfere with museum fee increase proposals. As a result, the museum had developed a practice of meeting with Burke prior to seeking approval for a fee increase from the Park District in order to address any concerns Burke had.

10

During the call with Bekken, Burke explicitly threatened to use his position as Chairman of the Committee on Finance to kill the museum's admission fee increase proposal on account of the museum's failure to respond to his recommendation of Molly Gabinski. GX 91 (Burke stated, "I'm sure I know what you wanna do because if the Chairman of the Committee on Finance calls the President of the Park Board, your proposal's gonna go nowhere."). The proposal was scheduled to be considered by the Park District Board on September 13, 2017.

After Bekken's call with Burke, museum executives quickly worked to find out what happened to Gabinski's application and to appease Burke. At the same time, Burke continued to capitalize on his threat to the museum. Burke directed a member of his staff to email the museum on Monday morning, September 11, 2017, stating "I just wanted to follow up regarding Molly Gabinski. She has not heard anything from the Museum so the Alderman asked me to check in." GX295-A. Soon thereafter, the museum's president emailed Burke with an explanation of how Molly Gabinski's internship application had fallen through the cracks and advising that a paid full-time job was available in the museum's public relations department. The annual salary for this position was $47,500.

The next day, September 12, 2017, Burke telephoned Celeste Gabinski, Molly Gabinski's mother, and told her about the full-time job. Following this call, Burke directed his assistant to email the museum for details about the job, and in response, an employee of the museum provided that information and indicated that the museum would contact Molly Gabinski for an interview.

On September 13, 2017, the Park District Board approved an increase in the museum's admission fee without interference from Burke. On September 19, 2017, Molly Gabinski told the museum that she was not pursuing the job. GX307.

Each of these four episodes is, standing on its own, starkly reflective of Burke's corrupt use of his official position to secure for himself and select others personal and financial benefits. Yet, the audacity of this illegal conduct is even more striking when the episodes are considered together in the tight three-year period in which they took place. Burke's involvement with efforts in March 2017 to resolve issues between 601W and the Department of Water Management (*see, e.g.,* GX 230; Tr. 1521), for example, occurred three months before the conversation between Burke and Zohaib Dhanani in which Burke linked his assistance with the Burger King building permit to the Dhananis giving him law firm business. Burke's email to an Amtrak official about problems 601W had with Amtrak in June 2017 (GX 254) occurred in the same month as the Zohaib Dhanani conversation. Burke's telephone call to Judy Frydland about the Binny's pole sign occurred only one week before Burke threatened Deborah Bekken about withholding support for the admissions fee increase. The Bekken conversation occurred only one month before Andrews, at Burke's direction, shut down construction at the Burger King. The temporal interconnectedness of these episodes demonstrates the ease and frequency with which Burke abused his official position for personal and financial gain. In sum, the relationship of the episodes demonstrated that, as reflected by the jury's verdict, Burke committed these offenses through a pattern of racketeering activity.

## II.  GUIDELINES CALCULATION AND OBJECTIONS TO THE PSR

### A.  Offense Level Calculations

The Probation Office and parties agree on the Guideline sections to be applied in this case.  The only disagreement relates to the calculation of the harm or loss caused by Burke's conduct under Guideline § 2C1.1(b)(2), as described in more detail below.

The government calculates the harm or loss caused by Burke's conduct as $829,525 and the total offense level as 32:

| Level | Description | Guideline | PSR |
|-------|-------------|-----------|-----|
|  | All counts of conviction group under the Guidelines | USSG §§ 3D1.2(d) and 2C1.1 | PSR ¶¶ 93-98 |
| 14 | Base Offense Level | USSG §§ 2E1.1(a)(2), 2E1.2(a)(2), and 2C1.1(a)(1) | PSR ¶ 100 |
| 2 | The instant offense involved more than one bribe or extortion | USSG § 2C1.1(b)(1) | PSR ¶ 101 |
| 14 | Value of the payment, the benefit received or to be received in return for the payment, the value obtained or to be obtained by the public official totaling $829,525, which is more than $550,000 but less than $1.5 million | USSG §§ 2C1.1(b)(2) and 2B1.1 | Gov. Version |
| 4 | Defendant was an elected public official, namely, an elected Alderman | USSG § 2C1.1(b)(3) | PSR ¶ 109 |
| -2 | Defendant meets the criteria of a zero-point offender | USSG § 4C1.1(a) | PSR ¶ 117 |
|  |  |  |  |
| 32 | **TOTAL OFFENSE LEVEL** |  |  |

13

Taking a conservative approach to measuring the harm/loss Burke caused as to each of the four episodes of criminal activity, the government's position is that the total loss/harm under § 2C1.1(b)(2) is $829,525, which equates to a 14-level enhancement. The government objects to the Probation Office's calculation of the loss/harm under § 2C1.1(b)(2) as $183,607.50, which equates to a 10-level enhancement. The Probation Office's calculation is based solely on the pole sign episode and fails to apply any value to the loss/harm caused by Burke's illegal conduct as to the other three episodes, which is not consistent with § 2C1.1(b)(2), which provides as follows:

> If the value of the payment, the benefit received or to be received in return for the payment, the value of anything obtained or to be obtained by a public official or others acting with a public official, or the loss to the government from the offense, whichever is greatest, exceeded $6,500, increase by the number of levels from the table in §2B1.1 (Theft, Property Destruction, and Fraud) corresponding to that amount.

Thus, as relevant to this case, the loss or harm may be measured by the value to be obtained by Burke from his conduct, **or** the value of the benefit to be received in return for the payment to Burke, whichever is greater. As described below, undertaking this calculation for each of the four criminal episodes results in a total of $829,525:

| Episode | Amount | Basis Under § 2C1.1(b)(2) |
|---|---|---|
| Post Office project | $105,000 | Value of the bribe to Burke |
| Burger King restaurant | $65,000 | Lost profit realized by Tri-City Foods from shut down of restaurant |
| Pole sign permit | $612,025 | Value of benefit to be anticipated by Cui in return for giving bribe to Burke |

14

| The Field Museum | $47,500 | Value to be obtained from attempted extortion |
|---|---|---|
| | | |
| **TOTAL** | **$829,525** | |

*See* Gov. Version at 34-37.

### 1.    Post Office Project – Harm/Loss of $105,000

Section 2C1.1 provides that the harm or potential harm as to the Old Post Office episode can be measured by the greater of the value of the legal business to be obtained by Burke, or the value of the benefit to be received by 601W in return for giving Burke the legal business.  The greater loss calculation would be to apply the benefit received by 601W in return for giving Burke legal business.  601W benefited in receiving City Council approvals for a Class L ordinance worth approximately $50-$100 million (the largest in City history) and TIF funding of approximately $18 million, because Burke had significant leverage over both matters as Chairman of the Committee on Finance.  In January 2018, after receiving Skydell's promise of business for the Sullivan Center, Burke put both measures on the Committee on Finance agenda, recommended that the City Council approve both measures, and voted for both measures.  If the combined value of the Class L designation and the TIF funding were used to calculate the harm, Burke's Guideline range would skyrocket given the size of both awards.

However, to err on the side of caution, and to avoid the Court having to undertake a potentially complex analysis of the value of the benefits received by 601W, the government instead measured the harm by the value of the benefit to be received by Burke, which is guided by the two contingent fee agreements entered into

15

between Klafter & Burke and 601W for tax appeal representation of large commercial properties—(1) the Sullivan Center and (2) One South Wacker Drive. Under the Sullivan Center agreement, Klafter & Burke would be paid a flat fee of $15,000 per year for three years of tax appeal work for a total of $45,000. GX445. Under the One South Wacker agreement, Klafter & Burke would be paid a flat fee of $20,000 per year for three years of tax appeal work for a total of $60,000. GX449. Further, under both agreements, if the firm successfully filed an appeal before the Property Tax Appeal Board or the Circuit Court of Cook County, 601W was then obligated to pay 20 percent of the tax savings to the firm. *Id.*

Thus, Burke's law firm would have received no less than a total of $105,000 ($45,000 + $60,000) from 601W for the tax appeal work on the two properties. This calculation does not even account for the additional 20 percent share that Klafter & Burke could have received if the tax appeals were successful.

The Probation Office, however, declined to assert that there was any dollar value corresponding with the bribe as to the Post Office project under § 2C1.1(b)(2). PSR ¶ 104. The Probation Office relied in part on the fact that Klafter & Burke never received any fees from 601W, and its interpretation of the fee agreement. *Id.* The Probation Office concluded, "While it appears evident . . . that the defendant intended to receive legal fees from 601W, this officer agrees that such fees would have required successful legal work by Klafter & Burke and no such work was done." *Id.*

The government respectfully disagrees with the Probation Office's position. The evidence reflects that the flat fee as to the Sullivan Center and One South Wacker

were *not* contingent upon Klafter & Burke successfully appealing the property taxes for those properties. The flat fees to be paid for appealing to the Cook County Assessor's Office regardless of success; the contingent fee of 20 percent was to be paid if there was a successful appeal to the Property Tax Appeal Board or in Circuit Court. Indeed, Bryan Oyster, who handled property tax matters for 601W in Chicago and who negotiated the contingent fee agreements with Klafter & Burke, testified to this fact. Tr. 1931, 1936. Oyster testified, "There's a flat fee for appealing and the appeal process, so that they [Klafter & Burke] get that automatically." Tr. 1931. Likewise, Klafter & Burke attorney Chris Caira explained in an email to Oyster that the "flat fee retainer" was being proposed "instead of proposing a contingent fee" and as different from a "refund based" fee precisely because a contingent fee would likely result in an *outsized* payment to Klafter & Burke:

**From:** Chris Caira <ccaira@klafterandburke.com>
**Sent:** Tuesday, August 14, 2018 2:32 PM
**To:** Oyster, Bryan <Bryan.Oyster@am.jll.com>
**Subject:** [EXTERNAL] Proposed Fee Agreement

Thank you Bryan,
I've attached a proposed fee agreement for the coming 2018 triennial period for the Sullivan Center Offices at 1 S. State.

Upon calculation of the previous year's appeals and savings we calculated that a contingent fee for such services at the Assessor and Board would have resulted in a fee in excess of $125,000 annually.  Instead of proposing a contingent fee for those services we have, instead, proposed a flat fee retainer for all Assessor and Board of Review filings at $35,000 annually. This will include all budgetary projections and other value added services and consultations regarding the property. We do not charge on an hourly basis for these services and the are all included in the overall annual retainer.

We have also adjusted our refund based filing fees down from the standard 33% to 30%.

So, take a look and let me know if you have any questions or if you'd like to discuss further. Thank you for the opportunity to be of service to you and to the Sullivan Center owners.

GX382.[1]

In any event, *even if* the flat fees totaling $105,000 were contingent upon success in the appeals process, applying $105,000 as a loss figure is not speculative. Clearly, Burke anticipated that his law firm would make money from its representation of 601W's commercial properties.  Klafter & Burke was not in the business of doing the work involved to file tax appeals for large commercial properties for free.  As the recordings make clear, Burke was chasing Skydell and 601W to be a

---

[1] As Oyster explained during his testimony, the flat fee for the Sullivan Center was negotiated down from the proposed $35,000 per year to $15,000 per year.  Tr. 1930.  Furthermore, the agreed-upon contingent fee for refunds obtained at the Property Tax Appeal Board or Circuit Court level was reduced to 20 percent rather than the 30 percent proposed by Caira.  Tr. 1930-1931; Tr. 1935-1936.  Oyster further testified that the flat fee for appeal of the taxes at One South Wacker was more than the Sullivan Center ($20,000 annually as opposed to $15,000) because of the additional size of One South Wacker and amount of work that would need to be done to appeal One South Wacker's taxes.  Tr. 1935.

client because Burke expected the "cash register" to ring. GX11. Burke was so sure that he would get money from 601W that he offered a "marketing arrangement" to Solis for bringing in 601W as a client so that he could "share the wealth" with Solis. GX2, Clip 1. And in fact, specifically as to the Sullivan Center, Klafter & Burke itself anticipated a very successful appeal—as set forth above, Caira predicted based on prior filings that a successful appeal would result in fees to Klafter & Burke of more than $125,000 under a contingent fee arrangement. GX382.

In short, it strains reason to conclude there was no value to Burke from his corrupt solicitation of tax business from 601W, when it is clear from the evidence that Burke anticipated he would receive significant fees in connection with the representation of 601W commercial properties. The benefit to Burke of $105,000 provides a reasonable and conservative estimate of the "harm" under § 2C1.1(b)(2). *See United States v. Buncich*, 20 F.4th 1167, 1172 (7th Cir. 2021) (in calculating the harm under the "benefit to be received" prong of § 2C1.1(b)(2), recognizing that, "benefit calculations cannot always be precise, and so we accept reasonable estimates based on the information available in the record.") (citation omitted); *United States v. Spano*, 421 F.3d 599, 608 (7th Cir. 2005) ("Reasonable estimates are proper predicates for calculating loss.") (citations omitted).[2]

---

[2] Burke argues that One South Wacker should not be included in the loss calculation because 601W's representative, Bryan Oyster, sent the property to Klafter & Burke by mistake and Oyster first reached out about the property after the relevant time period, *i.e.*, after the September 2018 vote on the TIF funding. Def. Version at 3-4. The One South Wacker property is appropriately included in the loss calculation. First, as a threshold matter, Burke solicited tax appeal business from Skydell between 2016 and 2018, prior to the TIF funding vote, and he did not limit his solicitation to any particular property or any particular number of properties. Skydell sent two properties to Burke during the period of their relationship—

### 2. Burger King - Harm/Loss of $65,000

As provided by § 2C1.1(b)(2), the harm caused by Burke's attempted extortion of Tri-City Foods can be measured by assessing the loss to Tri-City Foods incurred by Burke's obstruction of the remodeling of the Burger King. Here, the government has calculated this number in a conservative fashion by looking at the effect that Burke's shutdown of construction had on sales and ultimately profit at the Burger King, rather than the fees Burke stood to gain as a result of the extortion.

Focusing only on the approximately two-month period that Burke halted construction—which ran from October 24, 2017, through at least approximately

---

the Sullivan Center and One South Wacker. Burke signed contingency fee agreements for both properties—one before and one after the TIF funding vote. *See* GX 382, 449. The contingent fee agreement for One South Wacker bore the date of October 12, 2018 and Burke's signature. GX 449. Thus, by all appearances to Burke and Klafter & Burke, Burke's solicitations of Skydell for tax appeal business, done prior to September 2018, netted the firm two properties. On November 8, 2018, Oyster told Caira by email to "hold tight" for the moment on the One South Wacker property. GX 367. On December 17, 2018, Oyster notified Caira by email that 601W was not going to award the contract for One South Wacker to Klafter & Burke. *Id.* Oyster's email did not refer to One South Wacker as having been sent to Klafter & Burke by "mistake," and thus there is no evidence that, at the time, Klafter & Burke believed it had received the property in error. Tr. 1965-66. At the time of this email, Klafter & Burke still represented the Sullivan Center. Then, on December 20, 2018, after Oyster notified Caira about the One South Wacker representation, Caira notified Oyster that Klafter & Burke was withdrawing its representation on the Sullivan Center property. Oyster testified that he was not expecting the withdrawal by Klafter & Burke from the Sullivan Center property. Tr. 1964. The inclusion of the One South Wacker property in the loss calculation is appropriate because Burke's solicitation of Skydell, during the pendency of the Old Post Office renovations and while Skydell needed various City of Chicago and Amtrak approvals, was successful. Even if Skydell sent the One South Wacker property to Burke by mistake, the One South Wacker property was in Klafter & Burke's hands for a period of time between October 2018 to December 2018. The fact that Burke's firm received the One South Wacker property after the TIF vote is of no consequence because Burke's solicitations for law firm business occurred well before the TIF vote. Guideline Section 2B1.1, Application Note 3(A)(ii) defines "intended loss" to mean "the pecuniary harm that the defendant [Burke] purposely sought to inflict…." Here, Burke meant to secure the contingent fee and the flat fee in connection with the One South Wacker property, and therefore it is properly included in the calculation of loss.

December 19, 2017, Tri-City Foods lost profits totaling $65,000.[3] Alternatively, under § 2C1.1, the "greater" of the harm/loss calculation would be the value of the legal fees that Burke attempted to obtain from Tri-City Foods. As set forth above, Burke attempted to obtain the tax business for *all* of Tri-City Foods' Burger King restaurants in Illinois—more than approximately 150 locations. It would be difficult to estimate the legal fees Burke attempted to obtain, however, because the fees would be based upon appeals for each unique restaurant location and would have been paid only if the law firm was successful. Furthermore, the fees upon success would have been a percentage of the property tax savings, rather than a set amount. *See* GX443 (draft contingent fee agreement Klafter & Burke sent to Tri-City Foods, reflecting potential fees in the form of 25 percent of the first year's tax savings). But, undoubtedly, Burke and his law firm stood to gain a significant amount of income from representing more than 150 individual restaurant locations in property tax appeals as a result of landing all of the Dhananis' Illinois-based business as clients, even if some of those appeals were not successful; indeed, those potential profits

---

[3] Using this method of calculating loss, arguably Burke should be held responsible for the entire period that the construction was shut down at the Burger King, which ran from October 24, 2017 through at least February 15, 2018. GX357. Once Burke finally allowed construction to continue in late December 2017, Tri-City Foods could not begin construction immediately upon the Chicago Department of Transportation (CDOT) approving the driveway permits. Rather, the company had to go to CDOT to pay for the driveway permits to be issued, which occurred in January 2018, and then, the general contractor needed time to amass the materials and labor needed for the construction to restart after sitting dormant for months (*see* GX357). But again, the government has taken the most narrow and conservative approach. The Court may, of course, consider that the government's calculation likely understates the true harm of Burke's illegal conduct when applying the factors identified in 18 U.S.C. § 3553(a).

underscore why Burke was chasing Tri-City Foods so aggressively as a property tax client. *See* GX47.

Nevertheless, focusing only on the two-month period during which Burke specifically halted the construction, as set forth above, the Burger King on Pulaski suffered a substantial reduction in sales. During this period, only the drive-through was operational and the halted construction made the restaurant appear to be shut down. As presented at trial, a December 5, 2017, email from a representative of the Burger King corporation states the Burger King corporation observed that demolition was completed at the Burger King on Pulaski in October 2017, and since then, sales had been down 55 percent. GX345. Tri-City Foods executive Zohaib Dhanani testified about GX474, which compared the difference in sales at the Burger King between the shut-down period of October 2017 – April 2018, with the same time period during the prior year and subsequent year. This information showed a drop in sales of approximately 60 percent:

| Month & Year | Restaurant Status | Total Approximate Sales at Burger King |
|---|---|---|
| Oct. 2016–April 2017 | Prior to remodeling | $932,563 |
| Oct. 2017–April 2018 | Construction began 10/18/17, construction halted on 10/24/17 (only drive-through was operational), construction restarted on 2/15/18 (only drive-through was operational), store completely closed for remodeling 3/21-4/5/18, store and drive-through fully re-opened on 4/26/18 | $395,856 |
| Oct. 2018–April 2019 | After remodeling | $976,417[4] |

---

[4] Based on these figures, the loss in sales to the Burger King on Pulaski because of Burke's conduct could be measured at more than $530,000.

Similarly, according to information obtained from Tri-City Foods (*see* Gov. Version, Exhibit A at 6-7, Report of Wachaa Interview), sales during this period were down approximately 60 percent, based upon a comparison of sales during the shut-down period (November-December 2017) with the same months in the following year, when the restaurant was fully operational:

| Month & Year | Restaurant Status | Total Approximate Sales at Burger King on Pulaski |
|---|---|---|
| November 2017 | Construction halted. Only the drive through was operational. | $53,000 |
| November 2018 | Restaurant was fully re-opened and had been remodeled. | $135,000 |
| December 2017 | Construction halted. Only the drive through was operational. | $63,000 |
| December 2018 | Restaurant was fully re-opened and had been remodeled. | $196,000 |

Thus, the estimated **loss in sales** due to Burke's shut down of the construction was approximately $215,000 (($153,000-$53,000) + ($196,000-$63,000)).  The **lost profit** during this two-month period was $65,000.  *See* Gov. Version, Ex. A at 6-7.[5] The Probation Office agrees that the $65,000 figure represents lost profit.  PSR ¶ 105.

Despite all of this evidence, Burke completely ignores the fact that $65,000 represents lost *profit*, and inexplicably claims (with no basis whatsoever) that this figure represents lost *revenue*.  Defense Version at 8.  Then, Burke argues that only 18 percent of the $65,000 should be considered as profit based a number derived from the internet.  *Id.*  Burke's claim that $65,000 is lost revenue (as opposed to profit)

---

[5] Wachaa has submitted a sworn statement, in which he confirmed his prior estimate that the shut down of the restaurant resulted in lost profits to Tri-City of at least approximately $65,000, and explained that the loss in profit was driven by sharply lower food sales in November 2017 and December 2017, as compared to November 2018 and December 2018.

lacks any basis in evidence, is contrary to the Probation Office's finding that Tri-City Foods is due $65,000 in restitution, and should be disregarded.

While the Probation Office agrees that Burke's conduct caused Tri-City Foods to lose $65,000 in profit, the Probation Office declined to apply any value under § 2C1.1(b)(2) for the Burger King conduct on the basis that $65,000 is not the value of the payment sought by Burke, it was not a benefit to be received by Burke, or loss to the government. PSR ¶¶ 105, 197. The government respectfully disagrees because § 2C1.1(b)(2) provides for measuring loss by the value of the "benefit received or to be received in return for the payment." Here, Tri-City Foods would have benefited by at least $65,000 if it had given Burke the legal business he had sought before starting construction at the Burger King because then Burke would not have shut down construction at the site. As with the Post Office project, it strains reason not to apply *any* loss/harm value to Burke's attempted extortion of Tri-City Foods given the significant value of the legal business that Burke sought, and given that the Probation Office agrees that $65,000 in restitution is due to Tri-City Foods—a loss that would not have occurred if Burke had gotten the business he wanted.

### 3. Pole Sign Permit – Harm/Loss of $612,025

The harm as to this episode should be measured by assessing the value of the benefit to be received by Cui in exchange for retaining Klafter & Burke (the bribe)— in other words, the value of the permit for the pole sign. The lease agreements between Cui's company and Binny's provided that the rent for the Irving Park property would be reduced by $0.50 per square foot of the 24,481 square foot property if Binny's did not have use of the pole sign. GX424; GX407. The rent reduction was

24

to apply annually for the entirety of the 50-year lease period.[6]  GX407 at 1-2.  Thus, the value of the pole sign permit is appropriately measured as the $612,025 in rent that Cui's company would have collected if the permit were approved.

Cui's own statements in a contemporaneous email indicated that he believed he stood to lose as much as $750,000 in rent if the pole sign permit were not approved. GX304.  The evidence further showed that failure to secure the use of the pole sign ran the risk that Binny's would withdraw as a tenant for the Irving Park property (see GX270), which would then jeopardize the entirety of Cui's TIF, which totaled approximately $2 million.  Although the government's loss calculation embraces the more conservative $612,025 figure as the value of the benefit to be received by Cui, the higher figures are appropriate for the Court to consider when applying the factors identified in 18 U.S.C. § 3553(a).

The Probation Office agrees that the harm caused by the pole sign episode should be measured by the rent reduction Cui would have avoided if the pole sign permit had been approved.  PSR ¶ 106.  However, the Probation Office has considered only the 15-year initial lease period in making that calculation, which results in a rent reduction of $183,607.50.  The Probation Office concluded that it was too speculative to assume that the lease would be extended beyond 15 years for the full lease term of 50 years.  GX407; PSR ¶ 106 ("Given that any number of factors could

---

[6] The lease agreement has an initial 15-year lease period and seven additional five-year periods that the lease could have been extended.  GX407 at 1-2.  Thus, the maximum period of the lease was 50 years.

cause a lease to be terminated or not extended, this officer respectfully declines to speculate that the lease would continue for the full 50-year term.").

The government respectfully disagrees with the Probation Office's position. Binny's was no fly-by-night operation; rather, it was an established business, and occupied a significant portion of Cui's property at 4901 W. Irving Park. Cui himself was under the impression that the lease would go the full term of 50 years. GX304. The lease specified that Binny's had the right to extend the lease after 15 years for up to 50 years. Thus, it is not too speculative to assume for loss purposes that the lease would go the full term of 50 years. The Court's calculation of loss must be a reasonable estimate, and it is reasonable under the evidence to assume that the lease would go for its full term. *United States v. White*, 737 F.3d 1121, 1142 (7th Cir. 2013) (the district court need only make a reasonable estimate of the loss) (citing *United States v. Love*, 680 F.3d 994, 999 (7th Cir. 2012)); *United States v. Stein*, 756 F.3d 1027, 1029 (7th Cir. 2014) (same).[7]

### 4. The Field Museum – Harm/Loss of $47,500

The harm as to the museum episode can be measured by assessing the value of the thing to be obtained by Burke for his family friend—namely, the salary for the

---

[7] Burke suggests that the appropriate measure of loss is $60,000 because that is the sum for which Cui and Binny's ultimately resolved the issue after the pole sign permit denial was not reversed. The Court should reject this argument because it relies on an amount that the parties to the lease agreement settled on well after Burke's (and Cui's) crime were complete— *i.e.*, when Burke agreed to accept Cui's tax business in exchange for Burke's help reversing the pole sign permit denial. Cui's contemporaneous email communications make clear that the value of the pole sign permit to him at the time he offered a bribe was much greater. Even if the amount of the settlement is relevant, the evidentiary record is undeveloped with respect to whether Binny's received any additional value as a result of its decision to resolve the pole sign matter for $60,000.

full-time position that Burke sought to extort from the museum for Molly Gabinski as charged in the superseding indictment. The position carried an annual salary of $47,500. GX426. The government's calculation takes the conservative approach of including only one year's salary.

The Probation Office declined to apply a loss/harm value to the museum matter on the basis that it was too speculative to assume that Molly Gabinski would have been awarded the position in question, and that it was unknown whether Molly Gabinski would have accepted the position given that she withdrew her interest in it. PSR ¶ 107. The approach taken by the Probation Office, however, is inconsistent with the text of the applicable guideline. Burke was convicted of attempted extortion, not extortion, and thus the benefit at issue—the salary for Molly Gabinski— necessarily was not received. Taking this reality into account, § 2C1.1(b)(2) provides that the harm/loss can be measured by "the benefit received or *to be received*." Accordingly, the Seventh Circuit has recognized that "benefit calculations [under § 2C1.1(b)(2)] cannot always be precise" and therefore the Court must make "reasonable estimates based on the information available in the record." *Buncich*, 20 F.4th at 1172. Here, the record provides a firm number—the full-time job had an annual salary of $47,500. Moreover, Burke pursued this salaried position for Molly Gabinski, and the museum specifically reached out to Molly Gabinski about the position and offered her an interview. Although an interview may not guarantee a position, it is obvious that Burke aimed to obtain money for Gabinski in the form of the salary she would receive as a museum employee.

27

### B.    Criminal History Category

The government agrees with that defendant has no criminal history points and is therefore in criminal history category I.  PSR ¶¶ 125-126.

### C.    Advisory Guideline Range

Based on the government's calculation of a total offense level of 32, and a criminal history category of I, Burke's Guideline range is 121 to 151 months' imprisonment.  The Probation Office found the total offense level to be 28 with a resulting Guideline range of 78 to 97 months' imprisonment.  PSR ¶ 185.

## III.   Sentencing Factors Under 18 U.S.C. § 3553(e)

Section 3553(a) requires the court to impose a sentence that is "sufficient, but not greater than necessary," to comply with the purposes of sentencing.  In order to determine the sentence to impose, after calculating the Sentencing Guidelines, the court must consider the statutory factors listed in § 3553(a)(1)-(7).  *Gall v. United States*, 552 U.S. 38, 49 (2007) ("As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark.").

For the reasons set forth below, consideration of the statutory sentencing factors reveals that a Guideline-sentence of 121 months' imprisonment is warranted.

### A.    The Nature and Circumstances of the Offense and the History and Characteristics of the Defendant

#### 1.    The Offense Conduct Merits a 121 Month Sentence.

The nature and circumstances of the 13 offenses of conviction weigh strongly in favor of a significant sentence that is within the Guidelines range.    Public

28

corruption has had a long-standing presence in and has been a persistent scourge on the City of Chicago. Burke was one of the most powerful and well-known public officials in Chicago for decades. He was the face—or "Dean"—of the City Council, and was widely considered to be the City's most powerful politician next to the Mayor. Burke's prominence makes his criminal activity even more damaging. Burke, through his pattern of corrupt and extortionate activity, deprived all the residents of Chicago of honest government. Burke engaged in that conduct brazenly and boldly. Judge Zagel, in addressing former Governor Blagojevich at his sentencing hearing, another corrupt Illinois politician in a top position of government, stated: "the fabric of Illinois is torn and disfigured and not easily or quickly repaired. You did that damage." *United States v. Blagojevich*, No. 08 CR 888 (Dec. 7, 2011) (N.D. Ill.) (Zagel, J.), Dkt. 1036 at 260. Likewise, here, Burke's conduct has further eroded the public trust in Chicago public officials, and he has done damage that will not be easy to repair.

Burke's criminal activity was pervasive, long-lasting, and particularly contemptable because it involved repeated attempts to acquire private business—and thereby line his pockets—by freely trading his public office for private gain. In so doing, Burke served his best interests and not the best interests of Chicagoans. Over and over again, Burke demonstrated that he was willing to use the power of his public office to enrich himself and to attempt to influence City officials and government to benefit his private clients.

Burke also victimized the entities that he intended and attempted to extort. The government's conservative approach to calculating the harm and loss in this case far understates the value Burke was seeking to obtain and far understates the harm that Burke's conduct caused.

The Field Museum is one of the most significant public institutions in Chicago, standing as a peer to the finest museums in the world and drawing more than a million visitors each year. Nevertheless, Burke threatened to block a proposed admission fee increase, which the preeminent institution needed for its operations, all because the museum had not responded to Burke's efforts to secure a paid internship for his family friend. This incident shows how far Burke was willing to go—and the depths to which Burke was willing to sink—to get what *he* wanted by abusing the office he had been elected to fill.

The Burger King shakedown demonstrated that Burke put his interests above those of his constituents and Ward. Tri-City Foods was a nationwide business that was trying to do business in Chicago—to remodel and improve the appearance of its Burger King restaurants, and to bring the accompanying construction and restaurant jobs to the city. But, instead of supporting Tri-City Foods, Burke threatened and attempted to extort the company because it failed to promptly give business to his private law firm. Burke's conduct not only had a real financial impact on Tri-City Foods in terms of the loss of revenue, but it also impacted the Dhananis and other representatives of the company who interacted with Burke and his staff for months. These Tri-City Foods representatives feared that Burke would hurt their operations

across the City of Chicago, much as he had done to the Burger King in his ward. Burke's conduct unfortunately confirms that idea that there is a corruption tax for companies that wish to consider relocating and doing business here.

The Old Post Office shakedown drives this point home. The Old Post Office was in a state of disrepair when 601W purchased it and undertook a massive and complicated renovation of the building, which was good for the City of Chicago. Burke, however, continually made it clear that he was "not motivated" to help the project because 601W had not hired his firm. Although the renovation of the Old Post Office was good for the City, Burke expressed a willingness keep the TIF monies 601W needed off the agenda of the Committee on Finance simply because he had not been able to line his own pockets with 601W's money.

The evidence in this case makes it obvious that Burke was no novice when it came to corruption. The consensual recordings and wire interceptions vividly demonstrated the ease with which Burke exploited his public position for private gain. Burke operated as a seasoned professional when it came to identifying new potential clients for his law firm and exploiting his power and position in order to secure their business. A few samples from the recordings are set forth below.

In September 2016, after Burke asked Solis to recommend Klafter & Burke to 601W, Burke and Solis discussed the marketing arrangement Burke had offered to Solis in exchange for bringing developers to him as law firm clients. GX2. With regard to the marketing arrangement, Burke told Solis that he was a "**believer in sharing the . . . wealth**" and that it "**wouldn't be the first time, won't be the**

last time." GX2, Clip 1 (emphasis added). Burke and Solis then talked about all of the developers Solis had access to through projects in his ward, all of which were potential clients for Klafter & Burke.

On January 25, 2017, Burke and Solis discussed 601W's need for assistance with Amtrak and with getting a historical landmark designation. Burke could have easily used his position as a public official to support this important project for Chicago—a project meant to turn a husk of a building into a thriving gateway into the City. But that support was not forthcoming because, as Burke made clear, he was not going to do "any lifting" for Skydell, one of 601W's principals, because "the cash register has not rung yet":

BURKE:         -I haven't heard a word.

SOLIS:         But I thought we were gonna do this tour and have a discussion with, um, Ray Lang or Moreland or somebody.

BURKE:         Jeff Moreland is the, um-

                    (Simultaneous conversation.)

SOLIS:         -the board member-

BURKE:         -the member of Amtrak.

SOLIS:         Right.

**BURKE:**         **Um, um, but, you know, if, if we're not, uh, signed up, I'm not gonna, uh, do any lifting for this guy.**

* * *

SOLIS:         The other stuff is working well. CMK on both sides of River City and just north of Roosevelt Road. **And I think the Post Office is, they're g-, they got, they have a lot of other stuff, uh, this, they're gonna need in the future. This, uh, I don't**

>**think the historical landmark issue has been resolved yet either. So.** Alright. So, so-

**BURKE:** **-So far, we got no, the cash register has not, uh, rung yet.**

*See* GX11 (emphasis added).

Similarly, on May 19, 2017, Solis told Burke that a representative of 601W's real estate management company was continuing to have problems with Amtrak and the City of Chicago Water Department. GX29. 601W, however, had not retained Burke's law firm as of that date. Burke told Solis that he had not heard about "getting hired to do the tax work," so he was not "motivated" to provide any assistance on the Post Office project. *Id.*

On May 26, 2017, Solis told Burke that Solis had spoken with Skydell. GX38. Burke responded, "So, did we land the, uh, the tuna?" *Id.* The tuna, of course, was a reference to 601W's tax business for Burke's firm. At the direction of law enforcement, Solis told Burke that Skydell had agreed to provide tax work in the future. *Id.* Then, after learning the tuna was almost reeled in, Burke agreed to assist 601W by following up with the City of Chicago Water Department and his contacts at Amtrak. *Id.*

But 601W still had not actually sent Burke's law firm business as 2017 neared an end. On October 17, 2017, Skydell and others met with Burke and Solis in Solis' City Hall office to discuss the progress of the Old Post Office project and the need for TIF. GX104. After the meeting, when alone with Solis, Burke threatened the TIF because his firm had not been hired to represent 601W yet, stating he was not "fond of the way they've conducted themselves up until this point, and as far as I'm

concerned, they can go fuck themselves." *Id.* Solis explained that he had told Skydell that 601W's request for TIF would go before Burke's committee. *Id.* Burke responded, "Well, good luck getting it on the agenda." *Id.* Burke expressed his unwillingness to allow a developer in the City of Chicago to have a funding request considered by the crucial City Council committee, all because that developer had not yet given Burke private legal business. Spite and greed—not the public interest—drove Burke's response.

The way Burke operated with regard to the Dhananis also demonstrated Burke's well-honed extortion skills. Burke used techniques from his corruption playbook in order to secure the Dhananis' legal business—that is, start by using a local, Texas-based acquaintance of Shoukat Dhanani to tell Shoukat how powerful Burke was in the City of Chicago (GX47, Burke's call with Rodney Ellis), and then move on to "play[ing] nice" with Shoukat by taking him to a country club and making a pitch for Klafter & Burke (GX106). Burke then used the hardball technique when he was not hired, by marshaling his political power to damage the Dhananis' ongoing business until they agreed to hire him.

Not once in any of the recordings did Burke indicate that he was motivated by what was good for the City of Chicago or what was best for its constituents. Just the opposite. Again and again, Burke had dollar signs in his eyes. He was fixated on making money for himself by abusing his high public office. This singular focus on self by this thoroughly corrupt public official, together with his willingness to pressure, damage, and extort whoever got in his way, merits a sentence of 121

34

months.

### 2. Burke's Other Characteristics Do Not Justify a Below-Guidelines Sentence.

The government acknowledges that Burke has no criminal history. Burke is devoted to his family and has a close relationship with his wife and children. The letters of support set forth that Burke can, at times, be a generous person and helpful friend. Burke had a very lucrative law practice and an extremely successful career in government.

But, while these facts may mitigate Burke's sentence, some of them are aggravating factors because they demonstrate that Burke's actions were motivated by greed and not need. Burke did not need to solicit bribes or extort business owners to obtain yet more business for his law firm. He already was living a very comfortable life. Indeed, as the presentence investigation report notes, Burke has millions upon millions upon millions of dollars to his name. These factors, then, support a within-Guidelines sentence and not one below it.

The government has taken account of Burke's current age in its sentencing recommendation. Burke's age is why the government recommends a sentence at the low end of the applicable Guideline range—rather than one at the high end of the range, which Burke's offenses of conviction would otherwise fully merit, particularly when given the conservative approach the government has taken with respect to its loss calculations in this case. Quite simply, Burke's age neither deterred nor prevented him from abusing his public office for personal benefit. Burke's age, as a result, should not be considered as a significant mitigating factor.

Indeed, Burke was in his 70s when he committed the crimes at issue. The jury and the Court had the opportunity to observe and hear Burke on recordings that were made when Burke was in his mid-70s, and on those recordings, Burke projected power, confidence, and ease in his daily public life. Burke certainly did not appear to be an elderly man in bad health. To the contrary, Burke knew what he was doing, aggressively pursued what he wanted, and juggled a busy schedule while carrying out multiple, simultaneous criminal acts. Burke's already advanced age at the time he committed these crimes demonstrates that his current age does not warrant a below Guidelines sentence.

If anything, Burke *used* his age to his advantage to help him carry out his crimes. Burke touted his decades of experience, his seniority in the City Council, his lengthy roster of connections, and the power he amassed over those decades to obtain clients and to advise other governmental officials. For example, during Burke's first meeting with Harry Skydell, Burke told Skydell that he had been in office for 47 years and compared himself to Peter Vallone, the long-time Speaker of the New York City Council, whom Skydell described as "very powerful."[8] GX5, Clip 2. Only then did Burke solicit from Skydell 601W's property tax appeal business. GX5, Clip 3. Later, after Skydell talked about Amtrak-related problems, Burke referred to Jeff Moreland, a member of the Amtrak Board of Directors, and bragged of having "made" Moreland's daughter a judge. GX5, Clip 6. Burke referenced the number of people

---

[8] According to open-source information, Peter Vallone, Sr., was the Speaker of the New York City Council from 1986 through 2001 and was a Councilman since 1974. *See*, *e.g.*, https://en.wikipedia.org/wiki/Peter_Vallone_Sr.

whom he and Solis knew in Chicago, *see, e.g.,* GX5, Clip 6 and GX5, Clip 7, as a means of demonstrating his extensive reach, power, and influence. None of these efforts were subtle, and they were all aimed to puff up Burke's image to persuade others to give him what he wanted.

Burke was aware of the power of invoking his name to cause others to act in the way Burke wanted. Former Commissioner of the Department of Water Management Thomas Powers testified about how his awareness of Burke's power impacted the way he responded to Burke when Burke reached out to him after he left office. Tr. 1537-1538. Another former Water Commissioner, Barrett Murphy, testified that the fact that Burke's name was invoked caused him to be more cooperative with 601W:

> Q:      Was Mr. Burke the same or different when it came to alderpeople by way of your responsiveness?
>
> A:      It was definitely different. I mean, he was the most senior alderman of the City Council. And as head of the Financial Committee, he had a lot of power and influence.
>
> Q;      For you personally, was there any type of fear factor – any type of fear factor involved in the involvement of Edward Burke in a situation like this?
>
> A:      Yes.
>
> Q:      Would you describe that for us, please?
>
> A:      Just that Alderman Burke can be extremely intimidating and was intimidating, and that you wanted to make sure you could be as responsive as possible to any request that he had.

Tr. 1549.

Notably, when considering Burke's age, Burke ran for re-election and won in

2019, *after* he was charged by complaint, when he was 75 years old. Neither Burke's age nor the pending criminal charges prevented Burke from continuing to engage in the political process and seeking public support. Indeed, well into his 70s, Burke had significant responsibilities as: Alderman of the 14th Ward; Chairman of the Committee on Finance; 14th Ward Democratic Committeeman with political duties relating to slating candidates and judges; and a name partner in an active law firm, Klafter & Burke. Burke was alert and engaged in these roles and has continued to be alert and engaged throughout these proceedings.

The government acknowledges that a sentence of 121 months is a significant sentence for someone of Burke's age. But it is a sentence that is warranted for the reasons stated herein (and further below as it concerns the need for general deterrence). Burke's age is a factor, but only one factor to consider in determining the appropriate sentence. *United States v. Johnson*, 685 F.3d 660, 663 (7th Cir. 2012). Importantly, as a counterweight to Burke's physical age is the fact that Burke *committed the crimes at issue while in mid-70s.* It is clear that Burke's age did not mitigate his conduct and should not be a reason to impose a below-Guidelines sentence.

In discussing the reasonableness of a 78-month sentence imposed upon a 70-year-old defendant who pleaded guilty to possession of a firearm by an unlawful user of a controlled substance, the Seventh Circuit aptly stated:

> The 70-year-old criminal is a *rara avis*, and by engaging in criminal activity at such an age provides evidence that he may be one of the few oldsters who will continue to engage in criminal activity until they drop. . . Suppose there were

> a rule that a person who commits a crime after his seventieth birthday can be sentenced to no more than six months in prison, lest he die there. Then those oldsters who like the defendant in our case do not terminate their criminal careers upon reaching that milestone will have only a weak disincentive to commit further crime—especially if the probability of apprehension of and conviction for the crimes in which he habitually engages is low. For the expected cost of punishment is a function of the likelihood of being punished as well as of the severity of the punishment if imposed.

*Johnson*, 685 F.3d at 662; *United States v. Moreland*, 703 F.3d 976, 991 (7th Cir. 2012) ("As for age and infirmity, age 59 is not elderly in our society; the elderly do not have a license to commit crime, and adequate medical care is available in federal prisons."); *see also United States v. Brown*, 26 F.4th 48, 70-71 (1st Cir. 2022) (citing *Johnson* in affirming a 300-month sentence for a defendant who was 64 years old when he committed the criminal activity and would be 91 years old at the time of release from prison; affirming district court's conclusion that the other relevant sentencing factors outweighed defendant's age).

Burke's health also appears to be relatively good. Burke reported to the Probation Office that he is in "pretty good health." PSR ¶ 156; *see also* PSR ¶ 158 ("I'm doing good."). Burke submitted extensive medical records to the Probation Office, and the PSR summarizes Burke's medical issues. PSR ¶¶ 145-155, 157-159. Burke appears to have the type of medical conditions accompanying his age of 80. None of Burke's medical conditions appear to be extraordinary or to be currently having a significant impact on his health, as demonstrated by the fact that Burke ably sat through a six-week trial. In any event, the Bureau of Prisons is equipped to

provide Burke with any medical treatment he may need.  *Moreland*, 703 F.3d at 991; *see also United States v. Pilon*, 734 F.3d 649, 656 (7th Cir. 2013) (affirming a within-Guidelines sentence of 78 months' imprisonment for a 60-year-old defendant convicted of wire fraud who was suffering from sarcoidosis, asthma, an irregular heartbeat, fused vertebrae in her spine, and growths in her eyes causing vision problems, stating that "Pilon's arguments about her health and age were not exceptional.") (*citing Moreland*).

Moreover, Burke's full character was revealed on the many recordings the jury heard at trial—not only his greed, but also the way he treated people when he did not get what he wanted.  When Burke was soliciting business from someone he deemed important, he was respectful to them in conversation (as in the case of Shoukat Dhanani and Harry Skydell).  But when Burke did not get what he wanted, he was demeaning (as in the case of Deborah Bekken) and negatively commented upon people's religion (as in the case of Harry Skydell).  During the trial, Burke's counsel tried to explain away Burke's behavior as "old school," but the jury did not buy this effort to contort what was really going on.  The fact is that Burke is *not* a man of high character, notwithstanding the protestations made in various character references he has submitted that appear to be entirely—and willfully—oblivious to his multi-year crime spree and the way he treated and regarded people.

### B. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense, to Promote Respect for the Law, and to Provide Just Punishment for the Offense

Burke engaged in a prolonged, calculated, and deliberate pattern of racketeering activity that took place over the course of several years, involving the

shakedown of multiple individuals as described above. Defendant made a conscious choice—indeed he made a conscious choice whenever he engaged in a new round of extortionate threats or made fresh requests for bribes—to break the law.

A sentence below the Guideline range for a high-ranking public official who betrayed his office, while obviously desired by the defendant, would not promote respect for the law; rather, it would cause people to question our system of justice, by suggesting that people that choose to ignore the law time and again, and corrupt the highest levels of government can receive lighter punishment than other, less well-heeled and politically connected individuals.

As the Seventh Circuit has observed, there is no different standard that applies to defendants surrounded by privilege:

> [N]o "middle class" sentencing discounts are authorized. Business criminals are not to be treated more leniently than members of the "criminal class" just by virtue of being regularly employed or otherwise productively engaged in lawful economic activity. It is natural for judges, drawn as they (as we) are from the middle or upper-middle class, to sympathize with criminals drawn from the same class. But in this instance we must fight our nature. Criminals who have the education and training that enables people to make a decent living without resorting to crime are more rather than less culpable than their desperately poor and deprived brethren in crime.

*United States v. Stefonek*, 179 F.3d 1030, 1038 (7th Cir. 1999) (citation omitted). By the time he committed the offenses of conviction, Burke was not just middle class; he stood at the very top of society in this City. He wants for nothing; his net worth comfortably exceeds $30 million. He was well educated, served as an elected official, and had a thriving legal practice. Despite all these advantages and treasures, he

41

choose to engage in a pattern of racketeering, and to break the law.  For these reasons, the government submits that a sentence of 121 months is appropriate and just.

**C.  The Need for the Sentence Imposed to Afford Adequate Deterrence to Criminal Conduct and to Protect the Public from Further Crimes of the Defendant**

As Edward Burke would have it, a senior public official at the pinnacle of his power in the City of Chicago can solicit bribes, extort the lesser privileged, and shake down local businesses for years on end, deny his guilt and express no remorse despite a parade of witnesses and overwhelming evidence to the contrary—and after refusing to accept responsibility or own up to his crimes to this day, happily retire to the comfort of his own home after being found guilty on 13 counts of corruption.

Burke is dead wrong.  High-level public officials in this City and in this State like Burke need to receive a simple, undiluted, and unequivocal warning loud and clear: You will pay dearly—regardless of your age—if you choose the dark path of corruption that Burke decided to walk for many years.  The need for general deterrence is particularly compelling in this case.  This public corruption prosecution has been identified as one of the most significant in many years in this City, and everyone within City and State government will be watching what this Court does.  The message to all of them should be that a very stiff sentence is in your future if you do what Edward Burke did—no ifs, ands, or buts.

Judge Seeger previously recognized the importance of general deterrence in public corruption cases during the sentencing of former Illinois State Representative Luis Arroyo:

Public corruption is deeply damaging. Public corruption makes the public cynical about their government. Public corruption infects the culture, too. It's so prevalent in Chicago that people kind of expect it. Public corruption, unfortunately, is in the air in Chicago. Public corruption breeds more public corruption. Public corruption leads to cynicism. It leads people to think that that's just how things go around here.

Public corruption is so prevalent in Chicago that people start to think that it is no big deal. That reminds me of the old line by Senator Moynihan by defining deviancy downward. People start to think, well, that's the Chicago way, that's just how things run around here.

So I start with the premise that public corruption is incredibly serious. It's serious business.

\* \* \* \*

I have to think about other members of the Illinois House. I need to think about the senators. I need to think about aldermen. I need to think about all of the public officials in the state/city government, high and low who might be tempted to sell out the public like you did and turn to public corruption. Public officials are watching. Public officials are listening. I need to make sure that they hear a message loud and clear. The message is this: Public corruption isn't worth it. I need to make sure that the message gets out that public corruption isn't worth it.

From a supply-and-demand perspective, the length of the sentence matters. The lower the cost—in other words, the lower the sentence—the more public corruption you're going to get. Public officials are rational actors. They think about the costs and benefits of public corruption. They think about how likely it is they're going to get caught. They think about what will happen to them if they do get caught. They think about the costs and benefits of corruption.

Judges play a role in that decision-making. Judges need to make sure that the costs of public corruption are high enough to deter other people from engaging in public

> corruption. For whatever reason, that message isn't getting through. I don't know why public officials in this city and in this state aren't hearing the message, but they need to. Public corruption isn't worth it. If you engage in public corruption, like Mr. Arroyo, there will be serious consequences. Public corruption doesn't pay.

*United States v. Arroyo*, 19 CR 805 (N.D. Ill.), Dkt. 162 at 107-08, 120-22. In affirming Judge Seeger's sentence, the Seventh Circuit emphasized that public officials are "prime candidates for general deterrence," because they act rationally in calculating the risks and rewards of criminal activity. *United States v. Arroyo*, 75 F.4th 705, 708 (7th Cir. 2023) (citations and internal quotations omitted). Moreover, the Seventh Circuit also recognized that the need for general deterrence can outweigh other mitigating factors, such as age and lack of criminal history. *Id.* at 709. Burke has added another sordid chapter to Chicago's storied reputation of corruption and "pay to play" politics, but that story is not complete without sending a strong message of general deterrence for those who consider following in his footsteps.

The need for general deterrence is also particularly strong for crimes that are lucrative and difficult for law enforcement to detect. *See United States v. Heffernan*, 43 F.3d 1144, 1149 (7th Cir. 1994) ("Considerations of (general) deterrence argue for punishing more heavily those offenses that either are lucrative or are difficult to detect and punish, since both attributes go to increase the expected benefits of a crime and hence the punishment required to deter it."). Public corruption crimes certainly fall into that category but have an even greater need for general deterrence given these crimes erode public trust in our government.

There is a more limited role for specific deterrence to play here. It is true that

Burke no longer holds public office. But it is apparent from the character letters received so far and the reaction to Burke's prosecution that there are those who lurk in the bowels of City government and walk in its corridors of power who are still strong allies of Burke—despite his 13 counts of conviction. Burke so far has failed to accept any responsibility in this case and maintains to this day he has done nothing wrong. It would be naïve to think that there is anything stopping Burke, the consummate political insider with his coterie of misguided friends and well-wishers, from engaging in the same type of conduct in conjunction with public officials in the future. For this reason, a sentence that specifically deters Burke is necessary to protect the public from his future criminal acts. *Cf. United States v. Medrano*, 12 CR 487-3 (N.D. Ill.) (Tharp, J.), Dkt. 300 at 50 (noting that former Alderman Ambrosio Medrano had pulled off a "corruption trifecta" in successive prosecution: "You have corrupted government processes in every role that you have come in contact with the government: as an elected official, as a government employee, and now as a member of the general public offering bribes to other elected officials.").

In summary, the epidemic of public corruption in this City weighs in favor of a Guidelines-sentence in this case, both for reasons of general and specific deterrence.

### D. The Kinds of Sentence Established by the Sentencing Guidelines and the Need to Avoid Unwarranted Sentencing Disparity

The government respectfully recommends that the Court impose a sentence within the applicable Guidelines range for another reason: sentencing within the advisory Guidelines enhances the fairness, integrity, and public reputation of judicial proceedings. The legislative history of the Sentencing Reform Act of 1984 explains

45

why this is so.  Prior to the adoption of the Guidelines, Congress studied the state of federal criminal sentencing and the indeterminate sentencing scheme then in place.

Congress was not at all pleased with what it saw.  The Senate Judiciary Committee concluded that the sentencing system in place prior to the Guidelines was unjust, because there was a "shameful disparity" in criminal sentencing, a disparity that resulted in similarly situated defendants receiving sentences that varied wildly depending on the judge they appeared before and the district they were tried in.  *See* S. Rep. No. 98-225 at 38, 65, 98th Cong., 1st Sess., 1984 U.S.C.C.A.N. 3182, 3221, 3248, 1983 WL 25404 (1983).  The Committee pointed out that "[o]ne offender may receive a sentence of probation, while another—convicted of the very same crime and possessing a comparable criminal history—may be sentenced to a lengthy term of imprisonment.  *Id.*  This system of indeterminate sentencing was considered neither fair to the offender nor to the public, because a sentence that was unjustifiably high compared to sentences received by other defendants was unfair to the defendant, while an unjustifiably low sentence was unfair to the public.  *Id*. at 39, 45, 1984 U.S.S.C.A.A.N. at 3222, 3228.  As Senator Edward Kennedy, one of the co-sponsors of the Sentencing Guideline legislation, put it, "[f]ederal criminal sentencing is a national disgrace.  Under current sentencing procedures, judges mete out an unjustifiably wide range of sentences to offenders convicted of similar crimes." 129 Cong. Rec. 1644 (1984).

The Guidelines were thus promulgated in part to foster public confidence in federal judicial proceedings by ensuring that similarly situated defendants received

similar sentences. In other words, the Guidelines were meant to ensure equal justice under law. *Cf.* U.S. Dep't of Justice, *Annual Report of the Attorney General*, 6, 7 (1938) ("there frequently occur wide disparities and great inequities in sentences imposed in different districts, and even by different judges in the same districts, for identical offenses involving similar states of facts," making "it difficult to maintain that equal, evenhanded justice is attained"). It was clear to Congress that respect for the law "cannot flourish among convicted defendants or the public when justice is undercut by unequal treatment." H.R. Rep. No. 1017, 98th Cong., 1st Sess. 31-32 (1983). It is for this reason that the Guidelines were implemented with bipartisan support—with Senators Edward Kennedy, Joseph Biden, Strom Thurmond, and Richard Lugar among the co-sponsors of the legislation.

Imposing a Guidelines sentence will serve the goal of ensuring similarly situated defendants receive similar sentences—regardless of where they are sentenced and what demographic they come from—and prevent the sentencing discrepancies that led to the Sentencing Guidelines in the first instance.

IV.    **SUPERVISED RELEASE**

The government agrees with the Probation Office that a term of supervised release of two years is appropriate and reasonable to protect the community and ensure that Burke does not engage in future criminal activity, as well as to promote respect for the law. The government also agrees with the Probation Office's recommended conditions of release, which the government refers to below by the same number listed in the PSR under the relevant heading:

<u>Mandatory Conditions of Supervised Release</u>

1.   Defendant shall not commit another Federal, State or local crime.  (PSR at 51; 18 U.S.C. § 3583(d); necessary to ensure that defendant is not committing crimes and necessary to protect the public.)

2.   Defendant shall not unlawfully possess a controlled substance.  (PSR at 51; 18 U.S.C. § 3583(d); necessary to ensure that defendant is not committing crimes and necessary to protect the public from future crimes by the defendant.)

5.   Defendant shall cooperate in the collection of a DNA sample if the collection of such a sample is required by law.  (PSR at 51; 18 U.S.C. § 3583(d); necessary to protect the public from future crimes by the defendant.)

<u>Discretionary Conditions of Supervised Release</u>

5.   Defendant shall refrain from engaging in the following occupation, business or profession bearing a reasonably direct relationship to the conduct constituting the offense: elected public office.  (PSR at 51.  Defendant Burke's elected position was directly related to the offenses of which he was convicted, including corruption related offenses under Illinois and federal law.  This condition is necessary to protect the public from future crimes by this defendant.)

6.    Defendant shall not knowingly meet or communicate with Charles Cui, because he engaged in criminal activity with Charles Cui, as found by the jury in Counts 11-16.  (PSR at 51-52; necessary to ensure that defendant is not engaging in criminal activity.)

7.   Defendant shall refrain from excessive use of alcohol, and from any use of a narcotic drug or other controlled substance . . . without a prescription by a licensed medical practitioner.  (PSR at 52, 21 U.S.C. §  841; necessary for the safety of the community and to ensure the defendant is engaged in lawful pursuits.)

8.    Defendant shall not possess a firearm, destructive device, or other dangerous weapon.  (PSR at 52, 18 U.S.C. § 922(g); necessary for the safety of the community.)

14.   Defendant shall not knowingly leave the Northern District of Illinois or Eastern District of Wisconsin unless granted permission to leave by the court or a probation officer.  The Probation Office recommends limiting this condition to the Northern District of Illinois, but given the fact that defendant has a second home in Wisconsin, the government recommends expanding this limitation to include the Eastern District of Wisconsin.   (PSR at 52; necessary to ensure that the Probation Office can effectively supervise and monitor the defendant.)

15.   Defendant shall report to the probation office in the federal judicial district to which you are released within 72 hours of your release from imprisonment.  You shall thereafter report to a probation officer at reasonable times as directed by the court or probation officer.  (PSR at 52; necessary to ensure that defendant is engaged in lawful pursuits and is paying any outstanding fine or restitution, to help the defendant with reintegration into the community, to allow the Probation Office to effectively supervise the defendant, and to ensure the safety of the community.)

16.   Defendant shall permit a probation officer to visit him at any reasonable time at home or at another reasonable location specified by the probation officer. Defendant shall permit confiscation of any contraband observed in plain view of the probation officer.  (PSR at 53; necessary to ensure that defendant is engaged in lawful pursuits, is not engaging in criminal activity, and to ensure the safety of the community and to ensure that the Probation Office can effectively supervise the defendant).

17.   Defendant shall notify a probation officer within 72 hours after becoming aware of any change in residence, employer, or workplace and, absent constitutional or other legal privilege, answer inquiries by a probation officer.  Defendant shall answer truthfully any inquiries by a probation officer, subject to any constitutional or other legal privilege.  (PSR at 53; necessary to ensure that defendant is engaged in lawful pursuits, is not engaging in criminal activity, and to ensure the safety of the community and to ensure that the Probation Office can effectively supervise the defendant).

18.   Defendant shall notify a probation officer within 72 hours after being arrested, charged with a crime, or questioned by a law enforcement officer.  (PSR at 53; necessary to ensure that defendant is engaged in lawful pursuits, is not engaging in criminal activity, and to ensure the safety of the community and to ensure that the Probation Office can effectively supervise the defendant).

22.   Defendant shall satisfy such other specific conditions as ordered below. (PSR at 54; see below for justification).

Special Conditions of Supervised Release

5.   Defendant shall not incur new credit card charges or open additional lines of credit without the approval a probation officer unless defendant is in compliance with the financial obligations imposed by this judgment.  (PSR at 54; necessary to ensure that defendant is complying with any and all obligations to pay restitution and/or a fine.)

6.   Defendant shall provide a probation officer with access to any requested

financial information necessary to monitor compliance with conditions of supervised release. (PSR at 54; necessary to ensure that defendant is complying with any and all obligations to pay restitution and/or a fine and is not engaging in criminal activity.)

7. Within 72 hours of any significant change in your economic circumstances that might affect your ability to pay restitution, fines, or special assessments, you must notify the probation officer of the change. (PSR at 54; necessary to ensure that defendant is complying with any and all obligations to pay restitution and/or a fine.)

10. Defendant shall pay to the Clerk of the Court any financial obligation ordered herein that remains unpaid at the commencement of the term of supervised release. (PSR at 56; necessary to ensure that defendant is complying with any and all obligations to pay restitution and/or a fine.)

11. Defendant shall not enter into any agreement to act as an informant or special agent of a law enforcement agency without the permission of the court. (PSR at 56; necessary to ensure that the Probation Office can effectively supervise the defendant.)

## V.    RESTITUTION AND FINE

The government agrees with the Probation Office that restitution in the amount of $65,000 is due to Tri-City Foods. PSR ¶¶ 197-198. The $65,000 figure represents profit lost by Tri-City Foods as a direct result of Burke's attempted extortion of the company.

Furthermore, the government agrees with the Probation Office that a fine is appropriate. PSR ¶ 197. The calculation of the harm caused by Burke's conduct under the Guidelines ($829,525) greatly understates the harm Burke caused in exploiting his public office for private gain and using the City of Chicago as an enterprise through which to engage in corrupt activities for years. Furthermore, Burke has very significant financial means. The Probation Office recommends a fine of $200,000, which is within the Guidelines-range of $25,000-$250,000. PSR ¶ 197. Given the seriousness of this offense and its harm to the City of Chicago, as well as

Burke's ready ability to pay, the government requests that the Court impose a fine of $250,000, which is the high-end of the Guideline range.

## VI.    CONCLUSION

For the foregoing reasons, the government respectfully submits that defendant's pervasive corruption, his failure to accept responsibility, and the need for deterrence warrants a Guidelines sentence of 121 months' imprisonment.

Respectfully submitted.

MORRIS PASQUAL
Acting United States Attorney

By: */s/ Sarah Streicker*
    SARAH STREICKER
    AMARJEET S. BHACHU
    DIANE MacARTHUR
    TIMOTHY CHAPMAN
    SUSHMA RAJU
    Assistant United States Attorneys
    219 South Dearborn Street
    Fifth Floor
    Chicago, Illinois 60604
    (312) 353-5300