**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | Case No. 19 CR 322 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | Judge Virginia M. Kendall |
| EDWARD M. BURKE, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## **DEFENDANT EDWARD M. BURKE'S SENTENCING MEMORANDUM**

JENNER & BLOCK LLP
Charles B. Sklarsky
Kimberly Rhum
353 N. Clark Street
Chicago, IL 60654
Tel: (312) 222-9350
csklarsky@jenner.com
krhum@jenner.com

LOEB & LOEB LLP
Joseph J. Duffy
Robin V. Waters
321 N. Clark Street, Suite 2300
Chicago, IL 60654
Tel: (312) 464-3100
jduffy@loeb.com
rwaters@loeb.com

GAIR GALLO EBERHARD
Chris Gair
Blake Edwards
1 East Wacker Drive, Suite 2600
Chicago, IL 60601
Tel: (312) 600-4901
cgair@gairgallo.com
bedwards@gairgallo.com

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION ................................................................................... 1

II. THE 18 U.S.C. § 3553(a) FACTORS SUPPORT THE IMPOSITION
OF A BELOW-GUIDELINES SENTENCE. ............................................ 2

    A. The Nature and Circumstances of the Offense. ......................... 2

    B. Mr. Burke's Personal History & Characteristics. ..................... 7

        1. Personal History. ............................................................ 8

        2. Mr. Burke's Extraordinary Personal Character. ........... 11

            a. Mr. Burke's Character for Private, Unsolicited
Acts of Generosity ............................................. 13

            b. Mr. Burke's Character For Providing Support
and Advocacy for Individuals Experiencing
Medical Crises, Grief, and Distress. ................... 16

            c. Mr. Burke's Civic, Charitable, and Philanthropic
Work. .................................................................. 23

            d. Mr. Burke's Dedication to His Family. .............. 26

            e. Mr. Burke's Fifty Years of Exemplary Public
Service. ............................................................... 30

            f. Mr. Burke's Character for Supporting and
Mentoring Women ............................................. 33

            g. Mr. Burke's Lifelong Devotion to His Faith .................... 35

    C. The Need to Provide Medical Care in the Most Effective
Manner. ....................................................................................... 37

    D. The Need to Provide Adequate Specific and General
Deterrence, Reflect the Seriousness of the Offense, Promote
Respect for the Law, and Provide Just Punishment. ................ 41

    E. The Need to Take Into Account the Types of Sentences
Available. ................................................................................... 42

    F. The Need to Avoid Unwarranted Sentencing Disparities. .................. 43

i

III.  CONCLUSION ................................................................................................ 44

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Gall v. United States,*
    552 U.S. 38 (2007) ...................................................................................... 1

*Kimbrough v. United States,*
    552 U.S. 85 (2007) ...................................................................................... 1

*Nelson v. United States,*
    555 U.S. 350 (2009) .................................................................................... 1

*Rita v. United States,*
    551 U.S. 338 (2007) .................................................................................... 1

*United States v. Adelson,*
    441 F. Supp. 2d 506 (S.D.N.Y. 2006) ..................................................... 12

*United States v. Booker,*
    543 U.S. 220 (2005) .................................................................................... 1

*United States v. Ciavarella,*
    716 F.3d 705 (3d Cir. 2013) ...................................................................... 6

*United States v. Cooper,*
    394 F.3d 172 (3d Cir. 2005) .................................................................... 12

*United States v. Greene,*
    249. F. Supp. 2d 262 (S.D.N.Y. 2003) ................................................... 29

*United States v. Maloney,*
    71 F.3d 645 (7th Cir. 1995) ...................................................................... 6

*United States v. Presley,*
    790 F.3d 699 (7th Cir. 2015) .................................................................. 39

*United States v. Prosperi,*
    686 F.3d 32 (1st Cir. 2012) ..................................................................... 12

*United States v. Schroeder,*
    536 F.3d 746 (7th Cir. 2008) .................................................................. 28

*United States v. Serafini,*
    233 F.3d 758 (3d Cir. 2000) .................................................................... 12

United States v. Tomko,
    562 F.3d 558 (3d Cir. 2009) ................................................................ 12

*United States v. Warner*,
    792 F.3d 847 (7th Cir. 2015) ............................................................. 12

*United States v. Willis*,
    322 F. Supp. 2d 76 (D. Mass. 2004) ................................................. 40

**Statutes**

18 U.S.C. § 3553(a) ...........................................................................*passim*

18 U.S.C. § 3553(a)(1) ................................................................... 2, 7

18 U.S.C. § 3553(a)(2)-(7) ...................................................................... 2

18 U.S.C. § 3553(a)(2)(B) ................................................................. 41

18 U.S.C. § 3553(a)(2)(C) ................................................................. 41

18 U.S.C. § 3553(a)(2)(D) ................................................................. 37

18 U.S.C. § 3553(a)(3) ....................................................................... 42

18 U.S.C. § 3553(a)(6) ....................................................................... 43

U.S.S.G. § 5H1.1 ............................................................................... 37

U.S.S.G. § 5H1.6 ............................................................................... 29

**Other Authorities**

A.D. Quig, *Colleagues praise Ald. Edward Burke as longest-serving
    City Council member ever leaves under cloud of indictment*,
    Chicago Tribune, April 19, 2023 ....................................................... 31

H.R. 3019 - 118th Cong. (2023 - 2024) ............................................... 39

Inspector General, *Chicago Department of Transportation Commercial
    Driveway Billing Audit*, July 2019 ..................................................... 6

Meg Anderson, *1 in 4 inmates deaths happen in the same federal
    prison. Why?*, NPR, Sept. 23, 2023 .................................................. 39

Meg Anderson, *Lawmakers Push for federal prison oversight after
    reports of inadequate medical care*, NPR, Dec. 12, 2023 ................... 39

Office of the Inspector General, U.S. Dept. of Justice, *The Impact of an Aging Inmate Population on the Federal Bureau of Prisons*, May 2015 ............................................................................................................ 40

Peter J. Henning, *Is Deterrence Relevant in Sentencing White Collar Criminals?*, 61 Wayne Rev. 27 (2015).................................................... 41

Richard S. Frase, *Punishment Purposes*, 58 Stan. L. Rev. 67 (2005) ...................... 41

U.S. Sentencing Commission, *Alternative Sentencing in the Federal Criminal Justice System*, May 2015.................................................... 43

U.S. Sentencing Commission, *Older Offenders in the Federal System*, July 2022.................................................................................................. 43

U.S. Sentencing Commission, *Statistical Information Packet,* Fiscal Year 2022.............................................................................................. 44

Walter Pavlo, *Federal Bureau of Prisons' Medical Care Falls Short of its Own Policy*, Forbes, April 19, 2022 .................................................. 39

## I.       INTRODUCTION

Edward Burke is a fundamentally decent man who has dedicated his life to living in the service of others. At eighty years old, he has quietly performed a lifetime of private acts of personal generosity and benevolence—most often unsolicited and never seeking recognition or anything in return.

The Court is now tasked with taking full measure Mr. Burke's character, his good deeds, and his fifty years of public and private service. The Court should prepare itself for a biblical flood of stories and letters from people of all walks of life who have been touched by his kindness and generosity. These testimonials are the most overwhelming in quality and sheer volume (over 200 letters) that his counsel have observed in over 100 combined years of legal practice.

After considering the letters, the Guidelines,[1] and all of the 18 U.S.C. § 3553(a) factors, the Court must impose a sentence that is sufficient but no greater than necessary to comply with the sentencing goals. Counsel submit that a truly individualized and fulsome consideration of these factors, including Mr. Burke's advanced age and physical condition, supports his request for a below-Guidelines sentence involving an alternative to incarceration, such as a period of home confinement.[2]

_____

[1] As set forth in the accompanying filing addressing the Guideline calculations, counsel submit that Mr. Burke is an Office Level 24, Criminal History Category I, which calls for an advisory guidelines sentence of 51-63 months' imprisonment.

[2] *See United States v. Booker*, 543 U.S. 220 (2005), *Rita v. United States*, 551 U.S. 338 (2007), *Gall v. United States*, 552 U.S. 38 (2007), *Kimbrough v. United States*, 552 U.S. 85 (2007), and *Nelson v. United States*, 555 U.S. 350 (2009).

## II.   THE 18 U.S.C. § 3553(a) FACTORS SUPPORT THE IMPOSITION OF A BELOW-GUIDELINES SENTENCE.

In order to arrive at a just sentence, the Court must consider all of the factors set forth in § 3553(a), including the nature and circumstances of the offense, the history and characteristics of the defendant, and the need for the sentence to reflect the seriousness of the offense, afford adequate deterrence, avoid unwarranted sentence disparities, take into account the types of sentences available, and provide the defendant with medical care in the most effective manner—among the other delineated sentencing goals and considerations set forth in § 3553(a)(2)-(7). These factors weigh overwhelmingly in favor of a below-Guidelines sentencing involving an alternative sentence, such as period of home confinement, as opposed to the government and probation's recommendations of lengthy periods of incarceration.

### A.   The Nature and Circumstances of the Offense.

The Court must first consider "the nature and circumstances of the offense." 18 U.S.C. § 3553(a)(1). Mr. Burke challenged the government's case at trial and, though he maintains his innocence, he accepts the jury's verdict. Because the Court is familiar with the nature and circumstances of the offenses having presided over the trial, counsel will not belabor the minutiae of the offenses here. To be sure, bribery, extortion, and racketeering are serious offenses, and nothing herein should be interpreted to suggest otherwise. However, counsel do wish to identify three broad themes that emerged from the trial testimony which both contextualize and mitigate the offenses.

First, when describing the offense conduct, the overwhelming majority of the government's witnesses described Mr. Burke's demeanor as respectful, professional, and friendly—never aggressive, threatening, nor intimidating. This respect, and even friendship, was often mutual. Field Museum CEO Mr. LaRiviere, for example, went so far as to send Mr. Burke a letter of support *after* he was charged with extorting the Field Museum. (TR. 645). Counsel respectfully submit that such testimony, from the government's own witnesses and extortion victims, arguably places the nature and circumstances of Mr. Burke's offense conduct outside the heartland of a typical racketeering, extortion, and bribery offender's conduct. For example:

- Tri City Foods CEO Shoukat Dhanani testified that Mr. Burke was respectful and friendly during calls and meetings, and Dhanani sent Burke a warm email after an allegedly extortionate meeting writing "it was a pleasure meeting you" (TR. 855, 866, 927);

- Tri City Foods VP Zohaib Dhanani testified that during allegedly extortionate calls and meetings Mr. Burke was "friendly[,]" and did not "threaten" him or "try to use fear or intimidation tactics" (TR. 2564, 2568-69, 2574, 2599-2600);

- Tri City Foods Sr. Director of Operations Pam Smith testified that Mr. Burke "never said anything improper" to her, and "always acted" in a very "matter-of-fact fashion" (TR. 1111-12);

- Water Cmn'r Barrett Murphy testified he had friendly dealings with Burke, Burke never did anything to intimidate him regarding the Post Office, and Murphy attended a fundraiser after Mr. Burke was charged, explaining to the government in a proffer "Friends don't abandon friends[.]" (TR. 1563);

- Water Cmn'r Tom Powers testified that he called Mr. Burke the "Chairman" as "a term of both respect and affection[,]" and that Mr. Burke was never aggressive, threatening, nor did Burke seek to intimidate him (TR. 1529-32);

- Amtrak Official Ray Lang testified his meeting with Mr. Burke was "very congenial[,]" Mr. Burke never threatened him or told him what to do, and Burke gifted him a book on Chicago history he authored (TR. 1709, 1714);

3

- Attorney Mariah DiGrino testified Mr. Burke was always "professional[,]" "respectful[,]" "dignified[,]" and a "storyteller" (TR. 1825);

- Department of Planning & Development Cmn'r David Reifman testified that Mr. Burke was always focused on what was good for the City in his meetings with Reifman, Burke never took a "harsh tone[,]" acted "underhanded" or "challenged any decision[,]" by Reifman, "always acted professionally[,]" and that they maintained "a good, cordial, professional relationship," (TR. 1399);

- Field Museum CEO Richard LaRiviere testified that Mr. Burke was always friendly, did not "make any threats whatsoever to [LaRiviere]," or "make a threat to the Field Museum that the admission fee increase was at risk[,]" and never "demanded" or "even asked" for a job for Molly Gabinski, such that his friendship with Mr. Burke continued after the offense (TR. 621, 624, 645);

- Field Museum Director of Government Affairs Deborah Bekken testified that after the Field Museum dropped the ball on Ms. Gabinski's internship application and Mr. Burke had expressed his frustration in a call with her, she attended an in-person follow up meeting with Mr. Burke, who was "very pleasant," "very cordial," "gracious," "respectful of [Bekken] and everybody from the museum," "didn't threaten anyone," or "berate anyone," and demonstrated his "love" and "pride" for the City of Chicago (TR. 504, 564);

- Building Cmn'r Judy Frydland testified that Mr. Burke "always" treated her "respectfully[,]" "acted professionally[,]" and did not "pressure" or "threaten" her (TR. 3542-43);

- Zoning Cmn'r Patricia Scudiero testified that Mr. Burke did not "put any pressure" on her to do anything regarding the pole sign (TR.3744);

- Department of Buildings First Deputy Cmn'r Matthew Beaudett testified that he never received pressure from Mr. Burke to approve the pole sign, and Burke gifted him a copy of a book he authored (TR. 3780).

Naturally, after continuously monitoring Mr. Burke for more than three years, the government captured several moments where he spoke in frustration (such as his initial call with Ms. Bekken),[3] or where he used crass language. But these moments

---

[3] Obviously, his interaction with Dr. Bekken was both obnoxious and intimidating, but it is clear that it was a momentary eruption in which he lost his temper. That conduct was an aberration for Mr. Burke, who was upset and worried for his goddaughter who was struggling with significant personal issues and looking for an opening into the adult world.

were few and far between when viewing the totality of the testimony and evidence (including the hundreds of hours of innocuous recordings that were not played at trial). The Court may certainly take this mitigating factor into consideration when weighing the nature and circumstances of the offense.

A second theme that emerged from the trial was the extent to which the various redevelopment issues Mr. Burke offered to lend his assistance to—often via a simple phone call—were in the public interest. For example, the Post Office-related witnesses testified that the Old Post Office building was dangerous and in disrepair. (*See e.g.*, TR. 1480-83) (architect Grant Uhlir testifying that the Post Office building had been unoccupied for 20 years, had numerous building code violations, and parts of the building were falling onto the Amtrak train tracks and roadway below). Mr. Burke's efforts to improve the developer's relations with Amtrak, assist with water connection issues, and pass unanimously supported Class L and TIF ordinances in order to expedite the development process actively contributed to improved public safety, stimulated economic growth, and served to preserve an important architectural landmark.

Similarly, Mr. Cui sought Mr. Burke's assistance for his redevelopment project at the Six Corners in Portage Park that was designed to bring new retail stores, businesses, and much needed vitality to one of Chicago's oldest and most important neighborhood shopping districts.

The Court also heard testimony that driveway permits—which the trial testimony convincingly demonstrated Tri City needed and failed to obtain for many

months despite urging from the Ward Office—are necessary to protect and insure against any accidents that may occur on the public way. (TR. 3004-05). Far from mere paperwork, the failure to timely obtain driveway permits and the required insurance coverage "expose[s] the City to liability for the period that it's not updated[.]" (TR. 3006). The City also loses millions of dollars in revenue from past due driveway permit fees, inaccurate billing, and unrecorded driveways.[4]

To be clear, counsel are not suggesting it is acceptable for a public official to request or accept a personal benefit to take an action that ultimately benefits the public interest. But this set of circumstances inflicts less harm than in instances where a public official accepts a personal benefit to take an action that runs *contrary* to the public interest—thereby doubling the public betrayal from the offense.[5] This is yet another mitigating factor that the Court should consider when weighing the nature and circumstances of the offenses.

Finally, it is also undisputed that Mr. Burke did not receive a single penny from the offenses, nor did he cause any serious financial harm to any party. While an unsuccessful bribe solicitation is punishable just as the successful receipt of a bribe,

---

[4] City of Chicago Office of Inspector General, "Chicago Department of Transportation Commercial Driveway Billing Audit," July 2019 (https://igchicago.org/wp-content/uploads/2019/06/CDOT-Driveway-Billing-Audit.pdf).

[5] *See e.g.*, *United States v. Maloney*, 71 F.3d 645 (7th Cir. 1995) (affirming racketeering, bribery and extortion convictions of Cook County judge who accepted bribes in exchange for fixing four criminal cases, including three murder cases); *United States v. Ciavarella*, 716 F.3d 705 (3d Cir. 2013) (affirming racketeering and several related public corruption convictions, and 336-month sentence, for judge convicted in "Kids for cash" scandal involving his receipt of millions of dollars of kickbacks for imposing harsh sentences on juvenile offenders to increase a private prison's occupancy).

6

it is mitigating that no bribe money was ever received here. This mitigating factor sets Mr. Burke's offenses apart from the vast majority of bribery and racketeering cases involving elected public officials in this district. The Court should also weigh this mitigating factor when considering the nature of circumstances of the offenses.

**B. Mr. Burke's Personal History & Characteristics.**

The Court must next consider "the history and characteristics of the defendant." 18 U.S.C. § 3553(a)(1). In his poem defining the qualities of a person who could be said to have "succeeded" in life, American essayist Ralph Waldo Emerson wrote:

> To win the respect of intelligent people and the affection of children; To earn the approbation of honest critics and endure the betrayal of false friends; To appreciate beauty; To find the best in others; To give of one's self; To leave the world a bit better, whether by a healthy child, a garden patch, or a redeemed social condition; To have played and laughed with enthusiasm and sung with exultation; To know even one life has breathed easier because you have lived – This is to have succeeded.

Mr. Burke's extraordinary life epitomizes Emerson's definition, as exemplified by the outpouring of over 200 character letters from people of all walks of life explaining how Mr. Burke has gained their respect, shared in their joys and comforted them in their sorrows, and helped them breathe easier—whether through his private acts of financial generosity, support during medical crises and grief, civic and charitable work, professional mentorship, constituent service, or leadership in government.[6]

---

[6] To make the Court's task slightly more manageable, counsel have attempted to identify some of the most important, representative letters and broken them out as "key letters." The 50 key character letters specifically referenced herein are attached as Ex. A-1 through A-50. The remaining character letters, which we respectfully request the Court to read as well, are

Guided by his unwavering Catholic faith, the letters demonstrate that Mr. Burke has lived his life deeply committed to his family, and in the service others—eschewing public recognition for his good deeds and seeking nothing in return. Under 18 U.S.C. § 3553(a), this lifetime of benevolent service supports the imposition of a below-Guidelines sentence.

### 1. Personal History.

Mr. Burke was born in Chicago on December 29, 1943, the first of three sons born to the marriage of his mother Ann and his father Joseph. His family, including younger brothers Joe and Dan, lived together in a one-bedroom apartment located in Visitation Parish—a close-knit Irish Catholic community on the Southside of Chicago.

When Mr. Burke was around 13 years old, his family moved to a nearby bungalow. Joseph had worked odd jobs when he was growing up—bartender, sewer laborer, part-time railroad worker—until he found steady employment with the Cook County Sheriff's Office, and later as a Chicago Police Officer. Joseph was also active in the 14th Ward political organization, serving as a committeeman, and was eventually elected Alderman of the 14th Ward in 1953 when Mr. Burke was nine years' old. As many of the character letters attest, Mr. Burke was very close with his

---

organized by category as follows: Ex. B–Faith Community; Ex. C–Law Enforcement Community; Ex. D–Legal Community; Exhibit E–General Chicagoland Community & Constituents; Exhibit F–Friends & Family; Ex. G–City & State Government Officials. Counsel have publically filed a redacted set of the letters, and have filed under seal the unredacted letters.

father Joseph. Mr. Burke's mother Ann was a homemaker during his childhood, later taking a position at the Cook County Clerk's Office.

Mr. Burke had a "very faithful Catholic upbringing" that revolved around parish life at Visitation, where he also attended school from kindergarten through eighth grade. (PSR ¶ 131). Mr. Burke still maintains close bonds with the friends he made Visitation Catholic School, several of whom have written letters of support. As Father Kiley explains in his letter, Visitation Parish was a "working class neighborhood" which was "populated by city workers, police and firemen, school teachers and postal employees," and "workers at nearby packing houses" where "[n]eighbors knew each other by name." (Ex. A-25). "There was a sense that all were in this together and folks took care of each other[,]" and "[t]he two highest callings were to enter public service or to become a priest." (*Id.*).

Mr. Burke initially heeded the call to the priesthood, attending Quigley Preparatory Academy, a seminary school for young men interested in becoming priests. He graduated from Quigley in 1961, but by that time he had decided to chart a different course into law enforcement and government. Mr. Burke attended DePaul University, obtaining his B.A. in Sociology in 1965. Following in his father's footsteps, Mr. Burke became a Chicago Police Officer in 1965. That same year, Mr. Burke also met Anne Marie McGlone, his future wife, who was then a Chicago Park District physical education teacher.

While working as a police officer and flourishing in his relationship with Anne, Mr. Burke decided to attend law school part-time through DePaul's evening J.D.

program. Anne too was flourishing at this time, gaining traction and public support for her idea of holding a "Special Olympics" for children with developmental challenges. Joseph Burke was incredibly proud of his son's success and encouraged him to marry Anne, but he never lived to see his son marry or graduate law school. On May 11, 1968—two weeks before Mr. Burke's planned wedding to Anne and on the eve of his law school graduation—Joseph Burke died suddenly from lung cancer at only 56 years' old.

As Anne Burke explains in her letter to the Court, "We married but it was under a veil of sorrow[,]" noting that Joseph's death was "shocking" as he had only been ill for three months. (Ex. A-4). Because Mr. Burke's mother had never worked outside the home and still had younger children to care for, Anne and Ed decided not to move into an apartment together as they had planned—instead moving into the attic of the family's bungalow so that he could assume his father's role within the family.

In addition to the void left in the family, Joseph Burke's death left a void in the 14th Ward Aldermanic office and political organization. Mr. Burke filled those roles, too. At age twenty-four, he became the youngest person in Chicago's history to be elected Ward Committeeman, and the following year became the second-youngest person ever elected alderman when he won his seat as Alderman of the 14th Ward. Mr. Burke held that office from March 14, 1969 until his last term ended on May 15, 2023—becoming the longest serving alderman in Chicago history.

Mr. Burke was admitted to the Illinois bar in 1968. He practiced as a general practitioner at a small neighborhood law firm for several years before transitioning to property tax appeal work, later establishing the law firm Klafter & Burke in 1988. Mr. Burke also served in the United States Army Reserve. He has served as a member and in leadership roles on dozens of committees, boards, and associations including the City of Chicago Economic Development Commission, City of Chicago Plan Commission, Policemen's and Firemen's Death Benefit Fund, Illinois Municipal Problems Commission, Chicago and Cook County Criminal Justice Commission, United Service Organizations, One Hundred Club of Cook County, Military Order of the World Wards, Irish Fellowship Club of Chicago, Southwest Realty Board, Back of the Yards Businessmen's Associations, and Knights of Columbus, among many others.

Mr. Burke's wife Anne Burke, also a lawyer, was a founder of the Special Olympics and served as a judge on the Illinois Appellate Court. She was elected to the Illinois Supreme Court in 2006, retiring in 2022 as Chief Justice of the Court. Anne and Ed Burke have enjoyed fifty-five years of deep and fulfilling marriage. The couple share five adult children—Jennifer, Eddie Jr., the late Emmett, Sarah and Travis—four of whom they adopted. They have also been blessed with nine grandchildren.

## 2. Mr. Burke's Extraordinary Personal Character.

Mr. Burke's sincere, lifelong acts of benevolence and personal generosity are staggering, and constitute overwhelming evidence of his extraordinary personal character. Courts have long recognized that a defendant's character for generosity

11

and genuine benevolence is a basis for imposing a below-Guidelines sentence under 18 U.S.C. § 3553(a). *See e.g.*, *United States v. Warner*, 792 F.3d 847, 850 (7th Cir. 2015) (affirming sentence of probation in *$5.6 million tax evasion case* where district court found the defendant's unprecedented charitable works and generosity were genuine and "went further than simply donating."); *United States v. Serafini*, 233 F.3d 758, 711-75 (3d Cir. 2000) (affirming state legislator's sentence of five months' imprisonment and five months' house arrest, finding his civic and charitable contributions were exceptional and "above and beyond customary political or charitable giving."); *United States v. Cooper*, 394 F.3d 172, 177-78 (3d Cir. 2005) (affirming below-Guidelines sentence of probation and six months' house arrest where defendant's acts of charity were "hands-on" efforts that had "a dramatic and positive impact on the lives of others.").[7]

Mr. Burke's admirable character traits, set forth in sections (a)-(g) below, strongly support his request for a below-Guidelines sentence.

---

[7] *United States v. Tomko*, 562 F.3d 558, 571–75 (3d Cir. 2009) (affirming sentence of home confinement on the basis of several dozen letters demonstrating pre-indictment charitable acts that involved not only money but "personal time" by the defendant); *United States v. Prosperi*, 686 F.3d 32, 34, 40, 50 (1st Cir. 2012) (affirming the district court's seven year downward variance in sentencing defendant to six months' home confinement in $5 million fraud case based on defendant's charitable works and care for family); *United States v. Adelson*, 441 F. Supp. 2d 506, 512–15 (S.D.N.Y. 2006) (sentencing defendant to three-and-a-half years of prison where the guidelines recommended a life sentence, noting that "if ever a man is to receive credit for the good he has done. . . it should be at the moment of his sentencing, when his very future hangs in the balance. This elementary principle of weighing the good with the bad, which is basic to all the great religions, moral philosophies, and systems of justice, was plainly part of what Congress had in mind when it directed courts to consider, as a necessary sentencing factor, 'the history and characteristics of the defendant.'")

### a. Mr. Burke's Character for Private, Unsolicited Acts of Generosity

Mr. Burke has a long history of private acts of generosity. As set forth in dozens of the character letters attesting to these acts, Mr. Burke has been quietly helping those in need for decades without recognition or fanfare—paying the funeral expenses, Catholic school tuition, and even mortgages of complete strangers. Several representative examples from the many letters are set forth below.

Meg Kouretsos, the former principal of Florence Nightingale School, describes her experience with Mr. Burke's generosity. (Ex. A-26). She explains that when a father in the community has been shot and killed at a bus stop coming home from work, Ed Burke sprang into action:

> Within hours Alderman Burke was on the phone asking what he could do to help. He eventually sent the family to the store to get clothes for the wake and funeral; sent the mom to the grocery store to get a cart of groceries; sent her to the funeral home to make the arrangements and again all of this was supplied to them at no cost. He then visited the family and brought them gift cards to use.

(Ex. A-26). Weeks later, Mr. Burke called Ms. Kouretsos to ask about how the family was doing, and he then "visited them again with gift cards." (*Id.*).

The local funeral home director, Jonathan Siedlecki, confirms Ms. Kouretsos' account:

> That day Ed Burke called my office and asked if we could help this family. The family had been in touch with us and was undecided what to do because there were no funds. Ed Burke told me to do whatever his family wanted to do and send his office the bill. We made the arrangements with the family and this man had a visitation and funeral thanks to Ed Burke. He further attended the funeral and after the funeral interacted with the surviving family to help them recover from this tragedy.

(Ex. A-44). Mr. Siedlecki notes, "This was all done discreetly and to this day I know very few people are aware of this incident and Ed Burke's kindness." In fact, Mr. Siedlecki writes: "This was not the only time Ed Burke came to the aid of a family in need but this incident has stayed in my mind and probably always will." (*Id.*).

Similarly, Julia Zizumbo, the mother of Daniel Zizumbo, a U.S. Marine Corps member killed in Afghanistan in 2007, writes that she received unsolicited financial assistance from Mr. Burke when her son Daniel was killed:

> The news came knocking on my door, representatives from the Army extended their condolences. They came and they left, and they said that they would only cover $8,000 of my son's funeral expenses. As we prepared for the celebration of Daniel's life, we still owed the funeral home $2,000. My husband and I scraped up our savings to fulfill the balance and when I went to go pay, the lady at the funeral home told me that Alderman Burke had covered the rest of the expenses.

(Ex. A-50). Ms. Zizumbo explains that this unsolicited help came as "a surprise" because she "had no contact with Mr. Burke[.]" (*Id.*). A year later, she was surprised again when Mr. Burke called to ask for her blessing to name a new neighborhood school after her son. (*Id.*). "Instant tears poured from [my] eyes; my son's death put me into a deep depression. Mr. Burke brought back hope for me. I had something to look forward to." (*Id.*).

In another letter, Jan Paul Murzyn, the head wrestling coach at Brother Rice High School, explains that in 2008 one of his most promising student-athletes tragically lost his older brother to suicide. (Ex. A-37). Mr. Murzyn explains that even though Mr. Burke had never met the student or his family, he "went out of his way to assist with caring for [the student] and his family through those tough times"—

14

contacting the school and paying for the student's tuition balance for that school year. (Ex. A-37).

Mr. Murzyn writes that Mr. Burke was also "always willing to help with the school's fund-raising goals as well as contributing year in and year out to the scholarship fund that helps kids in need attend the high school." (*Id.*). Mr. Murzyn points out that Mr. Burke's generosity also extended beyond Brother Rice to schools including Saint Rita of Cascia High School, Mount Carmel High School, Pope John Paul II Grammar School, and Saint Bruno Grammar School. (*Id.*). Noting that at Brother Rice they teach their students to "Act manfully in Christ Jesus" Mr. Murzyn writes that Burke "personifies those five words." (*Id.*).

Echoing this sentiment, Father Hurley, the Chaplain of Marist High School and Pastor Emeritus of Old St. Patrick's Church, writes that "even with a trial hanging over his head, Ed would still call and ask if there were any students with financial hardships because he wanted to help them. And he did." (Ex. A-24); (*see also*, Ex. A-6) (Jennifer Burke writing that her father has funded the educations of "extended family, neighbors, and strangers"); (Ex. A-4) (Anne Burke writing that her husband "helped a hundred or more kids by paying tuition for them").

Letters from Father John Sullivan and Mark Rowlands provide additional examples of his generosity. Father Sullivan recounts a time when a young mother, who he notes was not a constituent of Mr. Burke's, suddenly lost her husband. (Ex. A-47). To ease her financial burden, Mr. Burke "picked up her mortgage payment for 6 months[.]" (*Id.*) Mark Rowlands' letter recounts his experience with Mr. Burke's

15

generosity when he was involved in a fatal drunk driving accident. (Ex. A-41). Mr. Rowlands, who at that time had been pursuing the priesthood, was only an acquaintance of Mr. Burke. (*Id.*). But after the accident Mr. Burke reached out, unsolicited, to offer his support and to pay for his legal fees. (*Id.*). Mr. Rowlands explains how Mr. Burke's personal and financial support helped him to re-establish his life after experiencing this tragedy. (*Id.*).

Finally, Father Clete Kiley details an instance of Mr. Burke's private generosity, this time involving a Chicago Police Officer named Juan Jacinto who had been involved in a serious on-duty car accident resulting in the loss of one of his eyes. (A-25). Father Kiley writes:

> [Officer Jacinto] was very depressed as a young officer well might be. Ed took an interest in Officer Jacinto and when Cardinal George put together a delegation to go to Rome when he was named a Cardinal, Ed Burke lobbied the Cardinal to include Officer Jacinto. Fr. Clair and I were delighted to share that experience and were with Ed Burke and Officer Jacinto as the Swiss Guards and the Carabinieri stood at full attention to welcome Officer Jacinto. Ed Burke secured the cost of that pilgrimage for Officer Jacinto. It was life-changing for Juan.

Father Kiley correctly observes: "That is the kind of thing Ed Burke does time and time again." (*Id.*).

### b. Mr. Burke's Character For Providing Support and Advocacy for Individuals Experiencing Medical Crises, Grief, and Distress.

Another of Mr. Burke's admirable characteristics is that he is a caretaker. For decades, he has been sincerely supportive of both friends and strangers alike during their experiences of medical crises, grief, and distress—providing both comfort and advocacy during times of great need. Mr. Burke is often first to the hospital when a

member of law enforcement is injured or killed in the line of duty, and he dutifully attends each and every wake. Whether fighting an insurance company for healthcare coverage, finding the right healthcare specialists, supporting the disabled community, or simply sitting at a hospital bedside providing solace and support, Mr. Burke has always extended himself to those in need.

Many of the individuals who submitted character letters describe instances in which Mr. Burke privately helped them to navigate or fight insurance companies for healthcare coverage. For example, Mary Ann Ciolfi writes that twenty years ago Mr. Burke's assistance saved her husband's life after he was diagnosed with a cancerous tumor and given six months to live. (Ex. A-13). Mrs. Ciolfi had come into contact with Mr. Burke because he was a frequent customer of the garden center in Twin Lakes, Wisconsin that she owned with her husband. (*Id.*). She writes that when Mr. Burke learned that her husband's substandard insurance coverage would not cover a desperately needed procedure and treatment, "he stepped in immediately, without being asked," to navigate the situation and advocate on their behalf. (*Id.*). His advocacy worked, and her husband received the lifesaving treatment he needed. Mrs. Ciolfi writes: "Ed didn't do this for a fee, or for prestige, or for the promise of favors returned in the future or for anything for himself at all. We are blue-collar working-class folks of limited means, but Ed stepped in and saved not just John but our entire family from the tragedy of a life taken too soon." (*Id.*).

Similarly, Klafter & Burke attorney Christopher Caira writes that when his father-in-law faced a terminal cancer diagnosis, Mr. Burke intervened and advocated

on his behalf with the health care bureaucracy so that he could get the treatment and procedure he needed. (Ex. A-10). His father-in-law went on to live twenty more precious years. "It's difficult to quantify what that has meant to the entire family outside of calling it an everlasting blessing." (*Id.*) To Mr. Caira, Ed Burke "has been always a flesh and blood embodiment of the ideal of Christian service to others." (*Id.*)

Additional examples of Mr. Burke's medical advocacy abound:

- <u>Patrick Amend</u>. In 2017, Mr. Burke helped to reinstate insurance coverage for the severely handicapped son of a City of Chicago firefighter paramedic. Mr. Burke's intervention allowed Mr. Amend to continue to work as a firefighter paramedic rather stepping down to become his son's full-time caretaker. (Ex. A-1).

- <u>Adrienne Geary</u>. When Mrs. Geary's husband developed polycystic kidneys and needed a kidney transplant, Mr. Burke was "instrumental" in fighting the insurance company so that her husband could receive a successful transplant. Ms. Geary, a family friend, writes: "Four years later, Ed was by my side when my husband was fighting stomach cancer and when he passed. Ed visited Tom numerous times in the hospital and in our home." (Ex. A-21).

- <u>Patrick McNulty</u>. Mr. McNulty, a retired deputy superintendent of the Chicago Police Department, recounts how Mr. Burke helped one of his officers who was waiting for a kidney transplant. "[The Officer] had been on a list of acceptable candidates and had been slowly working his way towards being eligible for the transplant. However, hospitalization plans were changed and none of the new policies offered coverage at the health care facility where he was registered for the procedure. As a consequence, he would no longer be eligible for the transplant at his hospital of choice. Rather, he would be required to be placed at the bottom of a new list at a new facility." When Mr. Burke was made aware, he intervened to ensure that the officer retained his position on the original list. Shortly thereafter, the officer received the needed transplant. (Ex. A-32).

- <u>Russell Schaefer</u>. In 1983, Mr. Schaefer, a Chicago Police Officer, was partially shot in the face during a training exercise, suffering severe damage to his right eye. Mr. Schaefer fought being put on disability, seeking "light duty" until his condition improved. Mr. Burke took the time to listen to his story, and advocated for the case to be reviewed and

reversed. Mr. Schaefer recovered and returned to full duty. "Had it not been for Mr. Burke I would not have remained at a job that I loved[.]" (Ex. A-43).

In other instances, Mr. Burke has been instrumental in finding first rate medical professionals and arranging care. For example, Stephen Burke (who is not related to Mr. Burke), writes that Mr. Burke helped him to find the best possible surgeons and specialists for his wife when she was diagnosed with uterine cancer. (Ex. A-8). Similarly, Father Sullivan writes that Mr. Burke arranged excellent care for him and an elderly nun at Northwestern Hospital, as well as hospice care for the elderly nun. (Ex. 47).

Mr. Burke's advocacy and support for those in need has often focused on the most vulnerable among us—the physically and developmentally disabled. Father Jack Clair, Sister Rosemary Connelly, and Daniel Walsh have each written letters touching on Mr. Burke's support and advocacy for the residents of Misericordia, a home for individuals with developmental disabilities. (Ex. A-14) (Father Clair: "we owe a great debt to both Ed and Anne for the constant support"); (Ex. A-15) (Sister Connelly: "Ed's involvement has been a gift to our residents ... [w]e are truly blessed by his loving friendship"); (Ex. A-48) (Daniel Walsh, co-chair of The Walsh Group, writing that he has an adult child living at Misericordia, which is "a much better place today because of Ed and Anne's selfless generosity of their time, talent, and treasures."). Father Clair, the Executive Director of Misericordia, explains that Mr. Burke has been involved in the work at Misericordia for decades, and was instrumental in the process of building the North Side location:

19

> We made a decision to build a new skilled nursing facility at our North Side location. True to form, the State gave us an awful time and would not permit the construction. Ed reached out to the Governor and got him to come and see the home and the residents. It touched the Governor's heart and he reached out to the Departments and they granted the new license. 125 severe and profound, and medically fragile individual[s] enjoy a good life, thanks to the help of Ed Burke.

(Ex. A-14).

Similarly, Mr. Burke's friend Joseph Roddy writes that in 2009, Mr. Burke and his wife started the Burke Scholars Program at Notre Dame High School which "has impacted the lives of numerous developmentally disabled and disadvantaged people." (Ex. A-39). This program, the first of its kind in the Archdiocese of Chicago, provides an inclusive Catholic high school education for young men with cognitive disabilities such as Down Syndrome, Autism and other genetic and learning disabilities.[8]

Many of the letters also attest to the moral support Mr. Burke has provided to them during times of crisis. For example, James Mullen, a Chicago Police Officer who tragically became a ventilator-dependent quadriplegic when he was involved in a shooting incident, writes:

> During my hospitalization Ald. Burke was a pillar of strength and support for not only me but for my entire family. You can't even imagine the complexities of living with a situation like mine where every day could be a struggle between life and death. As I began to recover Ed was a constant source of information and resources so that I could begin living again as a disabled person. I spent the first three months of my recovery in the ICU. The alderman was a constant visitor to the hospital.
>
> My wife Athena now a retired CPD Sgt. relied on Ald. Burke and his office to help create a new life for me. The alderman worked closely with my wife and father to help us construct and create a suitable living space for me that makes life a little easier living as a quadriplegic. If it wasn't

---

[8] *See* Notre Dame College Prep, "Burke Scholar Program," (https://www.nddons.org/s/1034/bp22/interior-left.aspx?sid=1034&gid=1&pgid=366)

for Ald. Burke and his constant oversight and assistance I truly doubt I would be alive today to even write this letter on his behalf.

(Ex. A-34).

As the many law enforcement letters attest (Ex. C), Mr. Burke has long been a steadfast supporter of law enforcement officers injured and killed in the line of duty. (*See e.g.,* Ex. A-30) (Daniel Marquez, the brother of a CPD killed in the line of duty, explaining Mr. Burke's meaningful support). Notably, Mr. Burke also co-authored End of Watch: Chicago Police Killed in the Line of Duty, 1853-2006, and is an ardent supporter and contributor to the One Hundred Club, an organization that provides resources and financial support to first responders and members of the military killed in the line of duty.

Most often, Mr. Burke's support and kindness is unsolicited, as demonstrated by four additional representative examples from Father Clair, Margaret Houlihan Smith, Kathleen Gibson, and Rebecca Rodriguez:

- Father Clair writes: "Four years ago I developed lung cancer. I remember waking up in my hospital bed and Ed would often be sitting there. He would catch me up on news, offer to walk me around, or even read to me." (Ex. A-14).

- Margaret Houlihan Smith, a family friend, writes: "When my son was born 9 weeks premature at 2lbs, 2ozs, and his outlook was grim, Ed called and checked in on me and my family regularly . . . His soothing words of comfort and support calmed me and brought us inspiration and hope … [When] we were having a challenging time having a second child and were beginning to consider adoption, without even asking, Ed immediately sprang into action to assist. A close friend of Ed's volunteered with an adoption agency and within hours Ed has us meeting with his friend to receive advice and counsel on the process." (Ex. A-23).

- Kathleen Gibson, a former employee, recounts when Mr. Burke comforted a grieving father: "The father's English was really broken. Mr.

Burke took that phone call, spoke to him for a long time, in Spanish, listening to a man grieving, but, not as Alderman to resident, but as father to father, understanding as only a father who has gone through that same grief can. Mr. Burke helped this grieving family properly dress and bury their son. He spoke and prayed with this family going above and beyond what others may have done." (Ex. A-22).

- Rebecca Rodriguez, a constituent, writes that after her son was shot and killed, Mr. Burke came over to her house on Thanksgiving to bring her family food (Ex. A-40).

Another particularly poignant example of Mr. Burke's unsolicited moral support and kindness is set forth in Jeanne Bishop's letter. (Ex. A-3). Ms. Bishop explains how her sister, brother-in-law, and unborn niece were murdered in their Winnetka home in 1990 by a sixteen-year old New Trier High School student named David Biro. But in the six months before his arrest, wild and incredibly hurtful theories that the IRA may have been responsible were pursued by law enforcement and circulated in media, smearing Ms. Bishop's good name. During this time, Ms. Bishop received a lifeline from Ed Burke, *a person who she had never met*:

> One day, I received an unexpected handwritten note in the mail. It was from Ed Burke. It was courteous and kind. He expressed condolences for the loss of my loved ones. He said how sorry he was that I was being vilified in the press. He encouraged me to keep my head up. It was the first note of that kind I had received. It was a rare ray of light breaking through storm clouds. Ed Burke took notice. He reminded me that I was not alone. He exhorted me to go on. I saved, and reread, that note for a long time; it helped get me through the darkest valley of my life.

(Ex. A-3).

Twenty years later, Mr. Burke did Ms. Bishop a second kindness. Ms. Bishop writes that after years of being unable to even utter the name of her sister's killer that she had begun to think about "the merciless sentence he was serving: life in prison without the possibility of parole." (*Id.*). She decided to reach out to David Biro

in forgiveness, and incredibly he wrote back "confessing to the crime for the first time and offering his heartfelt apology." (Ex. A-3). Ms. Bishop and Mr. Biro agreed to meet in person, which they did at Pontiac prison. The meeting "felt like the first step of many toward healing and reconciliation." (*Id.*). But directly following her visit, she received a letter from IDOC claiming that because a filmmaker who had planned to film her entering and existing from the prison had parked incorrectly in the parking lot, she was forbidden from any further visits. Ms. Bishop was distraught:

> I would never be allowed to visit my sister's killer again, just as I was starting to learn facts from him that would answer questions that had haunted me for years. I was devastated—and I mentioned my distress to several people in conversation about why I looked so troubled. Somehow, word of that distress must have reached Ed Burke, because one day, I got an unexpected phone call from him, less than a minute long, telling me that shortly, I would be receiving a call from the head of the IDOC. And minutes later, I got that call, telling me that my visiting privileges at the IDOC had been restored. It felt like a miracle. I have been visiting David Biro since then, each one a step forward in a journey of forgiveness and reconciliation. I am grateful beyond words.

(*Id.*). Closing her moving letter, Ms. Bishop writes: "Ed Burke did not have to do that for me. He did that in exchange for nothing. He did it out of goodness and grace. And I had to tell you, because I could not bear it if you sentenced him without knowing this." (*Id.*).

### c. Mr. Burke's Civic, Charitable, and Philanthropic Work.

Mr. Burke's lifetime of civic, charitable, and philanthropic work is far too extensive to detail in full. Together with Anne, he has actively participated in, fundraised for, and contributed to countless civic, charitable, and philanthropic causes including the Chicago Food Depository, The Back of the Yards Neighborhood

23

Council, Mercy Home for Boys and Girls, Mercy Circle, Caritas for Children, Special Children's Charities, Misericordia, the One Hundred Club of Cook County, buildOn, the 14th Ward Youth Organization, the Knights of Columbus, the Irish Fellowship Club of Chicago, the Big Shoulders Fund, and the Special Olympics, among many others.

As representative examples of those efforts from the letters, counsel wish to highlight the letters of Brig. Gen. Michael Mulqueen (Ret.), the former CEO of the Greater Chicago Food Depository (Ex. A-35); Phil Fuentes, the Chairman of the Board of the Back of the Yards Neighborhood Council (Ex. A-19); and Sister Sanders, a nun with the Sisters of Mercy (Ex. A-42).

Mr. Mulqueen's letter provides that Mr. Burke would visit the Greater Chicago Food Depository ("GCFD") many times each year, often with his son Travis, and "[i]nvariably, his first question on every visit was, 'How can I help you feed more hungry Chicagoans?'" (Ex. A-35). And help he did, "provid[ing] food, training, and equipment to our 600 soup kitchens, pantries and other locations in Cook County." (*Id.*). Mr. Mulqueen writes that Mr. Burke was also instrumental when GCFD constructed its 280,000 square-foot food bank. (*Id.*). Reflecting on his forty-five years as a United States Marine and non-profit leader, Mr. Mulqueen observes, "Ed Burke is one of those servant leaders who led with courage, conviction and love." (*Id.*).

Phil Fuentes' letter details Mr. Burke's work with the Back of the Yards Neighborhood Council (BYNC), an historic non-profit formed in 1939 that provides meals, groceries, medicine, scholarships, and home repairs to the Southwest Side

24

community it serves, in addition to much needed anti-violence, affordable housing, economic development, and cultural programing. (A-19). Mr. Fuentes explains that Mr. Burke has been personally responsible for the successes and longevity of the organization, explaining that Mr. Burke "literally saved the organization during a very difficult time in our history." (*Id.*). Mr. Burke worked collaboratively with Mr. Fuentes "to identify and support those in the greatest need to provide food, jobs and training, transportation, and housing[,]" noting "I can go on endlessly with the contributions Mr. Burke has made to our organization and community." (*Id.*). Having known Mr. Burke for twenty-five years, Mr. Fuentes "can attest that he cared for his community, constituents, and friends with tremendous compassion." (*Id.*).

Finally, Sister Sanders recounts the time when Mr. Burke stepped in to save Mercy Circle, a continuing care retirement community sponsored by the Sisters of Mercy that houses around eighty nuns and priests, who, without Mr. Burke's help, "could have been without a supportive communal residence that now provides them with the spiritual, social, and health services they need after many years of dedicated service to all God's people." (Ex. A-42). Sister Sanders explains that in 2017 and while on the brink of bankruptcy, Mercy Circle sought to rescind a covenant with the Village of Evergreen Park that had restricted the community only to nuns, priests, brothers, and other religious clerics. (*Id.*). Turning to Mr. Burke for help, Sister Sanders explains how he stepped in to accompany her in negotiations, and served as a mentor and mediator during meetings with the officials and residents. His "patient and time-consuming help, and his respectful and even-handed negotiations skills, all tempered

25

with kindness and respect" led the opposition to withdraw their objection. (Ex. A-42). The Village removed the restrictive covenant allowing the community to grow and prosper, and today Mercy Circle is a thriving community for seniors—all thanks to Mr. Burke's kindness and help. (*Id.*).

These good works, and the many others included in the letters, amply demonstrate Mr. Burke's character for meaningfully contributing to civic, charitable, and philanthropic work. (*See also*, Ex. A-32) (Officer McNulty writing that throughout fourteen years of volunteering, the Society of Vincent DePaul District IX Food Pantry has had no greater supporter than Ed Burke: "His involvement in our efforts significantly enhanced the pantry's ability to meet the great need many families are facing."); (Ex. A-47) (Father Sullivan writing that Mr. Burke raised $8 million dollars in one day in order to keep Pope John Paul II School open into perpetuity after it was unceremoniously closed).

### d. Mr. Burke's Dedication to His Family.

The character letters establish that Mr. Burke is a dedicated and supportive husband, father, and grandparent who plays an integral role in his family. Ed Burke has been married to his best friend Anne for fifty-five years, and the couple share five wonderful adult children (Jennifer, Eddie Jr., the late Emmett, Sarah, and Travis), as well as nine grandchildren.

The letters written by Jennifer, Sarah, Eddie Jr., and Travis detail the special relationships Mr. Burke has fostered with each child. Jennifer Burke writes of her father:

> Whenever I call him, he answers "Hello Darling" and my call never goes to voicemail. I always felt that my father was 100% there for me. Never once have I felt alone–what a gift from a parent, an adoptive one. The prospect of no longer hearing "Hello Darling" on the other end of the line breaks my heart and makes me feel very alone.

(Ex. A-6).

Sarah Burke explains in her letter that the love and support she has receives from her father started from the day she was born:

> When I was born prematurely and in the NICU for six months, he came to the hospital every day to hold me. I learned this only decades later, after I'd sent out an all-staff email at the same hospital where I work. A woman I did not know immediately replied and asked if I was Ed Burke's daughter. I said I was, and she said she was the NICU nurse who had cared for me! 'Your dad was there every day in his suit and cufflinks,' she recalled. 'I'll never forget him.'

(Ex. A-7).

Travis Burke, who was adopted from the foster care system when Anne and Ed were in their fifties, describes his special relationship with his father in his letter. (Ex. A-9). He writes that he "felt as though [he] had no one in this world that would love and care for [him]" if he had not been brought home by Anne and Ed Burke. (*Id.*). Travis explains that because he grew up with learning disabilities, he did not have many friends. He was bullied at times, and was introverted. But his father was always there for him:

> The only person to spend time with me socially was my dad. During our time together, I was able to learn how to become a man and conduct myself in the world. With trips up to Wisconsin, swimming lessons, golf lessons, and other various activities, I spent all my social life as a child with my father.

(Ex. A-9).

Dr. Bennett Leventhal, the Irving B. Harris Professor of Child and Adolescent Psychiatry, *emeritus,* at the University of Chicago, confirms the important and ongoing role that Mr. Burke plays in Travis' life. (Ex. A-27). Dr. Leventhal was involved in evaluating Travis in connection with the litigation surrounding his adoption by Anne and Ed. Having participated in clinical observations of Travis' interactions with Ed when he was a child, Dr. Leventhal writes, "I was completely surprised when I saw Ed alone with Travis in my office. Ed was warm, incredibly sensitive, patient, kind, and creative as he engaged Travis, a child who, due to his autism, was not easy to engage." (*Id.*)

Dr. Leventhal explains that "Ed's patience and determination have long played a hugely critical role in treating Travis." (Ex. A-27). For example, Travis was fascinated with trains, and "Ed would ride with Travis for hours on the 'L' because it not only made Travis comfortable but, also, when on the train, Travis could relate and work on his language and independence skills." (*Id.*) Dr. Leventhal writes that "Ed's commitment of time and energy has proven to be a 'rock' for Travis," enabling him "to complete high school and college, as well as enter the workforce and live semi independently and be self-supporting." (*Id.*) Dr. Leventhal explains in his letter that "Ed's role in his life has been and currently is a critical, stabilizing force for Travis." Importantly, Dr. Leventhal notes:

> [Travis'] success in life depends in part on Ed's attention and caring. This is a very special relationship that will be severely taxed by Ed's absence, placing an innocent young man, Travis, in jeopardy. I hope it is possible to avoid this collateral harm.

(Ex. A-27).

Similarly, Anne Burke writes that Travis has become "a wonderful young man" but is not yet "fully independent" and they must "oversee his finances and other routine life tasks." (Ex. A-4). Anne explains that "Travis is "extremely close to Ed. They talk daily and Ed knows every detail of his life. Taking away this daily contact between Ed and our son will be miserable for both of them."[9] (*Id.*).

Many of the letters touch on Anne and Ed's experience becoming adoptive parents of Jennifer, Eddie Jr., the late Emmett, and Travis, as well as foster parents—roles that Ed clearly relishes. Anne writes: "When we were in our fifties, we decided to become foster parents. The first baby we fostered was taken away after a few weeks for a more permanent home. Ed's reaction was 'Why can't we keep him?'" (Ex. A-4); (*See also,* Ex. A-38) (Jean Ortega-Piron describing how Anne and Ed first became foster parents). Anne writes of Ed as a parent: "[he] was wonderful with all the children" making it "his business to take each one of them on special trips, just the two of them." (Ex. A-4).

Given the deep and special bond Mr. Burke has maintained with his children, the tragic loss of his son Emmett in a snowmobile accident was particularly devastating. Anne writes of this experience: "It is true that the death of a child is the worst experience in life. You may never get over such life trials but you can find your

---

[9] Counsel note that the loss of this kind of irreplaceable parent-child caretaking has long been recognized as a basis for imposing a below-Guidelines, non-custodial sentence under both § 3553(a) and/or U.S.S.G. § 5H1.6. *See e.g.*, *United States v. Schroeder*, 536 F.3d 746, 755-56 (7th Cir. 2008); *United States v. Greene*, 249. F. Supp. 2d 262, 264–65 (S.D.N.Y. 2003) (sentencing father who adopted six children, including one born addicted to narcotics, to three years' probation due to his charitable works and the need for his provision of ongoing emotional and financial support to his children)

way through them. For me, that path was possible with my life partner Ed and the faith we share." (Ex. A-4).

Finally, in addition to his children, Ed Burke also forged special bonds with his nine grandchildren, several of whom have written letters to the Court. Jennifer Burke notes that her father always knows what is happening with his grandchildren, who are in "constant contact" with their grandfather. (Ex. A-6). These wonderful tributes, as well as the overwhelming group of letters submitted by family and friends (Ex. F), and the attached family photographs (Ex. H), powerfully demonstrate Mr. Burke's lifelong dedication to his family.

### e. Mr. Burke's Fifty Years of Exemplary Public Service.

Mr. Burke served as a dedicated public servant highly respected by his colleagues and constituents for fifty years. (*See* Ex. E; Ex. G). Anthony Fratto, a former budget analyst in the City Office of Budget and Management explains in his letter that Mr. Burke was "different from other Aldermen," explaining that he was a "student of government and worked hard to master knowledge of City Budget," and "keep[] taxes in check" while also "spearheading environmental reforms in soaps and phosphate usage[,]" "eliminate[ing] indoor smoking[,]" and "bringing governmental services to all areas of the City[.]" (Ex. A-18). He describes Mr. Burke's work while Chair of the Finance Committee as "transparent, open and thorough." (*Id.*). Mr. Fratto writes that "his fiduciary duty to the City and taxpayers came first." (*Id.*).

Garry McCarthy, the former Superintendent of the Chicago Police Department, agrees that Mr. Burke was a dedicated public servant—"more so than any elected official that I have ever met." (Ex. A-31). Mr. Burke was "always worried

30

about the safety of the city he loves" and provided Mr. McCarthy with "much needed counsel" while never once asking for anything in return. (Ex. A-31).

Mr. Burke's dedication earned the respect of both allies and opponents.[10] For example, former assistant United States attorney Jim Montgomery, who served for three years as Corporation Counsel for the City of Chicago under Mayor Harold Washington, writes that even though Mr. Burke was a political opponent of Mayor Washington, Mr. Montgomery developed a "healthy respect Ed Burke over those years [as corp counsel]." (Ex. A-33). In fact, Mr. Montgomery explains that he became "close friends" with Mr. Burke during that time, and that their relationship "facilitated communication" with the administration and other aldermen during a contentious period in the City Council's history. (*Id.*). Mr. Montgomery explains that Mr. Burke was "revered by rookie Aldermen" and "mentored them in the legal and procedural complexities of City Government." (*Id.*). Praising his "extensive knowledge" of city government and political history, as well as decades of public service, Mr. Montgomery pleads for this Court's mercy on Mr. Burke's behalf. (*Id.*).

Similarly, Alderman William Singer who served alongside Mr. Burke in City Council writes to the Court in support of Mr. Burke even though he "cannot think of a single instance where we were on the same side of any contested matter." (Ex. A-45). Attempting to describe the impact of Mr. Burke's fifty years on the City Council,

---

[10] On April 19, 2023 when Mr. Burke served his last day on the City Council and gave his farewell speech, he was met with a standing ovation from the entire City Council. A.D. Quig, "Colleagues praise Ald. Edward Burke as longest-serving City Council member ever leaves under cloud of indictment," Chicago Tribune, April 19, 2023 (https://www.chicagotribune.com/2023/04/19/colleagues-praise-ald-edward-burke-as-longest-serving-city-council-member-ever-leaves-under-cloud-of-indictment/).

Mr. Singer writes that in the whole history of the City Council there are few members whose "overall contributions" even come close to Mr. Burke's. (Ex. A-45). While Mr. Burke's contributions are too numerous to list, he is particularly proud of his work around safety issues such as banning indoor smoking, requiring smoke and carbon monoxide detectors, and banning phosphates—efforts which were subsequently copied by other governments across the country after being first championed by Mr. Burke.

Mr. Burke's genuine concern for the City and his constituents was apparent to anyone who had the opportunity to see it up close—as demonstrated by the many community and constituent letters. (Ex. E). As one example, after observing Mr. Burke patiently interact with over 300 community members at a four hour "Community Policing" event, Jim Spratte, a retired CPD Captain writes, "in all my years, including the interaction with a number of other Aldermen, and other politicians" he never witnessed the kind of "patience" and "care" that Mr. Burke showed for regular Chicagoans. (A-46). Mr. Spratte also writes that he noticed Mr. Burke always refused "special treatment," declining to join other politicians who would skip to the front of the line at the wakes of fallen police officers that would stretch on for two to three hours. (*Id.*). "While waiting, oft times in the rain, or freezing weather, it was quite common to see a parade of local and state politicians being escorted to the front of the line, so they didn't have to wait. I never saw this with Alderman Burke." (*Id.*).

### f. Mr. Burke's Character for Supporting and Mentoring Women

Another admirable theme regarding Mr. Burke's character that emerges from many of the letters of support is the extent to which he has provided meaningful support and mentorship to women. This support and mentorship has taken many forms—from financial assistance and scholarships, encouragement to pursue public service, and professional opportunities and mentorship. Jennifer Burke observes that her father's commitment to advancing women was influenced by his upbringing:

> His father died young, and he saw that women (my grandmother, my aunt, my mom, my sister, me) need to be able to support ourselves. It was unusual among my peers to have a mother in school and a mother who worked. It was my father who insisted, against social norms at the time, that my mother be educated and able to support herself. This lesson is a critical part of who I am. And I have seen my father help many women be independent as well (after a spouse's death, divorce, or other family event).

(Ex. A-6). The letters of Kathleen Marchetti, Sister Margaret Zalot, Dena Carli-Pociask, Jeanette Badrov, Gabrielle Garcia, and JoAnne Losoya particularly reflect this quality in Mr. Burke.

Kathleen Marchetti and Sister Margaret Zalot's letters both describe how Mr. Burke established a scholarship for young women from Maria High School, Anne Burke's alma matter, that has advanced disadvantaged female students. As Anne Burke's letter explains, Mr. Burke specifically directed that the scholarship be directed to struggling students who were not superstars but had promise. (Ex. A-4). Kathleen Marchetti was the first recipient of the Anne McGlone Burke Scholarship. She writes that in 1994, medical crises and a failed family business had put her on the brink of homelessness. (Ex. A-29). Her receipt of the scholarship put her on the

"path to success," permitting her to continue her studies at Maria High School and go on to graduate *summa cum laude* from Saint Louis University. (Ex. A-29). Mr. Burke even offered her a position working in the Ward Office in the summer to make ends meet. Ms. Marchetti became a physical therapist at Loyola Medicine, and is also an assistant faculty member at Northwestern University. (*Id*.). Sister Zalot, the former Chair of Maria High School, confirms that twenty-six students received scholarship money to help pay their tuition, totaling over $78,000. (Ex. A-50)

Other letters confirm that Mr. Burke has provided financial assistance to women in need beyond formal scholarships. For example, Klafter & Burke firm administrator Gabrielle Garcia writes that when, as a young girl, her family became unable to pay her tuition at Lourdes High School, her principal Sister Josita sent her to see Mr. Burke for help. (Ex. A-20). Mr. Burke paid her tuition, and also offered to hire her at the Ward Office. She worked at the Ward Office for one year before transitioning to the law firm, where she still works today. (*Id*.)

JoAnn Losoya, a court reporter for the Finance Committee, writes that she sent a newly divorced young mother looking for work to meet with Mr. Burke. She writes that "[e]ven though they didn't actually need more office help, Mr. Burke employed her to help get her on her feet." (Ex. A-28). Similarly, Jeanette Badrov, an attorney and now a family friend of the Burkes writes that when she was experiencing illness and crisis in her family, Mr. Burke let her hang her shingle "rent free" at the Ward Office property so that she could continue practicing law, explaining

he "mentored me on career opportunities that would allow me to pay for my family's medical bills[.]" (Ex. A-2).

Mr. Burke has also encouraged women to pursue careers in public service. For example, Dena Carli-Pociask writes that she met Mr. Burke through her mother, who he also employed at the Ward Office. (Ex. A-11). Growing up in that environment and spending time with Mr. Burke inspired her to dedicate her life public service. (*Id.*). Ms. Carli-Pociask became an Illinois State Representative, and writes that throughout her life, Mr. Burke provided her with critical "professional and personal guidance[.]" (*Id.*). Mr. Burke's encouragement of women in public service is also demonstrated by the letters of support from women in the legal profession and in judicial roles (Ex. D), which is perhaps best exemplified by his support and encouragement of his wife Anne to attend law school, which she describes in her letter. (Ex. A-4).

### g. Mr. Burke's Lifelong Devotion to His Faith

As an overwhelming number of the letters attest, a key through-line in Mr. Burke's life has been his complete devotion to his Catholic faith. As Anne notes, his devotion to "Christian service" is "the theme of his life." (Ex. A-X). Indeed, his commitment is a unifying principle for his lifetime of good works and service to others already highlighted above. The letters of Father Kiley, Deacon Chyba, and Father John Costello each detail Mr. Burke's faithfulness, and how it has shaped his character.

Father Kiley writes that "Ed may not have become a priest, but his commitment to the church is deep and serious." (Ex. A-25). "Besides his daily mass

35

attendance, Ed is also a Member of the Order of Malta" which has involved "many charitable efforts on Ed's part." (Ex. A-25). Father Kiley writes:

> Most notably is an image I have of Ed and his wife Anne, serving as *bain cartiers* at Lourdes. They actually helped lift the *invalides* and place them in the healing waters. This is hard and loving work. This image reveals a whole different aspect of what others might only see as a powerful alderman.

(*Id.*). Deacon Chyba at St. Bruno and St. Richard Parish similarly observes that Ed is a "daily worshipper at mass, jumping to assist as a lector, proclaiming the sacred readings as well as a gift-bearer bringing up the bread and wine." (Ex. A-12). Following mass, "he was never in a hurry to leave especially if someone approached him for assistance." (*Id.*) Most often, Mr. Burke can be found "in the back pew" quietly fulfilling his daily obligation. (Ex. A-37).

Likening Mr. Burke to the "local village vicar," Father Costello observes how Mr. Burke has modeled his public service around his faith:

> I fondly remember a dinner Anne and Ed hosted for the Consul General of Ireland. Our fascinating discussion included how the vicar of the local Irish village became a model of governance for so many of Chicago's leaders. It was knowing the cop who walked the neighborhood beat, to the precinct captains and to the Chicago mayors of the 20th century. This Faith inspired solicitude assured our community of attaining the human fulfillment intended by our Creator. An honorable and giving man, Ed personifies this kind of Faith based service.

(Ex. A-16) (*See also*, Ex. B) (sixteen additional letters from the faith community attesting to Mr. Burke's Christian service and faith). Mr. Burke's faith-based service supports the imposition of a non-custodial sentence.

**C.** **The Need to Provide Medical Care in the Most Effective Manner.**

Mr. Burke is eighty years old, and in declining health. The Court must take into consideration the fact that an alternative sentence such as probation or home confinement, rather than a custodial sentence, would clearly serve to provide medical care to Mr. Burke "in the most effective manner." 18 U.S.C. § 3553(a)(2)(D); *see also* U.S.S.G. § 5H1.1 ("Age may be a reason to depart downward in a case in which the defendant is elderly and infirm and where a form of punishment such as home confinement might be equally efficient as and less costly than incarceration.").

The PSR provides background into Mr. Burke's physical condition based upon the Northwestern medical records provided by counsel. (PSR ¶ 142-56). The records demonstrate that he has numerous chronic conditions that pose serious risks to his health and well-being which only increase with age:

(1) **Hypercholesteremia** (high levels of cholesterol in the blood which raises risk of heart disease and cardiovascular problems);

(2) **Benign Neoplasm of colon** (doctors removed several precancerous polyps from his colon in 2007);

(3) **Prostate cancer** (treated in 2015 and 2016; in 2017, records reflect he experiences inflamed bladder lining caused by radiation therapy and blood in urine);

(4) **Urinary Incontinence**;

(5) **History of basal cell carcinoma excision** (skin cancer and numerous excisions and surgeries to remove carcinoma including in 2016, 2022, 2023);

(6) **Cerebrovascular accident** (in 2018 suffered a CVA, or stroke, due to thrombosis of cerebral artery, which occurs when an area of the brain becomes damaged from lack of blood supply to the brain; during the incident he fell on the sidewalk and sustained contusions to his right knee and right shoulder);

(7) **Venous insufficiency** (in 2019, chronic right gastrocnemius and peroneal deep vein thrombosi, which occurs when a blood clot forms in one or more of

the deep veins in the body, which is serious because clots can loosen and lodge in the lungs)

(8) **Essential hypertension** (Abnormally high blood pressure);

(9) **Osteoarthritis and Chrondrocalcinosis** (painful arthritis that causes calcium pyrophosphase crystal deposits in the joint tissues, which can lead to inflammatory attacks and cartilage damage);

(10) **Transient ischemic attacks** (experienced several in 2019; TIAs occur when blood flow to a part of the brain stops for a brief time; he also experienced several episodes of brief expressive aphasia—a condition where a person may understand speech, but they have difficultly speaking fluently themselves);

(11) **Seizure** (CMS-HCC designation) (on April 24, 2022 lost consciousness in episode ultimately coded as seizure, though doctor explains there are "some elements of seizure activity," but also some "suggestive of orthostatic hypotension [*i.e.*, sudden drop in blood pressure causing dizziness, fainting]");

(12) **Aortic atherosclerosis** (noted in 2023, it is the buildup of fat, cholesterol and other substances in and on the artery walls, called plaque, which causes arteries to narrow, blocking blood flow and can burst leading to a blood clot);

(13) **Adjustment disorder with mixed anxiety and depressed mood.** (noted in February 2024, prescribed Lexapro)

(PSR ¶ 142-56). Counsel may also be in a position to provide supplemental information to the Court on his physical condition in advance of sentencing.

Mr. Burke already has an excellent, dedicated team of physicians familiar with his medical history and particular treatment needs. If he were to decline while in custody, he would not receive the quality of care in the Bureau of Prisons that he would be able to seek on probation or home confinement.

While the government often argues that adequate care can be provided in the Bureau of Prisons, the BOP's care leaves much to be desired, with inmates waiting "months or even years for treatment"—including at BOP medical centers like FMC

Butner.[11] A recent NPR investigation explains that BOP "funnels the seriously ill to a prison hospital," "where it is expected they'll receive more intensive treatment," but there is "substandard care" there including "delays in treatment and mismanaged medications."[12]

In fact, things have gotten so bad at the BOP that earlier this month, the U.S. House of Representatives passed a bipartisan bill that would, for the first time, create significant federal prison oversight—establishing an Ombudsman to investigate issues that adversely affect the health, safety, welfare and rights of inmates and staff following numerous investigations and reports of misconduct and a lack of oversight. H.R. 3019 – 118th Congress (2023 – 2024).[13]

Setting aside considerations of the efficacy of the treatment inside the BOP, the Seventh Circuit has also called upon district court judges to consider the cost that the government incurs in incarcerating older individuals like Mr. Burke. *United States v. Presley*, 790 F.3d 699, 702 (7th Cir. 2015). Prisoners at least fifty years old cost the federal prison system about eight percent (8%) more than younger prisoners, and those costs only rise with age. *Id.* (citing Office of the Inspector General, U.S.

---

[11] Meg Anderson, "1 in 4 inmates deaths happen in the same federal prison. Why?" NPR, Sept. 23, 2023 (https://www.npr.org/2023/09/23/1200626103/federal-prison-deaths-butner-medical-center-sick-inmates).

[12] Meg Anderson, "Lawmakers Push for federal prison oversight after reports of inadequate medical care," NPR, Dec. 12, 2023 (https://www.npr.org/2023/12/12/1218627629/lawmakers-push-for-federal-prison-oversight-after-reports-of-inadequate-medical-).

[13] *See also*, Walter Pavlo, "Federal Bureau of Prisons' Medical Care Falls Short of its Own Policy," Forbes, April 19, 2022 (https://www.forbes.com/sites/walterpavlo/2022/04/19/federal-bureau-of-prisons-medical-care-falls-short-of-its-own-policy/?sh=7e911a645eab)

Dept. of Justice, The Impact of an Aging Inmate Population on the Federal Bureau of Prisons, May 2015 (https://oig.justice.gov/reports/2015/e1505)).

At age eighty and with several serious acute and chronic medical issues, Mr. Burke would be an expensive prisoner to house for *any* length of time, and even a short sentence is likely to amount to a death sentence. Under similar circumstances, courts have sought to avoid this cost defendants by exercising their discretion to depart from the guidelines in sentencing. *See e.g.*, *United States v. Willis*, 322 F. Supp. 2d 76, 84-85 (D. Mass 2004) ("It seems logical that were he to go to jail," "he will emerge in substantially worse shape than he is now, if he does not die before completing his sentence"; "it seems logical that while the BOP can care for him, the costs of that care are bound to escalate").

Finally, the Court should also consider the fact that since the pandemic and the passage of the First Step Act, the Bureau of Prisons has increasingly exercised its authority to compassionately release aging and physically vulnerable federal prisoners. Given Mr. Burke's age and physical condition, any sentence of imprisonment imposed could be susceptible to modification through administrative compassionate release. Utilizing the administrative time and government resources needed to effectuate Mr. Burke's incarceration (not to mention the harm to him and his family), just for the BOP to decide to turn around and release him shortly thereafter would be a waste of government resources under the circumstances.

**D.** **The Need to Provide Adequate Specific and General Deterrence, Reflect the Seriousness of the Offense, Promote Respect for the Law, and Provide Just Punishment.**

With respect to the specific deterrence and recidivism considerations in 18 U.S.C. § 3553(a)(2)(B) and (C), these factors are not salient (and therefore do not weigh in favor of a custodial sentence), because Mr. Burke does not pose a risk of committing new crimes given he will never be able to hold public office again. Given his age, health, and bar from public office, there is simply no reason, nor a valid social purpose, in warehousing Mr. Burke as if he must be incapacitated. Accordingly, counsel respectfully suggest that a sentence involving a period of home confinement would be more than sufficient to "protect the public from the defendant." 18 U.S.C. § 3553(a)(2)(C).

Counsel expect that the Government will lean heavily on one particular factor in justifying the need for a custodial sentence—the need for the sentence to afford adequate general deterrence to criminal conduct (18 U.S.C. § 3553(a)(2)(B)). But academic studies have concluded that more rigorous and frequent enforcement and prosecution of financial crimes, rather than longer sentences, more effectively deters white-collar crime. Richard S. Frase, Punishment Purposes, 58 Stan. L. Rev. 67, 80 (2005) ("White-collar and regulatory offenders are more likely to be deterred, even by selective enforcement and modest penalties; such offenders . . . have much to lose from being convicted, regardless of the penalty."); Peter J. Henning, Is Deterrence Relevant in Sentencing White Collar Criminals?, 61 Wayne Rev. 27, 48-49 (2015). Here, and in keeping with the above research, the Government's charging and

conviction of Mr. Burke, unto itself, has already substantially served the interests of general deterrence.

While counsel recognize that the factors in § 3553(a)(2)(A) and (B)—the seriousness of the offense and general deterrence—in nearly any criminal case will favor a sentence with some period of confinement, it is equally true that the sentence imposed must be sufficient, but not greater than necessary, to accomplish the sentencing goals. Mr. Burke has already been significantly punished for his wrongdoing. He is a convicted felon who is barred from ever holding public office, and has experienced a staggering public fall from grace. When combined with a period of home confinement, such punishment still serves as a strong general deterrent, without imposing a punishment that is greater than necessary given Mr. Burke's specific situation.

E.    **The Need to Take Into Account the Types of Sentences Available.**

The Court must also take into consideration "the kinds of sentences available" under 18 U.S.C. § 3553(a)(3). There is no mandatory statutory sentence, and Mr. Buke is therefore statutorily eligible for an alternative sentence with a period of home confinement. Though his placement in Zone D of the Guidelines range suggests a probationary or non-custodial sentence is not recommended, pertinent U.S. Sentencing Guidelines Commission data shows that Zone D offenders can, and do, receive sentences with alternatives to incarceration, such as home confinement. First,

in 2014, 12% of defendants in Zone D received alternative sentences.[14] The median loss amount for Zone D non-fraud offenders who receive alternative sentences was also <u>$220,890</u>—well above the defense and probation calculations of Mr. Burke's loss amount. (*Id.*). Thus, U.S. Sentencing Commission data place Mr. Burke well within the range of Zone D Offenders who have received alternative sentences.

### F. The Need to Avoid Unwarranted Sentencing Disparities.

Sentencing courts are also required to consider the need to avoid unwarranted sentencing disparities between similar defendants convicted of similar crimes under 18 U.S.C. § 3553(a)(6). Mr. Burke is a statistically unique defendant, and counsel have not found a specific set of comparable case(s) involving eighty-year-old public official-defendants convicted of racketeering, bribery, and extortion to directly compare Mr. Burke with.

However, we do know from U.S. Sentencing Commission data that the oldest offenders are the most likely to receive an alternative sentence or fine. According to its 2022 report "Older Offenders in the Federal System," the Commission found that roughly **31.3% of offenders 65-69**, and **42.1% of offenders 70 and older received an alternative sentence or a fine**.[15]

We also know the national sentencing statistics in 2022 for the 121 defendants convicted of extortion and racketeering offenses were as follows: 79.3% received

---

[14] U.S. Sentencing Commission, "Alternative Sentencing in the Federal Criminal Justice System," May 2015, p.17 (https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-projects-and-surveys/alternatives/20150617_Alternatives.pdf).

[15] U.S. Sentencing Commission, "Older Offenders in the Federal System," July 2022 (https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2022/20220726_Older-Offenders.pdf).

prison only, while **20.7% of defendants received an alternative sentence** (5% received prison and alternatives; 3.5% received probation and alternatives; 11.6% received probation only; and .8% received a fine only). Moreover, in the cases where the extortion/racketeering defendants received straight prison, **the median sentence was only twenty-seven months**; and in bribery cases, **the median was twelve months**.[16]

Taking this data together—that 41.2% of defendants roughly Mr. Burke's age are not sent to prison, and 20.7% of all racketeering and extortion defendants do not receive straight prison sentences—it is reasonable to conclude that a non-custodial sentence involving a period of home confinement would align Mr. Burke with similarly situated defendants. Or, at the very least, it would not create any *unwarranted* disparities.

## III. CONCLUSION

Shakespeare wrote that mercy blesses its giver and its recipient, and that mercy is "enthroned in the hearts of kings," and "is an attribute to God himself," such that "earthly power doth then show likest God's when mercy seasons justice." The Court possess considerable earthly power and discretion to impose a just and merciful sentence. And the law and facts—§ 3553(a) and the substantial record before this Court—would amply support the Court's decision to exercise its authority and

---

[16] U.S. Sentencing Commission, "Statistical Information Packet Fiscal Year 2022," (https://www.ussc.gov/sites/default/files/pdf/research-and-publications/federal-sentencing-statistics/state-district-circuit/2022/7c22.pdf)

discretion to impose a below-Guidelines, non-custodial sentence. Such a sentence would be a powerful and just expression of mercy for an eighty-year old man in the twilight of his life who has given so much of himself to so many and for so many years. The undersigned respectfully ask this Court to impose a non-custodial sentence.

Date: June 10, 2024

Respectfully submitted,

**JENNER & BLOCK LLP**

By:   */s/ Charles B. Sklarsky*
     Charles B. Sklarsky
     Kimberly Rhum
     353 N. Clark Street
     Chicago, IL 60654
     Tel: (312) 222-9350
     csklarsky@jenner.com
     krhum@jenner.com

**LOEB & LOEB LLP**

By:   */s/ Joseph J. Duffy*
     Joseph J. Duffy
     Robin V. Waters
     321 N. Clark Street, Suite 2300
     Chicago, IL 60654
     Tel: (312) 464-3100
     jduffy@loeb.com
     rwaters@loeb.com

**GAIR GALLO EBERHARD**

By:   */s/ Chris Gair*
     Chris Gair
     Blake Edwards
     1 East Wacker Drive, Suite 2600
     Chicago, IL 60601
     Tel: (312) 600-4901
     cgair@gairgallo.com
     bedwards@gairgallo.com

*Attorneys for Edward M. Burke*